### UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | Criminal Action |
| | * | No. 07-384 |
| Plaintiff, | * | |
| | * | Section "J"(6) |
| v. | * | |
| | * | New Orleans, Louisiana |
| DERRICK D.T. SHEPHERD, | * | July 29, 2008 |
| | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### BOND REVOCATION HEARING
#### BEFORE THE HONORABLE LOUIS MOORE, JR.,
#### UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Government:          United States Attorney's Office
                            By:  GREGORY M. KENNEDY, ESQ.
                            By:  MICHAEL W. MAGNER, ESQ.
                            Hale Boggs Federal Building
                            500 Poydras Street, Room 210
                            New Orleans, Louisiana 70130

For the Defendant:          Law Office of Clarence Roby, Jr.
                            By:  CLARENCE ROBY, JR., ESQ.
                            3701 Canal Street, Suite U
                            New Orleans, Louisiana 70119

                            Glass & Reed
                            By:  JOHN W. REED, ESQ.
                            530 Natchez Street
                            New Orleans, Louisiana 70130

Court Audio Operator:       (Magistrate Clerical)

Transcriptionist:           Dorothy Bourgeois
                            c/o U.S. District Court
                            (504) 589-7721

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

```
                    I N D E X

                Direct      Cross     Redirect    Recross
WITNESSES:

Gary Barteet          5          31          41          --

Thaise Ashford        59         76          96          --

Dewayne Horner        99         103         --          --
```

| EXHIBITS: | | Marked | Received |
|---|---|---|---|
| G-1 | DVD Copy of 911 Transmissions | 6 | 30 |
| G-2 | Photo of Rear Door | 14 | 30 |
| G-3 | Photo of Bedroom Door | 14 | 30 |
| G-4 | Photos of Wrist Abrasions | 15 | 30 |
| G-5 | Photos of Stomach Abrasions | 15 | 30 |
| G-6 | Photo of Bedroom | 16 | 30 |
| G-7 | Photo of Cell Phone | 19 | 30 |
| G-8 | Photo of Cell Phone Log | 19 | 30 |
| G-9 | Photo of Crown Victoria | 28 | 30 |
| G-10 | Photo of Broken Rear Windshield | 28 | 30 |
| G-11 | Photo of Broken Read Windshield | 28 | 30 |
| G-12 | Application for Arrest Warrant | 21 | 30 |
| G-13 | Search Warrant and Arrest Warrant | 22 | 30 |
| G-14 | Cell Phone | 26 | 30 |
| G-16 | Photo of Wallet on Bed | 95 | 103 |
| G-17 | La. Uniform Abuse Prevention Order | 100 | 102 |
| D-1 | Thaise Ashford Affidavit | 103 | 104 |
| PROFFER G-15 | Alleged acts of D. Shepherd | 58 | |

1                    P R O C E E D I N G S

2                  (Tuesday, July 29, 2008)

3            THE CLERK:  Criminal Action 2007-384, United States

4    of America v Derrick Shepherd set for a bond revocation

5    hearing.

6            THE COURT:  All right, Counsel, make appearance for

7    the record.

8            MR. MAGNER:  Good afternoon, Your Honor; Michael

9    Magner and Greg Kennedy for the United States.

10           THE COURT:  Thank you.

11           MR. ROBY:  Good afternoon, Your Honor; Clarence Roby

12   and John Reed on behalf of Mr. Shepherd.

13           MR. REED:  Good afternoon, Your Honor.

14           THE COURT:  Yes, good afternoon.  All Counsel are

15   present and so is the Defendant.

16           We have a bond revocation hearing scheduled for this

17   afternoon.  Is the Government ready to proceed?

18           MR. MAGNER:  Yes, Your Honor.

19           THE COURT:  Is the Defense ready to proceed?

20           MR. REED:  Yes, Your Honor.

21           THE COURT:  I've got to acknowledge receipt of a

22   courtesy copy of the Government's Memorandum of Law in Support

23   of Revocation of Release and Detention of Defendant Shepherd

24   pursuant to 18 USC Section 3148(b).  I've read it.  I've read

25   the exhibits attached thereto, all right.

1            Also, I am in receipt of the Superseding Indictment

2    wherein Mr. Shepherd was charged along with a co-defendant.

3    The Indictment is the subject matter under which the Defendant

4    was released on bond.

5            All right, it's the Government's motion.

6            MR. KENNEDY:  Yes, Your Honor.

7            MR. MAGNER:  The Government would ask for a

8    sequestration of the witnesses.

9            THE COURT:  All right.  Are there any witnesses

10   present?

11           MR. MAGNER:  The Government may call the detective,

12   Detective Barteet and Agent Horner, but Agent Horner will be

13   acting as the case agent in this matter, and Detective Barteet

14   will be our first witness.

15           THE COURT:  Very well.

16           Are there any Defense witnesses here present at this

17   time?

18           MR. REED:  Thaise Ashford, Your Honor.

19           THE COURT:  All right, Ms. Ashford.

20           All right, would you all step up whoever is not going

21   to be the Government's witness right now.

22           No, no, let her come up.  I want to give her some

23   instructions first.

24           Are there any other witnesses?

25           MR. REED:  Yeah, there are other witnesses who

1   whether the Government presently intends to call them, but

2   might be called.

3              MR. KENNEDY:  Not that we know of at this time.

4              THE COURT:  All right, very well.

5              My instructions to both of the witnesses are that

6   you're not to discuss this case or the facts with anyone other

7   than the attorneys.  It doesn't matter which side called you.

8   It's left up to you as to whether or not you want to talk to

9   them.  After the proceedings are over of course you're welcome

10  to come back in, either one of you, and to testify.  Now, the

11  case agent will be allowed to stay in and the first witness.

12  You have to remain on the outside, ma'am, until you're called

13  in.  Thank you.

14              If there should be any other witnesses who may come I

15  give the attorneys the responsibility to let the Court know so

16  we can impose the rule of sequestration upon them as well.

17              All right, first witness.

18              MR. MAGNER:  Thank you, Your Honor.

19              MR. KENNEDY:  The Government calls Detective Gary

20  Barteet.

21              THE COURT:  Very well.

22              **GARY BARTEET, GOVERNMENT'S WITNESS, SWORN**

23                     **DIRECT EXAMINATION**

24  BY MR. KENNEDY:

25  Q.   Detective Barteet, could you everybody who you work for,

1   please?

2   A.   I work with the Jefferson Parish Sheriff's Office.

3   Q.   And approximately how long have you been doing that?

4   A.   I've been in that position for ten years.

5   Q.   And what are your responsibilities for the JPSO?

6   A.   Currently I am the nighttime detective.  I investigate all

7   major incidents that occur between the hours of midnight and

8   eight o'clock in the morning.

9   Q.   And going back to approximately July 26th of this year,

10  did you get called out to a call on Cameron Street in Gretna?

11  A.   Yes, sir, I did.

12  Q.   And did you have an opportunity to listen to the 911 tape

13  that precipitated the call?

14  A.   I did at a later date, yes, sir.

15  Q.   And was that what you were responding to basically was the

16  911 call as dispatched to you?

17  A.   I was called by road deputies once they had made initial

18  arrival.

19  Q.   Okay.  I'm going to show you what the Government will mark

20  as Government's Exhibit Number 1.

21        MR. KENNEDY:  May I approach, Judge?

22        THE COURT:  Certainly

23  BY MR. KENNEDY:

24  Q.   I'm going to show you Government's Exhibit Number 1.  Have

25  you ever seen that before?

1   A.   Yes, sir.

2   Q.   And what is that?

3   A.   That is a DVD copy of the 911 transmissions for that

4   particular incident.

5   Q.   Did you have an opportunity to listen to that DVD?

6   A.   I did, sir.

7   Q.   And that portrays the events that you responded to on

8   July 26th?

9   A.   Yes, sir.

10           MR. KENNEDY:  Your Honor, at this time may I play

11   this for the Court, the 911 call?

12           THE COURT:  Sure.

13           MR. KENNEDY:  It might just take one second,

14   Your Honor.

15           THE COURT:  Sure.  Will it pick up?  You need the --

16           MR. KENNEDY:  I'm going to put the microphone down in

17   front of the speaker.

18           THE COURT:  Very well.

19       (Whereupon, the 911 transmission of 7/26/08 was played)

20       Ms. Ashford:  "My door."

21       911 Operator:  "What's your address?"

22       Ms. Ashford:  "115 Cameron Drive."

23       911 Operator:  "Okay."

24           MR. KENNEDY:  Excuse me, Your Honor, I'm going to

25   back that up for a second.

1          (Whereupon, the 911 transmission of 7/26/08 was played)

2          911 Operator:  "911 Operator 60."

3          Ms. Ashford:  "Hi, I'm calling because somebody just bust

4    down my door."

5          911 Operator:  "What's your address?"

6          Ms. Ashford:  "115 Cameron Drive."

7          911 Operator:  "Okay.  Do you have an apartment number or

8    that's a house?"

9          Ms. Ashford:  "That's a house."

10         911 Operator:  "What's your name?"

11         Ms. Ashford:  "Thaise Ashford."

12         911 Operator:  "Do you know who did it?"

13         Ms. Ashford:  "Yes, I do."

14         911 Operator:  "Who is it?"

15         Ms. Ashford:  "His name is Derrick Shepherd."

16         911 Operator:  "Is he still there?"

17         Ms. Ashford:  "He pulled off in his car.  He didn't go

18   towards where he lives.  He went up Wall.  He's driving a

19   Lincoln Continental.  It doesn't have a license plate, it has

20   very dark paint.  I mean he's driving a Crown Vic, I'm

21   sorry," --

22         911 Operator:  "Okay" --

23         Ms. Ashford:  -- "it's a beige color."

24         911 Operator:  "Where do you think he had kicked in your

25   door?"

1      Ms. Ashford:  "He kicked -- he bust down my back door.  He

2   hit me.  I've got scars on my arm and all by my stomach."

3      911 Operator:  "Can you tell me what he looks like?  Like

4   do you know what color shirt he was wearing?"

5      Ms. Ashford:  "He was wearing a light blue shirt.  He has

6   on some tan, khaki color slacks.  He has on some dark -- some

7   black shoes, dress shoes.  It was a button up shirt."

8      911 Operator:  "Do you know which way he went when he

9   left?"

10     Ms. Ashford:  "He went down Wall Boulevard towards

11  Belle Chasse.  State Senator Derrick Shepherd, they're going to

12  know who he is."

13     911 Operator:  "Okay.  All right, I'm sending somebody

14  over there.  It's 115 Cameron?"

15     Ms. Ashford:  "Yes."

16     911 Operator:  "Okay, do you need an ambulance or

17  anything?"

18     Ms. Ashford:  "No, I don't think I do."

19     911 Operator:  "Or you need me to somebody to check you

20  out just to be safe?"

21     Ms. Ashford:  (Indiscernible) "but you don't have to."

22     911 Operator:  "Okay.  Okay, well somebody should be there

23  shortly, okay?"

24     Ms. Ashford:  "Okay."

25     911 Operator:  "All right, bye-bye."

1         (End of 911 transmission playback)

2    BY MR. KENNEDY:

3    Q.   Detective, as a result of that phone call did you respond

4    to 115 Cameron Drive?

5    A.   Yes, sir, I did.

6    Q.   And approximately what time did you arrive there?

7    A.   I believe my arrival was around 4:35, 4:40, something like

8    that.

9    Q.   And did you meet with anybody once you got there?

10   A.   I met with the responding deputy who relay basically what

11   the victim had stated occurred, and I met with the victim,

12   Ms. Ashford, to find out her side of the story of what had

13   occurred.

14   Q.   Did you have an opportunity as you said to interview

15   Ms. Ashford?

16   A.   I did.

17   Q.   Okay, could you explain to the Court what it was that

18   Ms. Ashford told you, please?

19   A.   Ms. Ashford explained that she had been involved in a

20   romantic relationship with Derrick Shepherd beginning in 2001

21   to late 2005, that she had maintained contact with him for --

22   throughout those years since the termination until this year

23   where early this year she ended her relationship with him and

24   that he had continued to call her, come by and basically

25   aggravate her is a term that I guess would be appropriate.  And

1  she stated that on the 26th on that particular night she began

2  receiving telephone calls from a number listed as "private."

3  She believed that it was Mr. Shepherd.

4  Q.   Where was she when she received those calls?

5  A.   She was in her bed at 115 Cameron.

6  Q.   And did she give an approximate time when these phone

7  calls started?

8  A.   She said approximately two o'clock a.m.

9  Q.   Was there anybody else home with her at that time?

10 A.   No, sir.  There was nobody in the house.

11 Q.   And this house that she lives in does she live there by

12 herself?

13 A.   Yes, she does.

14 Q.   And as a result of these phone calls that she was

15 receiving what did she do?

16 A.   She advised initially she answered one -- one time and

17 said, "Hello," and didn't hear anything but hear somebody on

18 the other line, and then she just ignored all the other calls.

19 And then approximately 15 minutes after the last call she

20 advised that she heard rocks being thrown against her bedroom

21 window on the second floor.  She believed again that that was

22 Mr. Shepherd and she ignored it again.  And as the intensity

23 increased she felt like her window was going to be broken, so

24 she went downstairs to the back door to confront him.

25 Q.   And when she opened up the door who did she see?

1   A.    She saw Derrick Shepherd.

2   Q.    And what happened when she saw Mr. Shepherd?

3   A.    She advised that when she opened the door that he walked

4   in.  She described him as being calm, but she felt like he was

5   intoxicated.

6   Q.    Did she ever say as though she invited him into the house?

7   A.    No, she actually said that she did not want him to come in

8   the house.  He did not have permission to come in the house,

9   but she did not say that he couldn't come in and she didn't try

10  to block him.

11  Q.    And what type of shape was Mr. Shepherd in did she say?

12  A.    She believed he was intoxicated.

13  Q.    And what took place once Mr. Shepherd went into the house?

14  A.    She advised that he sat down at the kitchen table and she

15  sat across the room and that they spoke.  Initially it was

16  civilized and he was asking for her to take him back and

17  basically to rekindle the relationship.

18  Q.    And what was her response?

19  A.    She advised that she had no -- she didn't wish to engage

20  in the relationship.  She had formed another relationship and

21  that the conversation became more aggressive on his end.  When

22  I asked her to explain that she advised that he tried to hit

23  her and that he grabbed her by both arms.  She indicated during

24  that she grabbed a board that she kind of tried to defend

25  herself.  She said she was never able to strike him, but

Barteet - Direct                                          13

1    ultimately she pushed him away, that he punched her in the

2    stomach.   She was it was not a vicious blow, but he did strike

3    her in the stomach, and she fled up to her bedroom.

4    Q.   What happened when she got up to her bedroom?

5    A.   She shut and locked the door and as she turned -- pulled

6    the switch for her light, the door was forced open by

7    Mr. Shepherd.   She said she then fled out of the house, down

8    the stairs and out the back door.

9    Q.   And did she say how long she was locked out of the house

10   for?

11   A.   She indicated that Mr. Shepherd then locked her doors and

12   she was locked out for what she believed was 45 minutes.

13   Q.   What took place when she was outside?

14   A.   She advised she was just trying to get him to let her back

15   in and ultimately he opened the door and at that point she said

16   she physically grabbed him and threw him out the back door.

17   Q.   She removed him from the house?

18   A.   That's correct.

19   Q.   And did Mr. Shepherd stay on the property at that point?

20   A.   Yes.   Ms. Ashford indicated that she slammed the back door

21   and locked it and before she could move any further he bust

22   through the door shattering the frame and she then ran upstairs

23   back to her bedroom and called 911.

24   Q.   And once she called 911 what took place at that point?

25   A.   At that point she indicated that Mr. Shepherd entered his

1   vehicle which was parked in her driveway and backed up and left

2   the scene.

3   Q.   And at that point after 911 was called is that the point

4   that y'all responded to the scene?

5   A.   Initially deputies from the Second District Patrol

6   Division began canvassing the area for the vehicle description

7   which was given out and a deputy went to the scene.

8   Q.   When you arrived at the scene were you able to observe any

9   damage to the dwelling itself?

10  A.   Yes, sir.

11  Q.   And what did you see?

12  A.   I observed the back door of the residence the frame

13  defeated.  It looked consistent with somebody that had kicked a

14  door or leaned into a door and very similar damage to the

15  bedroom door.

16  Q.   And did you have an opportunity to observe Ms. Ashford

17  herself?

18  A.   Yes, I did.

19  Q.   Did you notice any injuries to Ms. Ashford?

20  A.   She had abrasions to her wrist and she had minor abrasions

21  also to her stomach area.

22  Q.   I'll show you what I've previously marked as Government's

23  Exhibits Number 2, 3, 4, and 5 --

24          MR. KENNEDY:  And I've provided copies to Defense

25  Counsel.

1            THE COURT:  Excuse me, abrasions to what?

2            THE WITNESS:  Her stomach, sir.

3            THE COURT:  And you said something else.

4            THE WITNESS:  Her wrist.

5            THE COURT:  Thank you.

6            THE WITNESS:  Yes, sir.

7    BY MR. KENNEDY:

8    Q.   Let's start with Government's Exhibits 2 and 3 and ask if

9    you can identify these, please, and if you could hold them up

10   for the Court.

11   A.   This is a picture of the rear door --

12           MR. REED:  Is that G-2?

13           MR. KENNEDY:  Yes.

14           THE WITNESS:  This is the doorframe that was

15   splintered.  This was looking into the house from the rear

16   door.

17           This is a picture looking into the bedroom upstairs

18   and this is the doorframe that was splintered.

19   BY MR. KENNEDY:

20   Q.   Is that the damage Ms. Ashford pointed out to you?

21   A.   Yes, sir.

22   Q.   And I'll show you Exhibits Number 4 and 5 also, and again

23   if you could read the number on the back and show them up to

24   the Court, please.

25   A.   Yes, sir.  Exhibit Number 4, this is the photographs taken

1   of Ms. Ashford's wrist with the abrasions to the wrist.

2       Exhibit Number 5, this is Ms. Ashford's stomach area and

3   the abrasion to her stomach.

4   BY MR. KENNEDY:

5   Q.   And did Ms. Ashford report to you that she received those

6   as a result of her scuffle with Mr. Shepherd?

7   A.   Yes, sir.

8   Q.   And did Ms. Ashford relate to you any property that was

9   missing from the house?

10  A.   She did.  She advised that her cell phone and a $100 bill.

11  Q.   And did she explain where those items were?

12  A.   She advised that the cell phone was attached to a charger

13  and plugged in next to her bed which would be the same room,

14  and that the $100 bill was in the purse right in plain view.

15  Q.   And I'll show you what I've marked as Government's Exhibit

16  Number 6, and again, Detective, can you identify what's in this

17  photo, please?

18  A.   Yes, sir.  This is Ms. Ashford's bedroom.  This is a

19  picture of the bed and the purse.  She described the phone as

20  being right here on the nightstand and the $100 bill inside the

21  wallet which was right on top of the purse.

22  Q.   And she had said the $100 bill was missing?

23  A.   Yes, sir.

24  Q.   Why was the $100 bill stuck out in her mind as reported to

25  you?

1   A.   She advised that she had set it aside for a debt and

2   that's why she knew immediately that it was missing.

3   Q.   And, Detective, were all these items in the same bedroom

4   that you pointed out to in the previous Government exhibit as

5   far as damage to the bedroom door?

6   A.   Yes, sir.

7   Q.   Now, Detective, after interviewing Ms. Ashford what did

8   you next do in your investigation?

9   A.   Ms. Ashford had advised me at the conclusion of the

10  interview about everything that Mr. Shepherd had arrived at her

11  mother's house and that he had banged on the door at the

12  mother's house as well as called her sister's phone which was

13  at the same location.  And I asked her to call her mother and

14  see if it would be okay because of the hour if I go over there

15  and speak to her about that incident.  And I went over there.

16  Q.   How was Ms. Ashford able to call over to her mother's

17  house?

18  A.   She had a work cell phone as well as a personal.  The

19  personal was the one that was missing.  The work cell phone was

20  what she used to call 911 as well as her mother.

21  Q.   And, Detective, did you have the opportunity to then leave

22  the scene and go to another location?

23  A.   Yes, sir.  I went to 1460 Angus in Harvey, the address of

24  where her mother was staying at the time and her sister,

25  Hashawn.

1   Q.   And what is her mother's name?

2   A.   Sharon Ashford.

3   Q.   Did you have an opportunity to interview them?

4   A.   I did.

5   Q.   And did they have any contact with Mr. Shepherd that

6   morning?

7   A.   Ms. Sharon Ashford, her mother, advised that she awoke to

8   somebody banging on the door.  She advised that she got up and

9   she looked outside and saw Derrick Shepherd.  She described the

10  Crown Victoria and indicated that he was pacing back and forth

11  banging on the door and using the phone.  She realized that he

12  was calling her other daughter, Hashawn, who was at the same

13  location, because Hashawn came out and informed her that

14  Mr. Shepherd was calling.

15  Q.   How long did they say Mr. Shepherd stayed at the location?

16  A.   Maybe five to ten minutes, not a long time.

17  Q.   Did they say whether they had any contact with him at all?

18  A.   Ms. Sharon Ashford advised she never opened the door and

19  Ms. Hashawn advised that she never looked out the window.

20  Q.   And were you able to look at any cell phones in that house

21  to determine whether or not it was in fact Mr. Shepherd

22  calling?

23  A.   Ms. Hashawn allowed me to view her call log with times and

24  I observed a cell number that she identified as that of Derrick

25  Shepherd and also Ms. Thaise Ashford had given me that number

 1  earlier as his personal cell phone.

 2  Q.   So, they were familiar with his phone number --

 3  A.   Yes, sir.

 4  Q.   -- Mr. Shepherd's phone number?

 5       And I'll show you Government's Exhibits Number 7 and 8 and

 6  ask if you can identify those, please.

 7  A.   Seven is the cell phone that Ms. Hashawn Ashford showed me

 8  as her personal cell phone and Number 8 is a closer shot of the

 9  call logs which display a phone number.

10  Q.   Now, Detective, can you tell from those photos

11  approximately when the phone calls began and when the last

12  phone call was according to the log on the phone?

13  A.   The first call that's on the screen is 1:30 a.m., the

14  second at 1:31, the third at 3:49 a.m., and then the next one

15  is at 4:10, and then 4:11, 4:12, and 4:15.

16  Q.   And, Detective, you said that they did not personally

17  speak to Mr. Shepherd that evening?

18  A.   No, they did not.

19  Q.   Did they indicate to you why they did not speak to him?

20  A.   They said they were scared to open the door.  They didn't

21  know what was going on.

22            THE COURT:  Excuse me, so that I can get this

23  right --

24            MR. KENNEDY:  Yes.

25            THE COURT:  -- Exhibits 7 and 8 are the same phone,

```
                        Barteet - Direct                    20
```

1    correct?

2              THE WITNESS:  Yes, sir.

3              THE COURT:  The last one is the closer shot with the

4    phone number displayed, is that correct?

5              THE WITNESS:  That's correct, sir.

6              THE COURT:  And who did that phone belong to?

7              THE WITNESS:  Ms. Hashawn Ashford.  That is the --

8              THE COURT:  That's the mother?

9              THE WITNESS:  That's the victim's sister, sir.

10             THE COURT:  Sister, thank you.

11   BY MR. KENNEDY:

12   Q.   And just to clarify, the victim's mother and sister live

13   together?

14   A.    Correct.

15             THE COURT:  All right.

16   BY MR. KENNEDY:

17   Q.   And, Detective, after you had an opportunity to interview

18   the mother and the sister, what did you next do in your

19   investigation?

20   A.   I then returned to my office, performed basic research,

21   and authored an arrest warrant for Mr. Derrick Shepherd.

22   Q.   And as a result of that did you in fact at that point in

23   time fill out an affidavit and an Application for Arrest

24   Warrant and Search Warrant?

25   A.   I filled an arrest warrant at that time, sir.

1   Q.   Okay.  And I'll show you Government's Exhibit Number 12 --

2              THE COURT:  You skipped --

3              MR. KENNEDY:  I did, Judge.  I pre-marked some other

4   photos so I'm just taking them out of order.

5              THE COURT:  Very well.  All right.

6              MR. KENNEDY:  I apologize.

7              THE COURT:  That's all right.

8              MR. KENNEDY:  Thank you.

9   BY MR. KENNEDY:

10  Q.   Can you identify that, please?

11  A.   Exhibit Number 12, this is the affidavit -- the

12  Application for Arrest Warrant that I authored for Mr. Derrick

13  Shepherd.

14  Q.   And what did you do with that Application for Arrest

15  Warrant?

16  A.   I presented it to Criminal Commissioner Carol Kiff.

17  Q.   And was it signed by Magistrate Kiff?

18  A.   Yes, it was.

19  Q.   And, therefore, a search and arrest warrant was executed

20  for Mr. Shepherd?

21  A.   It was issued, yes, sir.

22  Q.   Okay, and approximately what time are we talking about

23  that this was completed?

24  A.   We normally put the time.  It was approximately 10:30

25  11:00.

1    Q.   To the best of your recollection.

2    A.   Yes, sir.

3    Q.   Thank you.  And as a result of executing that arrest --

4    excuse me, having the arrest warrant signed, what did you do as

5    a result of that?

6    A.   I also had issued a court order for the victim's phone.  I

7    was attempting to local the stolen property and we began to try

8    to look at where that phone was.  We figured that was the best

9    piece of evidence as opposed to a hundred-dollar bill.  And I

10   obtained GPS coordinates of where the phone was, which brought

11   me to 3701 Lake Michel Court.

12   Q.   And why is that address significant?

13   A.   That is where the victim advised Mr. Shepherd resided.

14   Q.   And as a result of that were you able to get a search

15   warrant for that residence?

16   A.   Yes, sir.

17   Q.   And what is it you were looking for in the search warrant?

18   A.   The cell phone.

19   Q.   And I'll show you Government's Exhibit Number 13 and ask

20   if you can identify this, please.

21   A.   This is -- the first portion is the arrest warrant and

22   arrest affidavit.  The second portion is the search and seizure

23   warrant and then affidavit.

24   Q.   So, that was the search warrant that you obtained?

25   A.   Yes, sir.

Barteet - Direct                                        23

1  Q.   And was that signed by Magistrate Kiff as well?

2  A.   It was, sir.

3  Q.   And did y'all have an opportunity to actually execute the

4  arrest and search warrant?

5  A.   Yes, sir.

6  Q.   And approximately what time are we talking about now?

7  A.   About 6:30 p.m.

8  Q.   So, later on the same day --

9  A.   Yes, sir.

10  Q.   -- just much later.

11  A.   Correct.

12  Q.   And where did you go to execute both of those?

13  A.   3701 Lake Michel Court, in Gretna.

14  Q.   Is that in the Stonebridge Subdivision?

15  A.   Yes, sir.

16  Q.   And who accompanied you when you went to execute both of

17  those warrants?

18  A.   I had two Second District Patrol Division uniformed

19  officers with marked police units.  I had two other detectives,

20  and I had one squad of Street Crimes units.

21  Q.   And did y'all arrive at the same time?

22  A.   Yes, sir.

23  Q.   And did you go to the residence itself?

24  A.   Yes, I did.

25  Q.   What did you do when you first got there?

Barteet - Direct                                          24

1   A.   Initially I called the cell phone number that I was

2   provided as his personal cell phone.  I called the number a

3   couple of times with no answer.  So, then we approached the

4   house and began knocking and ringing the doorbell.

5   Q.   Was there any response at that time?

6   A.   No, sir.

7   Q.   What did you do when you got no response?

8   A.   I began to look in the house and see if there was in fact

9   any obvious presence of somebody being awake or moving around

10  and I observed Derrick Shepherd and a female.

11  Q.   And what was taking place that you observed?

12       MR. REED:  Objection, relevance.

13       MR. KENNEDY:  Your Honor, it's relevant to show the

14  entirety and also the Defendant's actions throughout this

15  investigation.

16       THE COURT:  Overruled.

17       THE WITNESS:  There was a female in a like a gray

18  sequined dress.  She was dancing.  Mr. Shepherd was seated on a

19  sofa.  His legs were kind of spread open.  He was facing my

20  direction and the female was dancing in front of him in between

21  where his legs.

22  BY MR. KENNEDY:

23  Q.   You clearly observed this?

24  A.   Yes, sir.

25  Q.   And was there anybody else in the room at that time?

Barteet - Direct                                          25

1   A.    I could not see, but there was a second female in the

2   room.

3   Q.    And what happened once you were able to observe this?

4   A.    Ultimately Mr. Shepherd realized we were at the door.  He

5   walked to an inner set of doors like a French door.  He peered

6   -- I think he was trying to identify who we were.  He slammed

7   the inner doors and he kind of ushered the two ladies to a side

8   door.  We thought he was trying to flee out the side door, so

9   we moved to that side.

10  Q.    So, did you meet him at the side door?

11  A.    Yes, sir.  We had a deputy on that side and the two ladies

12  came out and Mr. Shepherd came out to the threshold and

13  stopped.

14  Q.    And did you have an opportunity to execute any of the

15  warrants at that time?

16  A.    Yes, sir.  I identified myself, identified my agency, and

17  informed him that he was under arrest and that I had an arrest

18  warrant for him.  I asked him to place his hands on the outside

19  wall of his residence.  He began to do that, then he started to

20  run back into the house.  I grabbed him, put him back up

21  against the wall, informed him not to move.  He told me he was

22  trying to get into his door to shut his door.  And I informed

23  him that I also had a search warrant for his residence.

24  Q.    And did Mr. Shepherd cooperate with you at that time?

25  A.    Yes.

1   Q.   And were you able to execute the search warrant?

2   A.   Yes.

3   Q.   And how did you execute that?

4   A.   Members -- the two detectives as well as the one patrol

5   officer, initially we went in and we cleared to make sure there

6   was nobody else in the house for safety reasons.   Then I went

7   and allowed Mr. Shepherd to view the search warrant and I

8   actually allowed him to view just the arrest warrant itself and

9   I advised him of his rights.   And he declined to make any

10  comments.   And I explained to him that my search warrant was

11  relative to a cell phone and a cell phone only seeing if there

12  was any way he could assist me, it was large house, and help me

13  find the cell phone.

14  Q.   Did he assist you at that point?

15  A.   He asked me if I got the cell phone back would he still be

16  arrested.   I advised him that he would still be arrested and

17  then that was the end of our conversation.

18  Q.   Did you in fact find the cell phone there?

19  A.   Yes, sir.

20  Q.   And where was it located?

21  A.   It was in a bedroom on the second floor that appeared to

22  be the master bedroom or his bedroom of that residence.   It was

23  sitting on a windowsill plugged into a phone charger.

24  Q.   I show you Government's Exhibit Number 14 and ask if you

25  can identify that, please.

1   A.   This is Ms. Thaise Ashford's cell phone that she told us

2   was stolen from her house.

3   Q.   Okay, is there any identifying information on that?

4   A.   I can't really read the screen that well, but this is a

5   pink rubberized cover.  It's a BlackBerry Pearl.

6   Q.   And was it ever identified as being the cell phone of

7   Ms. Ashford?

8   A.   Yes, sir.  I actually called that number standing there

9   and that phone rang.

10  Q.   And, Detective, was Mr. Shepherd placed under arrest at

11  that point?

12  A.   Yes, sir.

13  Q.   And, Detective, later on in your investigation did you

14  have an opportunity to investigate anything regarding the car

15  that Mr. Shepherd was driving at the time that he went to

16  Ms. Ashford's residence?

17  A.   Yes, sir.  The Sheriff's Office received a call Monday

18  morning from a collision center indicating that Mr. Shepherd

19  had dropped his vehicle off that he said he had been in some

20  type of altercation and his car had been shot.  They were aware

21  of the fact of criminal allegations and they were afraid to be

22  manipulating any type of possible evidence, so they asked us to

23  come out.

24  Q.   Did you have an opportunity to go out and observe the car

25  itself?

1   A.   Yes, sir.

2   Q.   And what did you see?

3   A.   I observed a Crown Victoria, silver, with a large hole in

4   the rear window.  It was Derrick Shepherd's personal vehicle.

5   Q.   I'm going to show you Government's Exhibits Number 9, 10,

6   and 11 and ask if you can identify these, please.

7   A.   Number 9 is a picture of Derrick Shepherd's Crown

8   Victoria.

9   Q.   Does it show the damage as alleged by Mr. Shepherd?

10  A.   Number 9 shows a little bit of cracking on the windshield,

11  but not the actual impact point.

12  Q.   Okay.  And the next exhibit, please?

13  A.   Number 10 is a rear shot of the same vehicle with the hole

14  that Mr. Shepherd was asking to be fixed.  He wanted a new

15  windshield put in the -- or new window put in the back of the

16  car.

17  Q.   And the next exhibit, please?

18  A.   Number 11 is a picture of the same rear windshield from

19  the interior of the car looking out.

20  Q.   And you had an opportunity to interview the manager or the

21  owner of the auto body shop?

22  A.   Yes, sir.

23  Q.   And he spoke to Mr. Shepherd?

24  A.   Via phone they advise because the car was dropped off and

25  they called and asked what was wrong, you know, what happened

1    and he advised via phone that he been in an altercation.  He

2    didn't give any specifics and that the window had been shot.

3    Q.   And pursuant to your investigation were you able to

4    observe any video or learn what time the car was dropped off?

5    A.   According to the video of the collision center the vehicle

6    was dropped off approximately 30 minutes after the Sheriff's

7    Office receives the 911 call from Ms. Ashford.

8    Q.   And at any point in searching the Jefferson Parish

9    Sheriff's Office's records did Mr. Shepherd ever report anybody

10   shooting at him or him being involved in any type of

11   altercation at all?

12   A.   No, sir.

13   Q.   And, Detective, pursuant to your investigation did you

14   have an opportunity to learn of an interview that Mr. Shepherd

15   gave to the media upon his release from jail?

16   A.   Yes, sir.

17   Q.   And can you explain what it was that you heard

18   Mr. Shepherd say, please?

19   A.   I was advised that his mother and his sister had been

20   threatened in some kind of way.  It was not very specific and

21   that this was as a result of that.

22   Q.   Did you have an opportunity to investigate whether in fact

23   any threats had ever been reported against Mr. Shepherd's

24   family?

25   A.   We checked all of our data basis to see if anybody had

1   made any type of calls or request for reports, which we had

2   none.  We sent e-mails and telephone calls to Mr. Shepherd

3   asking if he could elaborate more so that we could look into

4   it.  And detectives interviewed Mr. Shepherd's father and he

5   advised that Mr. Shepherd's mother and sister were in Texas.

6   Q.   So, they were not even in Louisiana at the time of the

7   incident?

8   A.   That's what he advised our detectives.

9            MR. KENNEDY:  One second, please, Your Honor.

10           Your Honor, at this time I would tender the Witness.

11           Thank you very much, Detective.

12           THE COURT:  Thank you.

13           MR. KENNEDY:  Judge, just before I do that if I could

14  offer, file, and introduce Government's Exhibits 1 through I

15  believe 14.

16           THE COURT:  All right.

17           MR. REED:  No objection, Your Honor.

18           THE COURT:  Very well.  Those are the same exhibits

19  marked otherwise in support of the memorandum filed?

20           MR. KENNEDY:  I think the numbering may be different.

21           THE COURT:  The numbering, that's what I'm saying,

22  they were "A," "B," "C," "D," and all.  I read all that stuff.

23  That's what I want to let you all know.

24           MR. KENNEDY:  I believe the paperwork is the same

25  though, Your Honor.

1          THE COURT:  I'll look at it again.

2          THE COURT:  Just a minute, Mr. Reed, please.

3          All right, thank you very much.

4          Cross-examination, Counsel Reed.

5                          **CROSS-EXAMINATION**

6    BY MR. REED:

7    Q.   Good afternoon, Detective.

8    A.   How do you, sir?

9    Q.   How long have you been a detective?

10   A.   Since 2001, sir.

11   Q.   And what division are you assigned to?

12   A.   Right now the Night Watch Division, sir.

13   Q.   Any particular kinds of offenses or just general?

14   A.   Night Watch is considered a Person's Division.  It's under

15   the Person's Command, but we handle any major call that comes

16   out at night.

17   Q.   And involving principally offenses against persons?

18   A.   Principally, but we also handle burglaries and the like,

19   like that.

20   Q.   And you were not the officer who initially responded to

21   the scene, were you?

22   A.   No, sir.  That was a uniformed officer.

23   Q.   A road deputy showed up initially and spoke with

24   Ms. Ashford initially, correct?

25   A.   That's correct.

1   Q.   And you got there about a half an hour later, is that

2   about right?

3   A.   That's correct.

4   Q.   And then you took over from that point?

5   A.   Yes, sir.

6   Q.   The road deputy had already obtained some information from

7   Ms. Ashford?

8   A.   Yes, sir.  He had a basic gist of what occurred.

9   Q.   And he filled you in on some of those details?

10  A.   That's correct.

11  Q.   But you then took over yourself and did the thorough

12  investigation?

13  A.   Yes, sir.

14  Q.   Which included taking a statement from Ms. Ashford,

15  correct?

16  A.   That's correct.

17  Q.   And you also prepared the arrest warrant and the search --

18  the arrest warrant affidavit and the search warrant affidavit,

19  correct?

20  A.   That's correct, sir.

21  Q.   And you consider it important to have some understanding

22  of the relationship between Ms. Ashford and Senator Shepherd,

23  correct?

24  A.   That's correct, sir.

25  Q.   And you did that, you tried to ascertain what the

1   background was between them, isn't that right?

2   A.   Yes, sir.

3   Q.   Because that is relevant to your determination of the

4   issues in the case, is that correct?

5   A.   Yes, sir.

6   Q.   I mean you would handle every case in a professional

7   manner no matter what, right?

8   A.   Yes, sir.

9   Q.   But what's going on between the parties affects your

10  evaluation of the credibility of the allegations to some

11  extent, doesn't it?

12  A.   Not necessarily the credibility, but the severity I

13  believe.

14  Q.   Okay.  And in this case you spoke at some length with

15  Ms. Ashford about what that romantic, if we will, background

16  was?

17  A.   Yes, sir.

18  Q.   And she told you that there had been a romantic

19  relationship from sometime in 2001 through the end of 2005, is

20  that correct?

21  A.   Yes, sir.

22  Q.   And by romantic we understand an intimate relationship,

23  correct?

24  A.   That's what she led me to believe.

25  Q.   And she assured you that that relationship had ceased,

 1   correct?

 2   A.   She indicated that she maintained contact, but as far as

 3   intimacy she -- yes, sir.

 4   Q.   The personal intimate relationship had been terminated?

 5   A.   That's what she led me to believe.

 6   Q.   And had been terminated by her, she led you to believe or

 7   just by her --

 8   A.   Yeah, she said that she basically stopped.

 9   Q.   And that I think in further detail that he had only been

10   to her residence once within the last year, is that correct?

11   A.   Within 2008, yes, sir.

12   Q.   Within 2008.

13   A.   That she could recall.  She couldn't give the specific

14   time.

15   Q.   And on that occasion there had only been the briefest of

16   conversations and the matter was concluded, correct?

17   A.   You're talking about the other incident in 2008?

18   Q.   Yes.

19   A.   Yes, sir.  She described it as similar as this one except

20   this one turned worse.

21   Q.   And essentially that there had been no intimacy in 2008.

22   A.   That's correct.

23   Q.   And what you got a sense of was that this was an unwanted

24   visit, is that right?

25   A.   Yes, sir.

1  Q.   And that any visit during 2008 was an unwanted visit,

2  correct?

3  A.   Yes, sir.

4  Q.   And you relied on that information as you went forward

5  with your investigation?

6  A.   Yes, sir.

7  Q.   And of course part of your -- you need to know as many

8  facts as possible to -- let me go back.

9       This appeared to be some kind of a domestic situation in

10  the broadest sense of the word, is that right?

11  A.   Yes.

12  Q.   And in domestic situations you can only rely on the

13  information at this stage that's given to you by the

14  complainant, is that correct?

15  A.   That and the evidence at the scene.

16  Q.   And the nature of the relationship between the parties

17  affects how you evaluate that relationship, doesn't it?

18  A.   Yes, sir.

19  Q.   You look to possibilities of bias on the part of the

20  complainant that might influence how he or she as the case may

21  be relates to the matter, is that correct?

22  A.   We basically -- we're looking to see that we're being told

23  the truth about what's going on and we have certain

24  requirements that we have to act in certain domestic incidents.

25  Q.   Right.  And that background is part of that evaluation of

Barteet - Cross                                          36

1    the truth, correct?

2    A.   Yes, sir.

3    Q.   And you can only do what you can do based on what people

4    tell you?

5    A.   That's correct.

6    Q.   Now, you went to Senator Shepherd's house the following

7    day around 6:00, 6:30, is that right?

8    A.   Yes, sir.

9    Q.   You were in plain clothes I presume?

10   A.   I was wearing not a uniform.  I had a tactical vest on

11   that displayed "Sheriff."

12           THE COURT:  May I ask a question?

13           You said the next day.  You were talking about the

14   morning hours earlier of between --

15           MR. REED:  The same day.

16           THE WITNESS:  It's on the 26th, yes, sir.

17           THE COURT:  All right.

18           MR. REED:  The same day, right.

19           THE COURT:  That's all right.

20           THE WITNESS:  Later in the day --

21           THE COURT:  It was still the 26th.

22           THE WITNESS:  Yes, sir.

23           MR. REED:  The events were around 4:00 a.m. and the

24   search warrant --

25           THE COURT:  All right, I want to make sure we're on

1   the same day.

2                   MR. REED:  Right.  Thank you.

3                   THE COURT:  All right, go ahead.  I'm sorry to throw

4   you off, but I wanted to be accurate.

5                   MR. REED:  That's all right.  I'll get back on.

6   BY MR. REED:

7   Q.   And you looked through the windows and at some point saw

8   Senator Shepherd, correct?

9   A.   Yes, sir.

10  Q.   And at some point it became apparent he's inside the

11  house, you're outside the house.

12  A.   That's correct.

13  Q.   You're looking through the window.

14  A.   That's correct.

15  Q.   I guess peering against the glass, correct?

16  A.   Yes, sir.

17  Q.   And at some point you believe he could see that someone

18  was looking through his window?

19  A.   He wasn't responding to the doorbells or the knocking and

20  at some point we observed him move to the inner doors, so

21  obviously he saw us.

22  Q.   And he went with the two women to the side door, correct?

23  A.   Yes, sir, rear door.  It's an alternate entry from where

24  we were.

25  Q.   It's an alternate.  It's where the cars are, isn't it?

1   A.   Yes, sir.

2   Q.   It's where his car would normally be kept, correct?   In

3   fact there was a car there, wasn't there?

4   A.   There was a car there, yes, sir.

5   Q.   And you pulled up your car there at some point, did you?

6   A.   At some point, yes, sir.

7   Q.   Right.  And so that's essentially the entrance used by

8   people coming and going in vehicles, correct?

9   A.   I --

10  Q.   That's the driveway.

11  A.   It's his house, I don't know.

12  Q.   That's the driveway, right?

13  A.   There was a driveway on the other side as well.

14  Q.   Okay.  And there's a side entrance by that driveway?

15  A.   Yes, sir.

16  Q.   And that's the door he was going towards with the two

17  women, correct?

18  A.   Yes, sir, he was going toward the back door with the -- or

19  side door.

20  Q.   Appearing to usher the two women out?

21  A.   That's what it appeared to me, sir.

22  Q.   Right.  And that's when he encountered not you but another

23  one of the officers?

24  A.   There was another office there.  I was coming around the

25  corner as it opened.

1   Q.   Okay.  Now, regarding the calls made, Ms. Ashford has a

2   sister, correct, and a mother?

3   A.   That's correct.

4   Q.   They apparently live in the same house, correct?

5   A.   Yes, sir.

6   Q.   And it was apparent the mother reported to you -- well,

7   let me withdraw that.

8        The calls were all made to the sister's telephone,

9   correct?

10  A.   That's correct.

11  Q.   And the mother reported to you it was evident to her that

12  Mr. Shepherd was trying to get in touch with the sister,

13  correct?

14  A.   She believed he was trying to get in touch with her at

15  that residence and perhaps calling the sister to wake somebody

16  up in the house.

17  Q.   All right, to get in touch with the sister.

18  A.   The mother believed that Mr. Shepherd was there to speak

19  to her.

20  Q.   Oh, to speak to her?

21  A.   Yes, sir.

22  Q.   But in fact the telephone number, the telephone -- the

23  cell phone that you have is the sister's cell phone, correct?

24  A.   The cell phone that I have that we recovered or --

25  Q.   The cell phone --

1   A.   The cell phone that the picture is that of the sister of

2   the victim, Ms. Hashawn Ashford's --

3   Q.   Right.

4   A.   -- cell phone.

5   Q.   And that's the one that reflects a long number of phone

6   calls being made to the sister over the course of the evening

7   both before and after these events, correct?

8   A.   That's correct.

9   Q.   I think about seven.  And essentially everything that you

10  have said regarding what went on inside and outside that home

11  that night is based on what Ms. Ashford told you that evening,

12  correct -- Thaise Ashford.

13  A.   What she told me, if you're referring to what happened at

14  the Cameron location --

15  Q.   Yes.

16  A.   -- it's what she told me and what we observed as far as

17  damage to the house.

18  Q.   As far as damage.  How that damage occurred --

19  A.   Comes from her.

20  Q.   -- comes from her.

21  A.   Her telling us that -- how it got there.

22  Q.   How the marks on her came from her, correct?

23  A.   Yes, sir.

24           MR. REED:  One moment.

25           No further questions, Your Honor.  Thank you.

1        THE COURT:  Very well.  Next witness or redirect.

2        MR. KENNEDY:  Just very brief redirect.

3                    **REDIRECT EXAMINATION**

4    BY MR. KENNEDY:

5    Q.   Detective, the injuries that she received did she say they

6    were a direct result of contact with Mr. Shepherd?

7    A.   Yes.

8    Q.   And did you have an opportunity to do any other

9    investigative -- as Mr. Reed said, investigation in this

10   regarding the background of the Defendant in this case?

11   A.   Yes, we --

12   Q.   Okay.

13   A.   -- we did all our checks into previous altercations and

14   things like that.

15   Q.   And did you learn of other altercations that had occurred?

16   A.   There was with another woman, I believe --

17        MR. REED:  I object, Your Honor, to what altercations

18   there may have been at a remote time with "another woman."

19        MR. KENNEDY:  Your Honor, it goes into the

20   dangerousness of the Defendant, which is one of the criteria

21   for the release of the Defendant at this point and it's a

22   direct result of what Mr. Reed asked regarding his

23   investigation and whether he checked out the persons involved

24   in this altercation.

25        MR. REED:  My questions were about the account that

1    he received from Thaise Ashford.  The warrant and the issue

2    brought to the Court has been specifically based on the

3    allegations of what occurred the other day.  And this involves

4    "another woman" at some remote time.

5            MR. KENNEDY:  Well, Your Honor, it goes to -- if I

6    could be heard, it goes to his dangerousness and his propensity

7    for domestic violence which is the basis for the court hearing

8    today.  So, therefore, any other incidents of domestic violence

9    or any other incidents of violence or dangerousness on the part

10   of the Defendant are in fact relevant to the Court's

11   determination as to whether or not he should be released.

12           THE COURT:  I've already read about this stuff.  It

13   did not result in a conviction or a formal charge, is that

14   right?

15           MR. KENNEDY:  Yes, Your Honor.

16           THE COURT:  Well, what's the essence of it?

17           MR. KENNEDY:  The essence, well we --

18           THE COURT:  I'm saying what's the meaning, none of

19   this resulted in a conviction or a formal charge.

20           MR. KENNEDY:  Well, Your Honor, as we said before it

21   goes to the propensity of the Defendant's dangerousness in

22   order to act out in these types of situations and the fact of

23   the matter is we have a domestic violence situation here and

24   we're showing --

25           THE COURT:  He's not charged with domestic violence.

1          MR. KENNEDY:  It is in fact, Your Honor.

2          THE COURT:  He's charged with something else in the

3    state court.

4          MR. KENNEDY:  Your Honor, but in fact it's being

5    treated and I can explore that with Detective Barteet.  And the

6    fact is, is this is being treated as a domestic violence case

7    as a result of the relationship between Ms. Ashford and the

8    Defendant in this particular case.

9          THE COURT:  To what extent do you believe the -- or

10   do you argue the Defense opened the door in its presentation?

11         MR. KENNEDY:  I believe the Defendant has opened the

12   door because in fact he asked about the totality of his

13   investigation in other acts by other persons involved in this

14   particular case as well as the background of the Defendant and

15   the background of the victim in this particular case.  And,

16   therefore, that does open the door to other acts and shows the

17   propensity by Mr. Shepherd to commit other acts against other

18   persons which clearly goes to --

19         THE COURT:  You know the formal rules of evidence

20   don't apply to these proceedings, but you know they don't

21   strictly apply.  There is a rule and under the Rules of

22   Evidence to which we're going to have to stringently adhere to

23   during these particular types of proceedings.  Similar acts

24   which goes to intent, do you all know what I'm talking about?

25         MR. KENNEDY:  The 404(b), Your Honor.

1          THE COURT:  Yes, exactly.  You have to state it.  And

2  the Defense will have to have a chance to respond to that.

3          MR. KENNEDY:  Well, Judge, it's the Government's

4  position that all of Mr. Shepherd's record is in fact relevant.

5  As a matter of fact we're provided a number of documents to the

6  Court showing actions on this part, as well as Mr. Shepherd has

7  access to his own arrest history.  And the fact is that since

8  this is a hearing and the Rules of Evidence do not apply --

9          THE COURT:  They don't strictly apply, no, but I'm

10  just giving us a reference to look at.  Go ahead.

11          MR. KENNEDY:  Right, you're correct.

12          THE COURT:  Because I'm talking about all the lawyers

13  so you all can properly address the situation.

14          MR. KENNEDY:  Right.  And what we're saying is that

15  given the limited amount of time in which we had to prepare for

16  this case --

17          THE COURT:  Well, that's the way Congress intended

18  for it them to be --

19          MR. KENNEDY:  I agree, Judge.

20          THE COURT:  -- fast.

21          MR. KENNEDY:  And that's exactly why the Rules of

22  Evidence should not apply and we should have the opportunity to

23  bring this in, because if we had the Rules of Evidence applying

24  where we would have as much time as we normally would in a

25  criminal case, then certainly we can file a motion with the

1    Court ahead of time.  But it's the Government's position it's

2    not necessary in a hearing to determine whether or not the

3    Defendant's probation should be revoked.  Therefore, we're able

4    to bring in anything that is relevant to the background of the

5    Defendant to aid the Court in determining whether or not the

6    Defendant is a danger to other persons in society.  And,

7    therefore, his whole background is probative to the Court's

8    determination and should be allowed at this hearing.

9              THE COURT:  All right, Rule 404 the caption says,

10   "Character evidence not admissible to prove conduct, exceptions

11   other crimes."  Mr. Reed, address that, please.

12             MR. REED:  I would address it twofold.  First of all,

13   to the extent there are other issues and to my knowledge there

14   was never an arrest, there was only ever at worst some sort of

15   summons, they were presented to the court at the time the

16   original bond determination was made some three or four months

17   ago.  This issue here is now about, you know, the changed

18   allegation of some new circumstances that warrant the Court

19   reexamining.  I'm told that the original Pretrial Services made

20   reference --

21             THE COURT:  I don't know if it did or not.  I read so

22   many of these things.

23             MR. REED:  I'm sure you do.

24             THE COURT:  I don't have -- Mr. Lamy is here.  Do you

25   have the report, sir, so that I can refresh my memory?  See,

 1   because if those things have already been addressed, that's one

 2   thing, if not, I'll see.

 3            MR. REED:  Further, when you deal with 404(b) the

 4   Government has a burden of showing by a preponderance the

 5   underlying facts to demonstrate that --

 6            THE COURT:  You're correct about that.

 7            MR. REED:  -- the alleged events in fact occurred.

 8   And the fact that an officer remote and uninvolved in any way

 9   other than reading stale, out-of-date computer printouts could

10   establish anything by a preponderance is not the case.

11            MR. KENNEDY:  Your Honor, --

12            THE COURT:  Yes?

13            MR. KENNEDY:  -- Probation and Parole routinely list

14   the defendant's criminal history regardless of whether there's

15   a conviction or simply an arrest in that matter to aid the

16   Court in its determination.  What we merely are doing is

17   expanding upon that or expounding upon that to aid the Court to

18   learn some of the facts and circumstances that were involving

19   some of the prior arrests or some of the prior allegations

20   surrounding the Defendant which would be probative to the

21   determination of his dangerousness.  These are things that are

22   routinely brought up to the Court in aiding the Court in making

23   that determination.  We are merely just investigating that and

24   we're investing that as a result of questions by the Defense.

25            THE COURT:  Well, when I look at the Pretrial

1    Services report to refresh my memory here it says under

2    Paragraph 4, Prior Record.  According to the NCIC 3, Louisiana

3    Law Enforcement Telecommunications System, the Jefferson Parish

4    Criminal Record System, ARMNS, and the Motion Terminal of the

5    New Orleans Police Department, the Defendant has no known

6    criminal history.  That's what it says.

7              MR. MAGNER:  Your Honor, if I could shed some light

8    on that.  We have since learned --

9              THE COURT:  Well, one person's got to do this now.  I

10   can't everybody arguing so.  I want to establish parameters

11   first, one witness, one person.  You can talk to him and find

12   out what you want to say, otherwise the record is going to be

13   some mixed up.

14             That's what I had to look at.  I didn't know anything

15   about these other things.

16             MR. KENNEDY:  Your Honor, regardless of the Probation

17   and Parole Officer brought them --

18             THE COURT:  You mean Pretrial Services.  Now there's

19   a difference.

20             MR. KENNEDY:  Pretrial Services.  Yes, I apologize,

21   Your Honor.

22             THE COURT:  That's all right.

23             MR. KENNEDY:  Regardless of whether they list it,

24   what we are trying to do is bring in two separate incidents

25   involving very similar to these circumstances --

1          THE COURT:  I know what you're going to do because

2    I've read you memoranda.  Go on.

3          MR. KENNEDY:  -- involving violence against women in

4    a domestic violence situation or a relationship situation with

5    Mr. Shepherd in which he has in fact taken items from those

6    particular persons.  There were police reports that were

7    generated as a result of those.  Whether or not Probation and

8    Parole missed that -- excuse me, Pretrial Services missed that

9    or did not miss that, it does not negate the probative value of

10   that presentation to the Court in helping its determination.  I

11   don't think the Government is limited by what is contained or

12   not contained in the Pretrial Services report, but in fact we

13   have an obligation to bring to the Court --

14         THE COURT:  Time, place, how long ago?  Remoteness?

15   Recent?  Just tell me what time are you talking about, what

16   year.

17         MR. KENNEDY:  Your Honor, we're talking about

18   February of 2002 as well as the particular --

19         THE COURT:  That's six years ago.

20         MR. KENNEDY:  Yes, Your Honor.  As well as also

21   another incident in February of 2002 if my dates are correct,

22   Your Honor.

23         THE COURT:  So, we're talking about incidents that

24   you're trying to get admitted to determine a propensity for

25   danger that occurred allegedly or that were reported six years

1    approximately.

2              MR. KENNEDY:  But Your Honor they -- yes, Your Honor.

3              THE COURT:  That did not result in a conviction.

4              MR. KENNEDY:  Correct, Your Honor.  But they would be

5    in the time frame that Ms. Ashford was in fact involved in a

6    relationship with --

7              THE COURT:  I understand that.

8              MR. KENNEDY:  -- the Defendant.

9              THE COURT:  Since 2001, I've been paying real

10   attention to you all, to 2005.

11             MR. KENNEDY:  Yes, Your Honor.  So, therefore, it

12   does fall within that time frame of the relationship itself, so

13   therefore it is probative of the determination in this

14   particular case.

15             And, Your Honor, we have one other incident that also

16   occurred with a Ms. Sharelle Lacey (phonetic) in last fall of

17   2007, which is also obviously much closer in time to this

18   particular incident.

19             THE COURT:  Two thousand when?

20             MR. KENNEDY:  Two thousand seven, Your Honor.

21             THE COURT:  Did it result in a conviction --

22             MR. KENNEDY:  No, it did not.

23             THE COURT:  -- from the charge?

24             MR. KENNEDY:  No, it did not.

25             THE COURT:  No formal charge being made?

1          MR. KENNEDY:  No, Your Honor.

2          THE COURT:  All right.

3          MR. REED:  And the matters in 2002 did not result in

4   the arrest of Derrick Shepherd.

5          THE COURT:  That was going to be my next question.

6   What about the 2007, did it result in an arrest?

7          MR. KENNEDY:  No, Your Honor.  As the Court can tell

8   that it's a domestic violence situation and they determined not

9   to go forward with it, the victims in the case.

10          THE COURT:  Listen to this, and we're not bound by

11   this, "(b) other crimes, wrongs, or acts, evidence of other

12   crimes, wrongs or acts is not admissible to prove the character

13   of a person in order to show action and conformity therewith."

14   And that's what it seems like it's doing.  I'm not sure yet.

15   "It may, however, be admissible for other purposes such as

16   proof of motive, opportunity, intent, preparation, plan,

17   knowledge, identity, or absence of mistake or accident provided

18   that upon request by the accused the prosecution in a criminal

19   case shall provide reasonable notice in advance of trial," --

20   this is a trial rule, "or during trial if the court excuses

21   pretrial notice on good cause of general nature of any such

22   evidence it intends to introduce at trial."  As I said this

23   does not apply, however, it is some guidance.

24          I'm not going to admit it.

25          MR. KENNEDY:  Thank you, Your Honor.

1          I'm sorry, Your Honor, I have no further questions of

2    the Witness.

3          THE COURT:  You have some other questions on

4    redirect, sir?

5          MR. KENNEDY:  No, Your Honor, I do not.  Thank you.

6          THE COURT:  All right.

7          MR. MAGNER:  Your Honor, we would proffer at this

8    time as Government Exhibit 15 the police reports relative to

9    those incidents.  There was an arrest warrant issued for the

10   Defendant.  Mr. Lamy researched the matter in some detail and

11   there's some concern that it may have been pulled out the

12   system and he was not aware of this at the time.

13         That's the same thing we showed you, John.

14         So, we'll proffer this at the time --

15         THE COURT:  What are you speaking to, what --

16         MR. REED:  They're attempting to proffer that which

17   the Court ruled admissible.

18         THE COURT:  That's why I ruled about it.  I already

19   read this stuff.  This stuff is the stuff attached to this

20   memorandum?

21         MR. MAGNER:  Well, no, sir, it's not.

22         THE COURT:  They're not?

23         MR. MAGNER:  It's not.  It's another incident in

24   February of 2002 where the Defendant got violent with women.

25   He took their things.  It's intended to prove intent and plan

1   and modus operandi --

2          THE COURT:  Intent to do what?

3          MR. MAGNER:  Intent to harm women and steal their

4   things when he doesn't get his way.  So, there was --

5          THE COURT:  Was he charged with over here in Federal

6   Court?

7          MR. MAGNER:  No, sir.  There was an arrest warrant

8   issued.  It's somehow been pulled out of the system.  Mr. Lamy

9   tried to find it.  He was unable to do so and --

10         THE COURT:  You all found it though.  I mean how do

11  you know it's been pulled out of the system?

12         MR. MAGNER:  We'll --

13         THE COURT:  That's a tough statement to make and you

14  have.

15         MR. MAGNER:  -- have to ask Mr. Lamy about that.

16  We'll call Mr. Lamy.

17         THE COURT:  Well, and I really want to get to the

18  bottom of this so I can make a proper ruling on it.

19         MR. MAGNER:  Yes.

20         THE COURT:  Now --

21         MR. MAGNER:  It's being offer to show intent and plan

22  and modus operandi of a similar incident and showing those

23  elements of the crime.

24         THE COURT:  You know, I know I read about all of this

25  in these papers.

1          MR. MAGNER:  Well, we made a generalized statement

2    that there were other incidents of violence against women where

3    he took things.  What we intend to do --

4          THE COURT:  Well, I have to let Mr. Roby say

5    something because I let you talk in the place of Mr. Kennedy.

6    Mr. Roby has something.

7          MR. MAGNER:  I was going to call the next witness.

8          MR. REED:  I'll let Mr. Roby take on Mr. Magner one

9    on one.

10         MR. ROBY:  Just to be brief, Judge, I'm concerned as

11   to the Government's characterization of pulling a document out

12   of the system.  I would like for the Government if they could

13   explain what that actually indicates.  I know we --

14         THE COURT:  Yes, I'd like to know too --

15         MR. MAGNER:  Sure.

16         THE COURT:  -- if a Pretrial Services Officer was

17   trying to get it.  That's why I was very specific when I read

18   all the systems that were looked at in the report and wasn't

19   there.  So, you know, I mean there are things that don't get in

20   systems sometimes.

21         MR. KENNEDY:  Your Honor, may Detective Barteet stand

22   down, please?

23         THE COURT:  Sure he can stand down.  Are you all

24   finished with this gentleman?

25         MR. KENNEDY:  We're through with Detective Barteet.

1          MR. MAGNER:  Yes.

2          THE COURT:  All right, thank you, sir.

3          THE WITNESS:   Thank you.

4      (Witness excused)

5          THE COURT:  You know I mean -- see, we're not at a

6    trial.  It would be different if it was at a trial.

7          MR. MAGNER:  Correct, Your Honor.

8          THE COURT:  Here we're talking about a hearing where

9    I have to make a decision, a hearing that you have to -- the

10   strict rules of evidence you don't follow them.  They guide us.

11   They give us guidance and that's why I read it.  And what you

12   all want me to do now is to use evidence of other acts, that's

13   what you're saying.

14         MR. MAGNER:  Yes, Your Honor, --

15         THE COURT:  That's exactly what you're saying.

16         MR. MAGNER:  -- and there are other acts that do not

17   need to be crimes, there are other acts --

18         THE COURT:  Yeah, but they have other tests you have

19   to meet.  That why I talked about -- I was talking about

20   remoteness when I asked the questions.  I was talking about the

21   nature of the alleged acts and you, Mr. Kennedy at least was

22   explaining that there was supposed to have been alleged acts

23   regarding other females.

24         MR. MAGNER:  Yes.  And specifically what the report

25   says that during an evening of partying and women at a rented

55

1    location in New Orleans --

2            MR. REED:  Your Honor, I --

3            MR. MAGNER:  -- Mr. Shepherd --

4            THE COURT:  I read all of that.

5            MR. REED:  -- I'm sorry, I must interrupt.

6            THE COURT:  I read all of that you all.

7            MR. REED:  It's an attempt to backdoor --

8            THE COURT:  I know.

9            MR. REED:  -- what isn't admissible.

10           MR. MAGNER:  Your Honor, I'm proffering --

11           MR. REED:  There's a countervailing side to that in

12   which Mr. Shepherd filed a battery charge against the other

13   person and it was cross charges.

14           THE COURT:  I've read it all, gentlemen.  All this

15   stuff you all talk about, I've read all of it.

16           MR. MAGNER:  Yes, Your Honor, and I'm proffering it

17   for the record in case there is a need for an appeal.

18           MR. ROBY:  But, Judge, --

19           THE COURT:  Well, look, look, he can make a proffer,

20   but I'm not admitting that.  So, somebody who has to review

21   whatever I have to do they can review it.

22           MR. MAGNER:  Yes.

23           THE COURT:  But I'm not going to have it read in the

24   record, just submit it.

25           MR. MAGNER:  All right.

1          THE COURT:  Because it's already in the memorandums.

2          MR. MAGNER:  Well, Your Honor, this was not covered

3    in the memorandum other than --

4          THE COURT:  How would I know about all of this?

5          MR. MAGNER:  -- other than in general terms.

6          THE COURT:  All this stuff I read.  I mean, look,

7    look, Mr. Magner, come on, look.  I know about all of this.  I

8    read it.  Now, if I'm wrong --

9          MR. LAMY:  Your Honor, may I approach for a moment?

10         THE COURT:  Well, yes.  Just a second, let me talk to

11   Pretrial Services.

12      (Pause)

13         THE COURT:  Well, I've been reminded that this

14   information may have come to my attention when the Pretrial

15   Services Officer advised me of this recent arrest, and that's

16   what they're supposed to do under the statute.  They're

17   supposed to come and advise the Court when a person who is

18   under supervision has been arrested or charged with another

19   violation and to give me some background information.  Then we

20   had to before I signed the petition it appears that

21   Officer Lamy may have spoken to me concerning some of that

22   information.  I just can't keep everything in my mind at one

23   time.  That's why we have to have to help and that's why we

24   have to have things documents.

25         But I still remember reading something somewhere, I

1    know I've seen it.  Give me a moment.

2          MR. MAGNER:  On the first page of our memorandum,

3    Your Honor, we made a general statement that we would prove up

4    two other incidents involving violence against women --

5          THE COURT:  See, I know I had seen it.  Eureka!

6          MR. MAGNER:  Yes, --

7          THE COURT:  All right.

8          MR. MAGNER:  -- in general terms.  Now we want to

9    prove those up.  I will respect the Court's ruling if you

10   inadmissible.  I do want to proffer it though for the record.

11         THE COURT:  It's already proffered.  You just put it

12   in there.

13         MR. MAGNER:  Government Exhibit 15 --

14         THE COURT:  Yeah, that it is a proffer.

15         MR. MAGNER:  -- and the other incident in the fall of

16   2007 the Defendant that's where he got into a tussle with a

17   woman by the name of Ms. Sharelle Lacey.

18         MR. REED:  I object to this proffer.

19         THE COURT:  You don't have to say the names, just put

20   the proffer in and I'll -- put it in.

21         MR. REED:  This is unsubstantiated, Your Honor.  At

22   least here there is a piece of paper to prove whatever it may

23   prove.  But now Mr. Magner is simply declaring things to be so.

24         THE COURT:  Do you have that --

25         MR. MAGNER:  I'll proffer it then through the agent,

58

1   Your Honor.  I was trying to --

2          THE COURT:  All right, proffer 15.  And what's the

3   date of that, sir, 15?

4          MR. MAGNER:  It's on there, Your Honor, the date of

5   the report --

6          THE COURT:  Yes.

7          MR. MAGNER:  -- is February 14th, 2002.

8          THE COURT:  All right.  Let that proffer be made and

9   entered.

10         MR. MAGNER:  And without mentioning the names, then

11  another woman claimed that she was assaulted by Mr. Shepherd

12  when she refused to tell him what she had told the FBI and that

13  he took her keys and they got into a tussle in a parking lot

14  when he refused to give them back.

15         THE COURT:  And there was no formal charge.

16         MR. MAGNER:  No, right.

17         THE COURT:  That will be a proffer and that will not

18  be admitted for the purposes of this proceeding.  I'm going to

19  disregard it, but it will be preserved for whatever ruling I'll

20  make or whomever may want to take an appeal.  It doesn't matter

21  to me.

22         All right, next witness.

23         MR. MAGNER:  Your Honor, we'd submit on that basis.

24         THE COURT:  All right.  Defense presentation.

25         MR. REED:  Thaise Ashford.

 1              THE COURT:  Ms. Ashford, Ms. Thaise Ashford.

 2          **THAISE ASHFORD, DEFENSE WITNESS, SWORN**

 3                      **DIRECT EXAMINATION**

 4   BY MR. REED:

 5   Q.   Ms. Ashford, good afternoon.

 6   A.   Good afternoon.

 7   Q.   You're going to need to pull the mike a little closer to

 8   you and speak up.

 9              THE COURT:  Now you can pull it closer to you, ma'am.

10              THE WITNESS:  Okay.

11              THE COURT:  There you go.

12   BY MR. REED:

13   Q.   Good afternoon.

14   A.   Good afternoon.

15   Q.   Ms. Ashford, where do you reside?

16   A.   At 115 Cameron Drive in Gretna, Louisiana.

17   Q.   And how long have you lived there?

18   A.   It's been since 2004.

19   Q.   And whose house is that actually?

20   A.   My mother's.

21   Q.   And are you employed, Ms. Ashford?

22   A.   Yes, I am.

23   Q.   Where do you work?

24   A.   The Recovery School District.

25   Q.   And what is your position?

1   A.    Transportation Coordinator.

2   Q.    And do you know Derrick Shepherd?

3   A.    Yes, I do.

4   Q.    And for how long have you known Derrick Shepherd?

5   A.    Close to eight years now, seven, eight years.

6   Q.    And what has been the nature of your relationship with

7   Mr. Shepherd?

8   A.    Derrick and I have had an intimate romantic relationship.

9   Q.    And has that had some ups and downs?

10  A.    Yes, it has.

11  Q.    Could you tell us very briefly about that?

12  A.    We've had a pretty steady relationship since 2001 to 2005.

13  Around 2006 we started having our ups and downs.  We were off

14  and on a lot in 2007, but we were in the rebuilding process

15  this year.

16  Q.    Two thousand seven what?

17  A.    We had our off and on moments, but in this year we were in

18  the rebuilding process.

19  Q.    So, during this calendar year 2008 have you maintained an

20  intimate relationship?

21  A.    Yes.

22  Q.    And is that an intimate relationship that in a general way

23  was maintained currently through this past weekend?

24  A.    Yes, it has been.

25  Q.    And is that relationship been maintained at your home?

1   A.   At my home as well as his.

2   Q.   And within the -- these events occurred Friday night,

3   Saturday morning -- Saturday morning, in fact, right?

4   A.   Correct.

5   Q.   Had he been at your house and had you had an intimate

6   relationship within the past week?

7   A.   Yes.

8   Q.   Within the past few days in fact?

9   A.   Yes, that's correct.

10  Q.   Did you tell that to the police officers?

11  A.   No, I did not.

12        THE COURT:  Did she say within the last week or two

13  weeks?

14        MR. REED:  Within the last week.

15  BY MR. REED:

16  Q.   Within the last few days, is that correct?

17  A.   Correct.

18        THE COURT:  All right.

19  BY MR. REED:

20  Q.   At your house?

21  A.   Correct.

22  Q.   And in fact you told the police officers differently, is

23  that right?

24  A.   That's true.

25  Q.   On the morning of Saturday, this past Saturday, what's the

1   date, is it twenty --

2   A.    The 27th.

3   Q.    The 27th?

4   A.    No, the 26th I believe.

5   Q.    The 26th I think.  Was Derrick Shepherd expected at your

6   house?

7   A.    Yes, he was.  He was expected earlier, but he was

8   expected.

9   Q.    So, is it fair to say that he was expected by invitation?

10  A.    Yes.

11  Q.    And what time was he expected?

12  A.    He was supposed to be there roughly I was expecting

13  Derrick around 10:00, 10:30, because we had plans to spend some

14  time together, but he didn't come at that time.

15  Q.    What was the latest time you would have considered it

16  appropriate?

17  A.    One o'clock.

18  Q.    What was your reaction by one o'clock that morning?  When

19  did you retire, Ms. Ashford?

20  A.    I retired about 12:00 that morning.

21  Q.    And what was your reaction to that situation with regard

22  to Mr. Shepherd's non-appearance?

23  A.    I was upset that he hadn't come, but it -- you know, I

24  just felt like he let me down and I was angry with him, but I

25  didn't -- you know, I just went to sleep after that.  After

 1  waiting on him I went to sleep.

 2  Q.   Did this sort of effect how you thought of Mr. Shepherd at

 3  that time?

 4  A.   Yes, it had, because like I said we were rebuilding our

 5  relationship and we have had our ups and downs and different

 6  things had occurred and, you know, I had a lot of trust issues

 7  with Derrick and I just felt like this was another time that he

 8  let me down.

 9  Q.   Does the doorbell work at your house?

10  A.   No, it doesn't.

11  Q.   Has Mr. Shepherd and you communicated before by throwing

12  rocks against the window?

13  A.   Yes, we have.

14  Q.   And why is that?

15  A.   Because the doorbell doesn't work and my bedroom is on the

16  second floor and it's hard for me to hear with the air

17  conditioner vent being close to my window.

18  Q.   So, is it fair to say that given the nature of your

19  relationship and some of the hours Mr. Shepherd tossing --

20  getting your attention in that manner is not unusual?

21  A.   Correct.

22  Q.   Would you tell us what happened that night in terms of how

23  you came to come to the front door that night?

24  A.   I heard the rocks being thrown at the window.  First he

25  called me and I really didn't -- you know, I answered the first

1   call, but then I stopped responding to his calls because I was

2   upset.  Then he threw the rocks at the window.  After he threw

3   them a few times I went downstairs and I opened the door and I

4   told him to stop throwing the rocks because he hasn't known I

5   opened the door.  He was still standing more towards the

6   window.

7        So, once he saw me he came towards the door and I told him

8   that, you know, I started fussing at him and, you know, and I

9   just looked at him.  He looked at me and then he came inside.

10       Once he came inside --

11  Q.   Let me stop you for one minute.  Did you in any way tell

12  him he could not come inside or try to stop him from entering?

13  A.   No, I did not.

14  Q.   And he had routinely come in and out of your house on

15  recent occasion, correct?

16  A.   That is correct.

17  Q.   So, after he comes in what happens?

18  A.   He just goes and take a seat at the table, at the kitchen

19  table.

20  Q.   And what do you do?

21  A.   And I take a seat at a chair further from the table

22  because I was upset with him so I didn't want to sit close to

23  him.

24  Q.   And what sort of emotions do you express towards him?

25  A.   I expressed that I was angry with him and I told him, you

Ashford - Direct                                      65

1   know, just going through the motions of our relationship

2   stating that it's hard for me to believe him, it's hard for me

3   to trust him.  You know, I know that he had been out, you know,

4   and he and I had plans to spend time together, but yet he was

5   out doing whatever.  You know, I told him that I felt like he

6   was seeing other people.  We were going back and forth.  He was

7   making accusations at me about seeing someone and I was making

8   those same accusations at him and we were fussing downstairs in

9   that area and we just kind of did that for a few minutes.

10  Q.   Now, did that at any point turn physical?

11  A.   As I sat in the chair they had a piece of board by my

12  chair and I just picked that up because I started fussing at

13  him.  And when I picked that up he was already standing.  He

14  had approached me, you know, he came from the table, came

15  closer to me as he was fussing and I continued to fuss.  So, I

16  picked up the board and I was, you know, waiving it because I

17  didn't want him to come close to me.

18       And you know he was telling me to put the board down, and

19  we were fussing and I was waving and swinging the board at him.

20  He pleaded with me to put the board down and he grabbed hold of

21  the board and we both were struggling with the board back and

22  forth.

23  Q.   Did cell phones enter into the conversation between you

24  and Mr. Shepherd?

25  A.   Because I was making accusations at him and we were both

1    fussing about, you know, infidelities and me not trusting him

2    and everything, he told me, "Well, I'll let you look in my cell

3    phone."  And I said, "Well, I want to see it."  So, he started

4    to hand me the cell phone but he told me I needed to put the

5    board down.  So, then I placed the board back on the floor.

6         Then before he handed me his cell phone once again he

7    said, "Well, I want to see your phone, too."  So then I

8    retrieved my phone and then we exchanged phones.  I started to

9    look through his phone and he started to look through my phone.

10   Q.   And where did you retrieve your phone from?

11   A.   From my upstairs bedroom.

12   Q.   And did you on that occasion go up there by yourself or

13   with Mr. Shepherd?

14   A.   I went by myself.

15   Q.   And you came back down with the cell phone?

16   A.   Correct.

17   Q.   And the purpose of the cell phone exchange was what again?

18   A.   Because he didn't believe -- you know I didn't believe him

19   so he wanted me to trust him and in order for me to put down

20   the board and continue to talk to him he said he was going to

21   let me view his cell phone records.  So, he handed me his

22   phone, but he also wanted to see my phone.

23   Q.   As you went through that cell phone -- you have his cell

24   phone, correct?

25   A.   Yes, that's correct.

1  Q.   And you were looking through it?

2  A.   Yes.

3  Q.   What do you do as a result of whatever it is that you see

4  or think you are seeing it the cell phone?

5  A.   Well, I started to see different things and I was viewing

6  his text messages and everything, but before I could completely

7  look through the cell phone he wanted his phone back.  So, I

8  started to walk away from him.  And then that's when I went

9  upstairs and he followed behind me.  And when I went upstairs I

10  ran into the bedroom and he came behind me, but I closed the

11  door.  And when I closed the door, he came through the door.

12  He swung the door back open.

13  Q.   Now, that door, was any damage caused by his entry into

14  the room?

15  A.   The door was already slightly damaged because the house is

16  old.  It's an older home.

17  Q.   Was there any further damage?

18  A.   Because the door was pushed open it made what was there a

19  little worse, but it was in no more damage that what was

20  already there.  I mean the door was pretty much already messed

21  up.

22  Q.   And your purpose of heading to the bedroom with his cell

23  phone and then was to do what?

24  A.   Because I wanted to do continue to view the information

25  that I saw seeing in his phone.

Ashford - Direct                                    68

1   Q.   And then I take it he arrives in the bedroom, what happens

2   then?

3   A.   Once he did that, you know, we continued to argue and

4   everything about the phones and he wanted his phone back.  And

5   I started to tell him, "Well, why can't I look in your phone,"

6   which made me believe that he was lying about something because

7   he didn't want me to continue to look through his phone.  So,

8   after that, that's when I ran downstairs because I wanted him

9   to follow behind me.  And I was mad, you know, and I was

10  feeling like, well, if you don't want me to look in your phone,

11  then I don't believe you and I think you're lying, you know,

12  and I was ready for him to go.

13       So, I went back downstairs and I told him to come back

14  downstairs and we bought -- after that I went downstairs before

15  him then he followed behind me.

16  Q.   When that happened -- let me stop you for a second -- who

17  had what cell phones at that point?

18  A.   We still had -- I still had his and he still had mine.

19  Q.   All right, go ahead.

20  A.   So, I ran straight through the back door.  I went out the

21  back door.  Then Derrick came behind me.  And we were both

22  arguing outside in the area by the back door.  And I told him,

23  you know, "You're lying."  "I don't believe you.  You can just

24  take your phone and go.  I don't want to talk about it anymore.

25  I don't want to discuss it."

1        So, I shoved him his phone back to him and, you know, I

2   was telling him I wanted him to leave, but he stepped back

3   inside before I could step back inside and he closed the door

4   behind him.

5   Q.   What was your purpose in going outside?

6   A.   Because I wanted him to follow me so he could leave.

7   Q.   And I take it it turned out that he left you outside and

8   got back inside?

9   A.   Correct.

10  Q.   And at that point what's the situation with the cell

11  phones?

12  A.   He had both cell phones at that time.

13  Q.   And you didn't have --

14  A.   Any, right.

15  Q.   What happens between you as you're on either side of this

16  door?

17  A.   You know, we were talking and he was trying to get me to

18  compromise and tell me I need to listen and let's just talk

19  about it, and tell me you always want to fuss.  Why don't you

20  calm down?  We can get inside and go to bed.  And let's go

21  upstairs and we'll talk about it tomorrow.  And I told him, no,

22  I wanted to talk about it now.  And you know we were both

23  fussing back and forth.  I told him he was a liar and he's

24  telling me, you know, you never believe me.  Why don't you

25  trust me?  You know I want things to work.  You know and I was

1  pulling at the door and I twisting the door and I said,

2  "Derrick, you need to open the door," and it's like I'm getting

3  upset.  "Open the door and let me inside."  And I told him, "If

4  you don't open the door I'm going to call the police."  And

5  then he opened the door.

6  Q.   When he opened the door what did you do?

7  A.   Once he opened the door he just was standing in the door

8  as if he was welcoming me back inside, but I yanked him by his

9  shirt and was trying to pull him outside and that's when we

10  were both tussling back and forth.

11  Q.   And what were you attempting to do with Derrick?

12  A.   I was putting him out.

13  Q.   Let me show you what's marked as -- admitted as Government

14  Exhibit 2.  Is that a picture of your door?

15  A.   Yes, that's correct.

16  Q.   There's some damage to that door.

17  A.   Slightly there is.

18  Q.   Where is that?

19  A.   It would be in this area right here (indicating).

20  Q.   Where the door jam is, is that correct?

21  A.   Right.

22  Q.   When did that damage occur?

23  A.   The damage was there as I pushed, like I said, the wood

24  board wasn't as tight as it was -- as it should have been, but

25  as I was pushing for him to open the door and as Derrick and I

1    when I -- when he finally opened the door and he and I started

2    going back and forth, that's when the door got more damaged.

3    Q.   Now, after you push him out the door and close the door

4    does he reenter your home again?

5    A.   No, he proceeded to leave.

6    Q.   Was there any conversation?  You're inside now, he's

7    outside, is that correct?

8    A.   Correct.

9    Q.   Let me ask you one thing:  After you've pushed

10   Mr. Shepherd out through the rear door, he never forced the

11   door open and broke into the --

12   A.   No, he didn't.

13   Q.   What do you do at that point?  He's outside.

14   A.   After he's outside I locked the iron door and closed the

15   wooden door.  I went upstairs and when I went upstairs that's

16   when I realized he still had my phone and that's when I

17   retrieved my other cellular phone out of my nightstand drawer

18   and then I called the police.

19   Q.   Where were you when you called the police?

20   A.   When I first got my phone I took my phone and I ran

21   back --

22   Q.   This is the other phone --

23   A.   Right.

24   Q.   -- your work phone, correct?

25   A.   Correct.  I ran back downstairs and I knew he was in his

Ashford - Direct                                          72

1   car because he never tried to come back inside and he wasn't

2   inside, so I went out through the front door and he was already

3   backing out of the driveway.  So, I attempted to stand behind

4   the car, but he never stopped, so I moved to the side.

5   Q.   And did you do anything else at that time?

6        THE COURT:  What's that, what about this move to the

7   side?  What was happening there?

8        THE WITNESS:  He was backing out of the driveway --

9        THE COURT:  Okay.

10       THE WITNESS:  -- and I was trying to stand behind the

11  car so he won't continue to back out of the driveway.  But he

12  continued to back anyway, so I just moved to the side so he

13  wouldn't roll over me.

14       THE COURT:  All right, I got it.

15  BY MR. REED:

16  Q.   And did you do anything further?

17  A.   That's when he was pulling off and I picked up a rock and

18  I threw it at the car.

19  Q.   Do you know whether or where you hit the car?

20  A.   No, I'm not sure, because it was pulling off.

21  Q.   At what point were you in communication with the 911

22  operator?

23  A.   When I finally got a dispatch person Derrick had pulled

24  off at that time and I finally got through because I had to go

25  through two persons before I was actually connected to the

Ashford - Direct                                          73

1   dispatcher for Jefferson Parish.

2   Q.   So, the only time he would have heard your threat or

3   statement about "I'm going to call the police," was when you

4   were outside trying to get inside and he let you -- and you go

5   through that exchange, correct?

6   A.   That's correct.

7   Q.   Why did you call the police?

8   A.   I was angry and before I had thought about it I had

9   already did it and I was just frustrated.  You know I mean he

10  woke me up.  It was just confusion.  You know I was angry with

11  Derrick.  It was kind of a routine situation of us, you know,

12  lately.  Like I said, we've had our ups and downs in our

13  relationships and I was just frustrated and I just was mad, I

14  was really mad.

15  Q.   Ms. Ashford, you gave a quite contradictory account to the

16  police regarding the nature of your present relationship with

17  Mr. Shepherd, didn't you?

18  A.   Yes, I did.

19  Q.   And you also gave a different account of what happened in

20  the house, correct?

21  A.   That's true.

22  Q.   And regarding the cell phone, you said nothing about this

23  mutual exchange of cell phones to check?

24  A.   No, I didn't mentioned that at all.

25  Q.   And you said something else about how the cell phone came

1    to be in Derrick's possession, correct?

2    A.    That's true.  I told them that he took it out of my room.

3    Q.    Why did you tell the police the account that you did?

4    A.    Like I said, I was mad and I didn't mean for everything to

5    get carried away that it was, but you know I downplayed the

6    relationship because I felt like if I said that he and were not

7    dating and we were then they wouldn't -- anything wouldn't be

8    done.

9    Q.    And why did you embellish you know what had gone on

10   between you?

11   A.    Because I felt like if -- I mean my point was because I

12   just wanted my property back, but I didn't think -- I didn't

13   really think about it, you know.  It's just I was just mad.

14   And you know my anger and my frustration I just said you know

15   what I felt I remembered at the time.

16   Q.    There's a photograph, Government Exhibit 4, of some marks

17   I guess on your right wrist, is that correct?

18   A.    Yes, that's correct.

19   Q.    Where did those come from?

20   A.    When we were outside -- well, when we were in the door and

21   I was trying to force him out and I scratched myself on the

22   door.

23   Q.    And there is a photograph, Government Exhibit 5, showing

24   some marks around your abdomen.

25   A.    That's correct.  This was --

1   Q.   Where did those come from?

2   A.   From struggling when I was trying to put him outside.

3   Q.   Did Derrick Shepherd punch you?

4   A.   No, he did not.

5   Q.   Did he hit you?

6   A.   No, he did not.

7   Q.   You are aware today that everything you say is under oath,

8   is that correct?

9   A.   Yes, I am.

10   Q.   And the importance of telling the truth?

11   A.   Yes, I do.

12   Q.   You were not under oath when you were with the police a

13   few nights ago?

14   A.   No, I was not.

15   Q.   And I'm not suggesting to minimize that, but you

16   appreciate today that you're sworn to tell the truth?

17   A.   Yes.

18   Q.   Are you presently afraid that Derrick Shepherd will do you

19   do any physical harm?

20   A.   No, I am not.

21   Q.   Has he done you physical harm?

22   A.   No, he had not.

23   Q.   And have you for whatever effect it may or may not have,

24   made a request of the Jefferson Parish District Attorney's

25   Office to drop the charges?

1   A.   Yes, I did.

2   Q.   Did Mr. Shepherd at any time enter your house without your

3   permission and against your will?

4   A.   No, he didn't.

5   Q.   And did he at any time to your knowledge steal anything

6   from you?

7   A.   No.

8   Q.   And did he at any time raise his hands to you and do you

9   physical harm by hitting you or striking you?

10  A.   No, he didn't.

11          MR. REED:   I have no further questions, if you'll

12  answer the Prosecutors questions.   Thank you.

13          THE COURT:   Cross-examination.

14          MR. MAGNER:   Yes, Your Honor.

15                   **CROSS-EXAMINATION**

16  BY MR. MAGNER:

17  Q.   Good afternoon, Ms. Ashford.

18  A.   Good afternoon.

19  Q.   Ms. Ashford, I don't want to belabor this, but just so

20  we're clear, when you look at Government Exhibit 5 and that is

21  your stomach, correct?

22  A.   That is correct.

23  Q.   And those are scratches or abrasions or bruises on your

24  stomach, right?

25  A.   Yes, that's abrasions.

Ashford - Cross                                                      77

1   Q.   As a result of a fight or a tussle you had with

2   Mr. Shepherd, right?

3   A.   Yes, when I was trying to put him out of the house.

4   Q.   Okay.  And he was in your house for a period of time and

5   you were outside of your house and he wouldn't let you in?

6   A.   Correct.

7   Q.   All right, so you had to physically remove him from your

8   home and in the process of doing that you were injured as shown

9   here in Government Exhibit 5, correct?

10  A.   Yes.

11  Q.   All right.  So, that hurt, didn't it?

12  A.   I didn't at the time because I didn't know until after

13  that it had happened.

14  Q.   Okay, it hurt later?

15  A.   Not really, no.

16  Q.   All right.  And likewise in Government Exhibit 4 I mean

17  these are your wrists with scraps, abrasions on them, correct?

18  A.   Correct.

19  Q.   And that's as a result of the fight and tussle you had

20  with Mr. Shepherd, correct?

21  A.   Yes.

22  Q.   All right, those are your wrists?

23  A.   Yes, they are.

24  Q.   And you were worried about one particular thing that

25  evening that you told the detectives, weren't you?  Didn't you

1    tell the detectives you were worried that they were going to

2    sweep this all under the rug because Mr. Shepherd is such a

3    powerful man?

4    A.    No, I didn't say those words.

5    Q.    Okay.  Did you use the phrase "Are you guys going to sweep

6    this under the rug?"

7    A.    No, I did not.

8    Q.    You didn't use the phrase "sweep under the rug"?

9    A.    No.

10   Q.    Okay.  Now, you did sign an affidavit that you did not

11   wish to press charges against Derrick Shepherd, correct?

12   A.    That is true.

13   Q.    All right.  And you went to a lawyer's office to sign

14   that, correct?

15   A.    Correct.

16   Q.    And that was a lawyer that Mr. Shepherd had arranged to

17   prepare this affidavit, correct?

18   A.    No, that's not correct.

19   Q.    You aren't aware that Mr. Shepherd called Bruce

20   Netterville and said that Thaise Ashford is going to come down

21   and then put Mr. Reed on the phone and arranged for you to sign

22   this?

23   A.    No, I was not aware of that, no.

24   Q.    Okay.  And you did show up at Bruce Netterville's office

25   yesterday at about ten to one, about 12:50, correct?

1   A.   Correct.

2   Q.   All right.  And you went in there and you signed this

3   affidavit, correct?

4   A.   Yes, that's true.

5   Q.   All right.  And then Mr. Netterville was gone, he had to

6   go off to court by about five after one, correct?

7   A.   Yes, that's true.

8   Q.   All right.  So, you spent about 15 minutes or less with

9   this lawyer who prepared this affidavit, correct?

10  A.   Correct.

11  Q.   And you signed what he put in front of you?

12  A.   Yes, I did.

13  Q.   Had you ever met him before?

14  A.   That was my first meeting with Mr. Netterville.

15  Q.   And how much did you pay him?

16  A.   We have not arranged payment at this time.

17  Q.   Do you know if Mr. Shepherd arranged for that payment?

18  A.   No, I do not.

19  Q.   Okay.  In fact you had to give Mr. Netterville a driver's

20  license to prove this was you because he didn't know you from

21  Adam's housecat, right?

22  A.   He told me it was proper procedure to take a copy of my

23  license with any affidavit.

24  Q.   Right, because he had never seen you before and didn't

25  know you -- didn't know you?

1   A.   That was our first meeting.

2   Q.   Right.  And so in 15 minutes you went and signed this

3   affidavit after telling the Sheriff's Office that everything

4   that you had told them was true?

5   A.   That is correct.

6   Q.   All right.  Do you know if Mr. Netterville and

7   Mr. Shepherd are acquainted or if they're friends?

8   A.   No, I don't.

9   Q.   Now, you gave a recorded statement to the detective,

10  correct?

11  A.   Uh-huh, that's correct.

12  Q.   All right.  And we don't have the recording, but I have a

13  transcript here and I'd like to go through a couple of things

14  sort of line by line with you.

15          MR. MAGNER:  Counsel, do you need a copy?

16          MR. REED:  Yes, I do, thank you.

17          THE COURT:  That's the same copy of Exhibit C?

18          MR. MAGNER:  Yes, sir.

19          THE COURT:  Very well.

20          MR. MAGNER:  All right.

21  BY MR. MAGNER:

22  Q.   All right, and on the first page there you said you came

23  to the door after the rocks hitting your window and you saw

24  Derrick Shepherd standing outside your door, correct?

25  A.   Yes, that's correct.

1  Q.   All right.  You said that he appeared to be in an drunken

2  state.

3  A.   That is correct.

4  Q.   All right, and you told the officer that, correct?

5  A.   That's correct.

6  Q.   And just like you told us today, you told us that he came

7  inside, took a seat at the table, and you started to talk

8  initially, correct?

9  A.   Correct.

10 Q.   And then you also talk about picking up a board that was

11 in the floor, maybe you meant on the floor, but a board on the

12 floor to defend yourself, correct?

13 A.   I just said I picked up a board, yes, that's correct.

14 Q.   Okay.  But you told the police, "I picked up a board that

15 was in the floor to defend myself."

16 A.   That is correct.

17 Q.   Okay.  And you had this board and you had it and you had

18 it between you and Mr. Shepherd, correct?

19 A.   I was holding the board up like that and --

20 Q.   Okay.

21 A.   -- just to the side and then I would point the board at

22 him.

23 Q.   All right.  And you were trying to protect yourself from

24 Mr. Shepherd, correct?

25 A.   I didn't feel threatened.  I just was pushing him away

1   just letting him know, you know, just was out of anger and I

2   was just swinging a board at Derrick.  I mean he didn't come at

3   me in an aggressive way.  I was mad at him.

4   Q.   Okay, but you felt like you had -- you needed something to

5   keep him away, correct?

6           MR. REED:  Objection, that's been asked and answered,

7   Your Honor, and --

8           THE COURT:  Well, she's under cross-examination.

9   She's answering everything put to her.  Overruled.

10  BY MR. MAGNER:

11  Q.   You needed something to keep him away?

12  A.   No, I picked up the board before he even came -- before he

13  approached me.

14  Q.   And you did that because you were in fear for yourself?

15  A.   No, I was not in fear.

16  Q.   All right.  Do you typically pick up boards when you're

17  talking to Derrick?

18  A.   It depends on the way the conversation is going or if

19  we're fussing.

20  Q.   Okay, if the conversation is going bad and you're having

21  some problems that's when you pick up a board and you put it

22  between you and he?

23  A.   No, that was probably the first time that I've ever done

24  that.

25  Q.   And you told the detective that you sat there and tussled

1   in the chair, that was correct?

2   A.   Yes.

3   Q.   And you also said that you got him to push back from you

4   and you ran upstairs, correct?

5   A.   That's what I told them, yes.

6   Q.   All right.  And when you went upstairs you were able to

7   close this door, correct?

8   A.   Yes, I was.

9   Q.   And you were able to lock the door?

10  A.   I didn't lock it.

11  Q.   Okay.  So, you're saying that he came in the door and

12  didn't even try the handle?

13  A.   No, because when I closed the door, as I was closing the

14  door at the time I closed the door Derrick pushed the door back

15  with me.  The frame on that door was actually slightly cracked

16  as well, but when we came through the door and he pulled --

17  pushed it -- he was opening the door and I was pushing it the

18  door back on him.

19  Q.   Okay.  Was the door locked or not?

20  A.   No, it was unlocked.  I didn't have a chance to lock the

21  door.

22  Q.   All right.  So, in the course of him trying to enter the

23  room he further damaged that door, correct?

24  A.   Yes.  We both did.

25  Q.   All right.  And you both did it in the sense that you're

1    on one side of the door and he's on the other side of the door.

2    He's trying to get in and you're trying to keep him out, right?

3    A.   Right, because I was running with his phone.

4    Q.   And that's how the door got broken?

5    A.   That is correct.

6    Q.   Okay.  So, regardless of how you tried to thread the

7    needle, Derrick Shepherd did that damage, did he not?

8    A.   Like I said, the door was already cracked, but if you push

9    the door open, it depends on how you open the door and it made

10   the door -- the wood come further from the frame.

11   Q.   Likewise when he kicked you out of the house and locked

12   you out is that how this door got broken?

13   A.   I was on the outside and I was pushing that door.

14   Q.   Okay.  To try to get into your own mama's house?

15   A.   Correct.

16   Q.   And you told the police that you were out there for 45

17   minutes?

18   A.   I don't really remember exactly how long I was.

19   Q.   Would you agree that you told the police that you were out

20   there for 45 minutes?

21   A.   Yes, I did.

22   Q.   Okay, what were you wearing?

23   A.   I had on some pants and a shirt.

24   Q.   All right.  And that meant for whatever period of time it

25   was he was in your mama's house and you were outside at four

1   o'clock in the morning?

2   A.   That's correct.

3   Q.   And you're knocking on the door and you're banging on the

4   door and you're demanding that he let you in?

5   A.   Right.  I told him -- first we were talking and then I

6   told him to let me in and if he didn't I would call the police.

7   Q.   And then you told the police officers "And once I got

8   upstairs," we're back in the bedroom now, "once I got upstairs

9   I went into my bedroom and locked the door."  So, I guess that

10  begs the question, did you lock that door or didn't you lock

11  that door?

12  A.   No, I didn't lock the door.

13  Q.   So, you lied to the detective?

14  A.   Yes, I did.

15  Q.   All right.  "Within seconds I turned on the lights,

16  Derrick had bust through my door, and broke the paneling on my

17  door."  Okay, without beating a dead horse, that's the door

18  we're talking about there in the picture, right?

19  A.   That is correct.

20  Q.   And you told the officer at the time that he broke the

21  paneling, correct?

22  A.   Yes, I did.

23  Q.   And then you said, "Once I got away from him in the room

24  and I ran downstairs I unlocked my front door, but I ran

25  straight through the back door because I wanted Derrick

 1   Shepherd to follow me."  And I'll stop right there.

 2        And so what you were trying to do, you were trying to lead

 3   him out of your mama's house?

 4   A.   That's what I told the detective, yes.

 5   Q.   Okay, and you were afraid of him?

 6   A.   No, that night I was not afraid -- aggravated, but not

 7   afraid.

 8   Q.   Weren't afraid after --  after sustaining these injuries?

 9             MR. REED:  Pardon, I didn't hear the Witness' --

10             THE WITNESS:  I said aggravated but not afraid.

11   BY MR. MAGNER:

12   Q.   Okay.  You weren't afraid after sustaining any of these

13   bruises?

14   A.   No, I was just aggravated and mad.  Like I said, I didn't

15   know I sustained any bruises until after everything was over.

16   Q.   Okay.  And so it was your hope to basically lead him out

17   and get back in first and then lock the door, correct?

18   A.   That's what I told the detective.

19   Q.   But that's what you did.

20   A.    No, when I ran downstairs I just ran straight to the back.

21   Q.   Okay.  Let me see if I understand.  You left your own

22   mother's house at four o'clock in the morning, okay, and you

23   ran out of your own house for what purpose?

24   A.   Because I was telling Derrick that to come with me, we

25   were both heading downstairs at that time.  After we went

Ashford - Cross                                          87

1    upstairs with the phones and he demanded his phone back and I

2    felt like he was lying about something in his phone he didn't

3    want me to see it, so I told him, "Well, if I can't see your

4    phone, you're lying about something."  And that's when we -- I

5    went downstairs, he followed me, and I was telling him I wanted

6    him to go.  So, I was walking him out.  I stepped out of the

7    door, stepped off the -- out of the house off the floor of the

8    door, and stepped outside.  He did not follow.

9    Q.   Does Mr. Shepherd lie a lot?

10            MR. REED:  Objection, Your Honor, that's too broad.

11   BY MR. MAGNER:

12   Q.   Does he lie to you a lot?

13            MR. REED:  I mean that's just too broad.

14            THE COURT:  Just a minute, just a minute.

15   Specifically -- rephrase the question to a specific incident,

16   time and place.  Objection overruled to that extent.

17   BY MR. MAGNER:

18   Q.   You are accusing Mr. Shepherd of lying to you that night,

19   that evening, and I think from the context of your testimony

20   that you believe he lies at least to you a great deal?

21   A.   About certain things in our relationship he has failed to

22   come through with.

23   Q.   All right.  In the past few days did you ever threaten

24   Derrick Shepherd's mother or his sister?

25   A.   No, I have not.

1   Q.   Okay, did you ever threaten his mother or his sister?

2   A.   No, I have never.

3   Q.   Did you hear Mr. Shepherd publicly state that he was

4   defending his family when he got into all this?

5   A.   Yes, I did.

6   Q.   So that would be a lie, correct?

7   A.   I guess.  I don't know exactly what he was referring to,

8   but it didn't seem like it had anything to do with us.

9   Q.   And his mother and sister are living in Houston right now,

10  correct?

11  A.   I would believe they are.

12  Q.   And they didn't have anything to do with any of this, did

13  they?

14  A.   No.

15  Q.   So, when you heard that you knew that was just a lie and

16  that was just garbage, right?

17  A.   I just felt like he was just trying to take the attention

18  away from what was going on.

19  Q.   All right.  And you say here "What he did was lock me

20  out."  That part is true, correct?

21  A.   I'm sorry?

22  Q.   That he did lock you out of your own house.

23  A.   Yes.  Once you close the wooden door it locks

24  automatically, so he closed that door and I was locked out.

25  Q.   Okay.  And for as much of a period as 45 minutes?

1    A.    I don't believe it was that long.

2    Q.    And how long do you think it was?

3    A.    We had a few words back and forth and then I said I was

4    going to call the police and that's when he opened it.

5    Q.    And then you said that, "He went upstairs and went through

6    my personal items.  He took money out of my purse and my

7    personal cell phone is also missing."  And you told Mr. Reed

8    that this was the cell phone exchange, I'll look at your calls

9    if you look at my calls kind of thing?

10   A.    That is true.

11   Q.    All right.  There wasn't any reason though if that was the

12   case, if it was, you know, trust to verify as you kind of

13   described it, there really wasn't any reason for Mr. Shepherd

14   to take your cell phone charger, was there?

15   A.    I never said my charger was missing.

16   Q.    Well, didn't he in fact take your cell phone charger?

17   A.    No, he did not.

18   Q.    Can you describe your cell phone charger for your

19   BlackBerry Pearl?

20   A.    It's just a black charger you plug in a wall with a cord.

21   Q.    Okay, that fits your BlackBerry Pearl?

22   A.    Correct.

23   Q.    And charges it?

24   A.    Correct.  My charger was actually still in the wall from

25   where I left it when I took my phone out of the charger.

1   Q.   The hundred dollars, was a hundred dollars in fact

2   missing?

3   A.   I did lose a hundred dollars, yes.

4   Q.   That night?

5   A.   I'm not sure when I did.

6   Q.   Okay, you told the police you did, correct?

7   A.   Right, but I -- the last time -- I can't recall, because

8   the last time I looked in my wallet was earlier that day when I

9   was at work.

10  Q.   And you had the hundred dollars then, but then when the

11  police came after Mr. Shepherd left the hundred dollars was

12  gone?

13  A.   That is correct.

14  Q.   Have you found it since?

15  A.   No, I have not.

16  Q.   And then you say "When he finally let me inside, he opened

17  the door to let me in and that's when I grabbed him and we

18  tussled and I got him to go outside."  And is that when you

19  sustained your injuries?

20  A.   Yes, that's true.

21  Q.   And you told the detective where Mr. Shepherd lived,

22  correct?

23  A.   Correct.

24  Q.   And that's where you know him to live?

25  A.   On occasion, yes.

1   Q.   Okay.  Well, when you were asked -- you told the officers

2   that night, "He lives in Gretna, Louisiana, at 3701 Lake Michel

3   Court."

4   A.   That's what I told the detective, yes.

5   Q.   Now you said he lives there, correct?

6   A.   I could have said it that way.  I'm not sure.  I don't

7   remember.

8   Q.   Okay, because you sort of seem to be shading that issue a

9   little bit now that you say "Maybe sometimes stays there," but

10  that night at least you told them he lived there, correct?

11  A.   That's where I told him he was, yes.

12  Q.   And you know, you understand that that's outside his

13  Senate District and --

14           MR. REED:  Objection, relevance, Your Honor.

15  BY MR. MAGNER:

16  Q.   -- and that could cause him some issues?

17           THE WITNESS:  I don't have any idea about that.

18           MR. REED:  Objection.  Excuse me --

19           MR. MAGNER:  It goes to credibility, Your Honor.

20           THE COURT:  Well, whatever she knows and I don't

21  understand why this is relevant or irrelevant.  I've heard the

22  testimony about, you know, you know the agent said, the

23  detective said about that.  If she gave him the place where to

24  go, you know, the officer is going to go on there, but they had

25  to get a GPS or whatever it was if I remember correctly.  So,

1   I'm going to -- I don't need to --

2          MR. MAGNER:  I'll move on.

3          THE COURT:  Yeah, I'm going to maintain the

4   objection.  They had no problem finding him.

5   BY MR. MAGNER:

6   Q.   And you in fact told the officers that you physical

7   intimate relationship with Mr. Shepherd was over by 2008,

8   correct?

9   A.   Yes, I did downplay the relationship.

10         THE COURT:  Wait, that's not the answer.

11         MR. MAGNER:  Thank you.

12         THE COURT:  I mean that is an answer, but that's not

13   the question.  Propose the question again, please.

14         MR. MAGNER:  Yes.

15   BY MR. MAGNER:

16   Q.   You had told the police officers that your physical

17   intimate relationship with Mr. Shepherd was over by 2008,

18   correct?

19   A.   I told them that we had -- that during 2008 we still

20   dealt, but we had been off and on, but I told him lately we

21   were not dealing.

22   Q.   Okay.  But you also -- you made it very clear, and we can

23   go find it here, that you may have had some contact that your

24   romantic, intimate, physical relationship was over by 2008,

25   correct?

1    A.   That is what I told the detective.

2    Q.   All right.

3         THE COURT:   I should have said it wasn't responsive.

4    That was responsive.

5         MR. MAGNER:   Okay.

6    BY MR. MAGNER:

7    Q.   And you told the police officer, and these were your

8    words, that, "He grabbed me, but he did once punch me in my

9    stomach."  Those were your words, correct?

10   A.   I did not say that in that way.  At the end of the

11   conversation that we had on the tape he asked me did he hit me.

12   And I said that I was hit in my stomach, but I was hit when we

13   were fighting over the board.

14   Q.   Okay.  What's attributed to you here "He grabbed me, but

15   he did once punch me in my stomach."  Are you saying that you

16   did not say that?

17   A.   I do not recall stating it like that, no.

18   Q.   Okay, you could have said it but you don't remember now?

19   A.   I don't remember because the only time I remember him

20   asking about hitting is at the end of the tape.

21   Q.   And this is right at the end of the tape, is it not?

22   A.   Right, and I didn't mention grabbing.  I said we were both

23   fighting.

24   Q.   No one said anything about grabbing, Ms. Ashford.  The

25   phrase in particular, and it's your phrase, is "He did once

1   punch me in my stomach."  Did you tell the police officer that?

2   A.   I told the police officer that I was hit in my stomach,

3   yes.

4   Q.   And your word was "punch"?

5   A.   I don't remember.

6   Q.   You could have said that, you just not sure?

7   A.   Right, I'm not sure.

8   Q.   Where's Mr. Netterville's office?

9   A.   It's in Gretna.

10  Q.   And what street is that?

11  A.   It's off of Fourth Street.

12  Q.   Okay, right by the courthouse there?

13  A.   That's correct.

14  Q.   How did you know to go there?

15  A.   Because his address is on his card.

16  Q.   Okay, how --

17  A.   And he's listed.

18  Q.   How did you get the card?

19  A.   Because he's listed.

20  Q.   Okay, how did you know to go to that particular office at

21  12:50 p.m. yesterday afternoon?

22  A.   I had spoken with Mr. Reed.

23  Q.   Okay.  And that's Mr. Shepherd's attorney?

24  A.   Yes, he is.

25           MR. MAGNER:  One moment, Your Honor.

1   BY MR. MAGNER:

2   Q.   And you know we had talked about this issue of you ending

3   your romantic relationship.  Did you tell the officer and I

4   quote, "Recently over the past couple of weeks he started to

5   call me and I had talked to him over the course of those couple

6   of weeks.  The whole week I had not had one conversation with

7   Derrick."  That's what you told the police officer, correct?

8   A.   That is correct.

9   Q.   And the police officer followed up to that very statement

10  and said, "Okay, and basically you made it very clear to him

11  that you were no longer going to be in a romantic relationship

12  with him."  And your answer was?

13  A.   Correct.

14  Q.   That's what you told the police officer?

15  A.   That's what I told the detective, yes.

16  Q.   Have you sought any counseling, have you gone to any

17  battered women's shelters, have you spoken to any medical

18  professionals concerning your relationship and particularly the

19  physical nature of the relationship with Mr. Shepherd?

20  A.   No, I have not.

21  Q.   I'm going to show you what's been marked now as Government

22  Exhibit Number 16.  What I'm showing you, Ms. Ashford, in

23  Government Exhibit 16 is your wallet on your bed, correct?

24  A.   That is correct.

25  Q.   The night of incident, right?

1  A.    Correct.

2  Q.    And this had been removed from your purse and left on your

3  bed, correct?

4  A.    No, I took my wallet out the purse to take the picture for

5  the detective.

6  Q.    All right.  But it was in that purse or was it in that

7  wallet that the hundred-dollar bill was?

8  A.    Actually, it was more than just a hundred-dollar bill in

9  my wallet, but, yes, that's where it was.

10  Q.    Okay.  The hundred-dollar bill was in your wallet?

11  A.    Yes.

12  Q.    Okay.  It was there earlier in the day and it was gone

13  after Mr. Shepherd left?

14  A.    Correct.  That's when I noticed it was gone.

15           MR. MAGNER:  No further questions.

16           THE COURT:  Very well.  Is there any redirect?

17                    **REDIRECT EXAMINATION**

18  BY MR. REED:

19  Q.    Is what you have told the Court today about your intimate

20  relationship with Mr. Shepherd during this year and within days

21  of last Saturday the truth?

22  A.    Yes, it is.

23  Q.    Was what you told the officers about that relationship a

24  lie?

25  A.    Yes, it was.

1  Q.   What you have told the Court today about the events of

2  that night in your house and outside the truth?

3  A.   Yes, they are.

4  Q.   Insofar as there are different with that statement, were

5  those differences in the statement lies?

6  A.   In what I told the detective they were.

7          MR. REED:   And if the Government will indulge me on

8  one question.

9  BY MR. REED:

10 Q.   You're aware that calls were made to your sister at

11 various times that night, right?

12 A.   That is correct.

13 Q.   Including after these events?

14 A.   That's true.

15 Q.   Was there anything unusual about that?

16 A.   No, there are not.

17 Q.   And what respect isn't it unusual?

18 A.   Because usually when Derrick and I have anything going on

19 like a problem he would talk to my sister.

20         MR. REED:   Thank you.   I have no further questions.

21         THE COURT:   Thank you.   I have a few questions,

22 Ms. Ashford.

23         How much education do you have?

24         THE WITNESS:   A college graduate.

25         THE COURT:   What field?

1            THE WITNESS:  Business and marketing.

2            THE COURT:  And how old are you?

3            THE WITNESS:  Twenty-nine.

4            THE COURT:  What types of jobs have you had in the

5    past?

6            THE WITNESS:  I worked for Enterprise Leasing

7    Company.  I've worked for a local magazine.  I've worked for --

8    I've had administrative jobs, clerical jobs.  I worked --

9            THE COURT:  Administrative, clerical, what else?

10           THE WITNESS:  I worked for the Civil Court.

11           THE COURT:  Which Civil Court, Orleans, Jefferson?

12           THE WITNESS:  Orleans.

13           THE COURT:  All right, anything else?

14           THE WITNESS:  No, that's basically it.

15           THE COURT:  All right, thank you very much.  You may

16   step down

17           THE WITNESS:  Okay.

18           THE COURT:  You can either remain inside or you can

19   go on about your business affairs.  Thank you.

20       (Witness excused)

21           THE COURT:  Next witness.

22           MR. REED:  Nothing further, Your Honor.

23           MR. MAGNER:  Your Honor, we have some very, very

24   brief rebuttal.

25           THE COURT:  Certainly.

1        MR. MAGNER:  Your Honor, the Government calls Special

2   Agent Dwayne Horner.

3        THE COURT:  All right.

4        **DEWAYNE J. HORNER, GOVERNMENT'S WITNESS, SWORN**

5                     **DIRECT EXAMINATION**

6   BY MR. MAGNER:

7   Q.   Agent Horner, you're a Special Agent with the FBI?

8   A.   That's correct.

9   Q.   Were you with me approximately 2:00, 1:30, 2:00 this

10  afternoon when we called Bruce Netterville?

11  A.   Yes, I was.

12  Q.   And were you able to hear, was it on the speakerphone?

13  A.   The call was placed and we spoke with him over the

14  speakerphone.

15  Q.   What did Mr. Netterville tell us concerning how it came to

16  be that he prepared this affidavit signed by Ms. Ashford?

17  A.   He stated that he received a call from Mr. Shepherd and

18  that the victim was interested in dropping the charges, and

19  then Mr. Reed got on the phone and had a conversation and then

20  the affidavit was prepared.  She came over, signed it, and he

21  was off to court by 1:05.

22  Q.   All right.  And when did they first meet up?

23  A.   The day that she signed the affidavit.

24  Q.   Approximately what time?

25  A.   Twelve forty-five, I believe.

1            MR. MAGNER:  Your Honor, at this time we would offer

2    Government Exhibit 17, a Louisiana Uniform Abuse Prevention

3    Order entered in connection with Mr. Shepherd's --

4            THE COURT:  Exhibit 17?

5            MR. MAGNER:  Yes.

6            THE COURT:  And what is it, sir?

7            MR. MAGNER:  It's basically the stay away order,

8    Louisiana Uniform Abuse Prevention Order.

9            THE COURT:  And that pertains to Mr. Shepherd?

10           MR. MAGNER:  Yes.

11           MR. REED:  No objection.

12           THE COURT:  May I see it when you're finished?

13           MR. MAGNER:  In particular we'd direct the Court's

14   attention to the fact that you're ordered not to contact the

15   alleged victim's family personally, by phone, electronically,

16   in writing, or through a third party.

17           THE COURT:  What's the date of that?

18           All right, according to this the judge signed this

19   the date of the order appears to be 7/27 even thought that was

20   a "6" it must have been a mistake, it was scratched through,

21   7/27/08, expiration date 8/27/08.  That's what I read on the

22   second page.

23           MR. MAGNER:  Yes.

24           MR. KENNEDY:  Judge, for the record --

25           THE COURT:  Yes, sir.

1            And this is another part, it's a bail order on the

2     second part, is that right, Mr. Magner?

3            MR. MAGNER:  Yes.

4            THE COURT:  You put all this in?

5            MR. MAGNER:  Yes, sir, just for the sake of

6     completeness, but it's the stay away order that we --

7            THE COURT:  All right, Mr. Stechmann, pass it up to

8     me.  Cross-examine the Witness on it, or examine the Witness

9     on.

10           MR. MAGNER:  Thank you.  And again for the record's

11    sake, Your Honor, we intended to elicit the facts of the two

12    other abuse incidents through Agent Horner.  We respect the

13    Court's ruling, but we did --

14           THE COURT:  Are they included in that stay away

15    order?

16           MR. MAGNER:  No, sir.  We intended to elicit that

17    evidence through him.  We understand the Court's ruling.  We've

18    proffered our evidence at this time.  It would be offered to

19    prove intent, modus operandi, and that's what the evidence

20    would be offered with those other incidents --

21           THE COURT:  I have a question.

22           MR. MAGNER:  Yes, sir?

23           THE COURT:  Were those incidents given to

24    Commissioner Kiff, do you know that?

25           MR. MAGNER:  I'm sorry, Judge?

1              THE COURT:  Were those incidents explained to the

2    State Judge Commissioner Kiff --

3              MR. MAGNER:  I don't know --

4              THE COURT:  -- in issuing that warrant -- I mean in

5    issuing that stay away order?

6              MR. MAGNER:  I don't know.  I have no reason to

7    believe so, Your Honor.  We just came -- we were aware of this

8    second incident only when this all became a problem.

9              THE COURT:  I see.

10             MR. MAGNER:  I'm referring now to the 2002 incident.

11             THE COURT:  I follow you.

12             MR. MAGNER:  So, I don't want to beat a dead horse,

13   but this is the witness who would have testified concerning

14   those, but we respect the Court's order and with that we will

15   submit.

16             THE COURT:  Well, you're offering that into evidence,

17   are you not?

18             MR. MAGNER:  The --

19             THE COURT:  The paper.

20             MR. MAGNER:  Yes.  Government Exhibit 17 we offer

21   into evidence.

22             THE COURT:  Any objection?

23             MR. REED:  No objection.

24             THE COURT:  It's a court document.  Let it be

25   numbered part of the record.

1          THE CLERK:  Your Honor, we need 16 too.

2          THE COURT:  That is 17, what is 16?

3          THE CLERK:  I don't know who has 16.

4          THE COURT:  Sixteen is a photo --

5          MR. MAGNER:  Right.  Yes, sir.  I've got it right --

6          THE COURT:  -- of her wallet lying on the bed that

7    was taken out of her purse.  That's my note.

8          MR. REED:  By her.

9          THE COURT:  Yeah.  She said "taken out of my purse."

10         MR. MAGNER:  Judge, I don't want to, but --

11         MR. REED:  May I proceed?

12         MR. MAGNER:  -- by her in her most recent version.

13   There's an inconsistent statement in her previous --

14         THE COURT:  Look -- thank you.

15         MR. REED:  By her under oath.

16         THE COURT:  I get it, gentlemen.

17         MR. REED:  Thank you.

18         THE COURT:  Proceed.

19                        **CROSS-EXAMINATION**

20   BY MR. REED:

21   Q.   Agent, I'm going to show you what I've marked for

22   identification as D-1.  Have you seen that before?

23   A.   No.

24   Q.   Based on your conversation with Mr. Netterville do you

25   understand that to be the affidavit that Ms. Ashford signed

1  with regard to the charges?

2  A.   Yes, that's the affidavit.

3  Q.   With the --

4            THE COURT:  Mr. Reed, can I stop you one minute?

5            MR. REED:  I'm sorry.

6            THE COURT:  Now what are you showing him?  What's the

7  exhibit number on it?

8            MR. REED:  The affidavit that Ms. Ashford signed.

9            THE COURT:  That has not been introduced yet.

10           MR. REED:  No.

11           Any objection?

12           MR. MAGNER:  No objection.

13           THE COURT:  Very well.  What's the number you're

14  going to call it?

15           MR. REED:  D-1.

16           THE COURT:  D-1, let it be admitted.  Proceed.

17  BY MR. REED:

18  Q.   That reflects that it was notarized by Mr. Netterville,

19  correct?

20  A.   That's correct.

21  Q.   And as Ms. Ashford testified with your presence that her

22  license was affixed to it?

23  A.   Right, there's a copy of her driver's license on it.

24  Q.   And that the last -- could you read the last sentence or

25  the last clause, please?

1  A.   It says that, "I have not been forced, threatened, or

2  intimidated in any manner and I am doing this of my own free

3  will."

4  Q.   And you were present in court and saw Ms. Ashford's

5  testimony in this courtroom, didn't you?

6  A.   Yes, I did.

7            MR. REED:  Okay, thank you.  I have no further

8  questions.

9            THE COURT:  Let me see the affidavit, sir.  Thank

10 you.

11            Just a moment before you leave.

12            Agent Horner, do you have any knowledge as to whether

13 or not this affidavit has been presented to the Prosecutor of

14 Jefferson Parish?

15            My question was whether or not the Agent knows, if he

16 has any knowledge as to whether or not this affidavit is

17 presented to the District Attorney.  I said the Prosecution for

18 Jefferson Parish, the 24th Judicial District Court.  Has it

19 been presented there?

20            MR. MAGNER:  As an officer of the court I can

21 represent that I believe it has been --

22            THE COURT:  I was asking the agent that --

23            MR. MAGNER:  Yes.

24            THE COURT:  -- and if he doesn't know you can say it.

25 If he doesn't know, he doesn't know.

1          THE WITNESS:  Well, I was going to say --

2          MR. REED:  It's another one, as another officer of

3    the court I'll join in that representation.

4          THE COURT:  Well, let me get the Agent's answer

5    first.  I heard what you all said.

6          THE WITNESS:  I don't know if it's been presented to

7    the DA's Office.

8          THE COURT:  All right.  Now, you all are agreeing on

9    something?

10         MR. MAGNER:  I think we can agree on that.  I can

11   also state thought that it's the District Attorney's Office's

12   position that they -- that this does not necessarily mean that

13   they drop these charges.

14         THE COURT:  No, it doesn't.

15         MR. REED:  We understand.

16         THE COURT:  It doesn't mean that.

17         Have you all finished with the Agent?

18         MR. MAGNER:  Yes, Your Honor.

19         THE COURT:  Sir, thank you very much.  You may step

20   down.

21      (Witness excused)

22         THE COURT:  All right, I suppose you all have rested

23   now, both sides, we've had it.

24         MR. REED:  Yes, Your Honor.

25         MR. MAGNER:  Yes, Your Honor.

1          THE COURT:  Now let's have the closing remarks,

2    please.  Make the brief as possible and --

3          MR. MAGNER:  They'll be --

4          THE COURT:  -- crisp.

5          MR. MAGNER:  They'll be brief.

6          Your Honor, it's a sad fact of life in every court in

7    every state in the country that women who are abused later

8    recant their claims of abuse.  And what we have to look at

9    under these circumstances is the physical evidence, which this

10   witness has in fact admitted.  She has admitted, although she

11   tried to shade the matter to some degree, she admitted that she

12   was bruised on her wrist fighting with the Defendant to get

13   back into her own house.  She was abused on her stomach.

14   There's clearly abrasions, scrapes there.  She initially said

15   that she was punched.  I see some discoloration that would be

16   consistent with being punched.  I understand now she denies

17   being punched, but she clearly told the police officer she was

18   punched that night.

19          It's, you know, a sad fact that for whatever reason

20   women in this situation will recant.  And so because of that

21   it's the physical evidence that we have to look to here.  I

22   think there's clearly probable cause that a crime was committed

23   that night and they were the crimes that were charged properly

24   by the Sheriff's Office and probable cause to be found by the

25   Commissioner.

1          I think it's very telling that this woman would show

2    up at an attorney's office yesterday, 12:45, 12:50, sign an

3    affidavit for a lawyer that she had no idea who he was, how he

4    was procured, sign an affidavit saying that she does no longer

5    wish to proceed with these charges, leaves within 10 to 15

6    minutes, okay, somehow is steered, is directed to go to this

7    attorney to make this happen.  Agent Horner testified that the

8    attorney in fact said that it was Mr. Shepherd who arranged

9    this, who called and made the appointment with Bruce

10   Netterville for this woman to come in and sign this.

11          This same woman who signed this affidavit, a very

12   serious matter, okay, but somehow it all gets cloaked with an

13   attorney's notary public seal and a copy of her license, all

14   that is made to happen within a day of these incidents.  But

15   this same woman walks into court here and admits that -- or

16   states that she lied to the police officers.  I didn't see any

17   attorney with her there today.  So, the same people who had

18   such concern that she go to an attorney's office in Gretna,

19   apparently those same people didn't feel it was necessary that

20   she have representation here today when she admitted to lying

21   to police officers.

22          I submit to you, Your Honor, that that fact is just

23   incredibly telling when combined with the physical evidence of

24   her injuries, of the damage to her home, of the fact that we

25   have physical evidence taken from her home that has to be

1    obtained pursuant to a search warrant, I suspect, Your Honor,

2    that the truth of the matter is what the lady the officers that

3    night.  It's a detailed statement.  There's no hemming, there's

4    no hawing, there's no reluctance --

5              THE COURT:  You know what's interesting to me?

6              MR. MAGNER:  Yes, sir?

7              THE COURT:  If she had his cell phone and she ran

8    upstairs with it when she came back how -- you know, this is

9    strange to me, if he had his cell phone, that's what I'm trying

10   to find out, and he ended up with her cell phone which she said

11   that she gave to him downstairs.  And she wanted to see what

12   was on his cell phone and she ran upstairs with it.  And this

13   is what's so strange to me is that her cell phone was found at

14   his house.  Where was his cell phone found, if at any time?  I

15   didn't hear anything about that.

16             Continue with your argument.

17             MR. MAGNER:  Yes, Your Honor.

18             THE COURT:  I'm trying to put all these pieces

19   together.

20             MR. MAGNER:  Well, I think, you know, in a very sort

21   of basic and -- basic way that this was sort of the, you know

22   -- but he had what he wanted, okay.  He had the cell phone.

23   And he went back to his house and he kept it and it was going

24   to stay there until someone else got it from him.  Okay, so I

25   think the fact that --

1          THE COURT:  But the argument according to her is that

2    he wanted -- she wanted his cell phone because she wanted to

3    find out who was on the cell phone, you know -- you know,

4    that's all I --

5          MR. MAGNER:  Well, we can infer --

6          THE COURT:  The cell phone also I suppose makes up

7    some of the allegations that the stuff that was allegedly taken

8    was valued over $500.  I heard nothing about that today the

9    value of a BlackBerry cell phone.  All I know is from the

10   testimony is that the cell phone that was owned by Ms. Ashford

11   was supposed to have been located in Mr. Shepherd's home.

12   Nobody has said anything about his cell phone.

13         MR. MAGNER:  Well, we do.  We do know that he left

14   with the cell phone, Your Honor --

15         THE COURT:  All right.

16         MR. MAGNER:  -- because afterwards he was able to

17   call the victim's sister as shown on Government Exhibit 7 and

18   Government Exhibit 8.

19         THE COURT:  Did that come back to his cell phone?

20         MR. MAGNER:  Yes, it did and that was the testimony

21   by the detective unrebutted.  So, we do know that he left with

22   his cell phone, but he also went back to his house with the

23   victim's cell phone.

24         So, I think the physical evidence here is compelling.

25   You know, I understand, you know, girlfriends after they get

1   whacked and particularly after they get, you know, hit by an

2   important and powerful man in the community, you can understand

3   some of the pressures that this woman may be feeling in terms

4   of why she would recant on what she had previously told the

5   detective.  But she had no motive to lie that night.  The

6   physical injuries made it clear that she had been hit, that her

7   home had been damaged, and the physical evidence bears that

8   out.

9               THE COURT:  Thank you.

10              Counsel Reed.

11              MR. REED:  If Your Honor, please, and I think the

12  transcript will bear me out, just to respond to your first

13  concern, and there are times that Ms. Ashford spoke quickly,

14  but what happened was there was an exchange of cell phones.

15  I'll look at yours, you look at mine.  He's got hers, so to say

16  "Where have you been running around," and she has his, "Where

17  have you been running around?"  She goes up to the bedroom with

18  his trying to pursue a lead which leads to the events in the

19  bedroom.  And then I believe she testified that she gave back

20  hers -- that she gave back his when he was saying no and

21  objecting and so forth.  And that's how he ends up with both

22  cell phones and leave with both cell phones.

23              THE COURT:  All right.

24              MR. REED:  Derrick Shepherd surely does not need two

25  cell phones.  I mean there are --

1          THE COURT:  Well, she had two.

2          MR. REED:  Pardon?

3          THE COURT:  She had one for her work and one for --

4          MR. REED:  She had one for work and she had the

5    other.  But they were exchanged and one was returned and the

6    other wasn't in the course of the altercation that continued

7    over the course of the evening.

8          Now, you know it's fine for Mr. Magner to speak about

9    the general trends of society and issues in society and what

10   the problems may be between men and women in terms of their

11   relationships and their ability to handle them in decorous or

12   indecorous manners.  Nevertheless, we're here to judge the

13   facts of this specific case and the evidence --

14         THE COURT:  And that's whether or not he's in

15   violation of his bond.

16         MR. REED:  Whether he's in violation of his.

17         THE COURT:  Release conditions.

18         MR. REED:  Correct.  Which speak in terms of

19   committing offenses.  And what brought us here was the

20   allegation that he had committed two felonies and one

21   misdemeanor.

22         THE COURT:  That's correct.

23         MR. REED:  The felony was unauthorized entry of an

24   inhabited dwelling.  There was on the basis of Ms. Ashford's

25   sworn testimony no unauthorized entry of an inhabited dwelling.

1    She freely admitted him into the dwelling and then he went

2    outside and then he -- then they went outside, he's inside and

3    he gets her out of the dwelling.  But there's --

4         THE COURT:  But Mr. Magner would argue that that

5    statement here was impeached by a previous statement that she

6    gave to the reporting detective.

7         MR. REED:  But I don't think --

8         THE COURT:  Of course you brought out her statement

9    was under oath and the other one to the police officer was not.

10        MR. REED:  And I don't think that impeachment out of

11   court in that kind of a statement outweighs the force of a

12   sworn statement before Your Honor under the penalty of perjury.

13   And that's the real evidence of what happened or did not

14   happen.  I mean the woman was plainly, plainly -- I mean a

15   woman does not come in here and lie about an intimate

16   relationship with a person to the Court.  She was plainly

17   telling the truth about the nature of her intimate relationship

18   to the Court and she chose not to tell the detectives about

19   that because she wanted to blow that into something because she

20   was angry at Mr. Shepherd that night.

21        THE COURT:  That's what she said.

22        MR. REED:  That's what she said.

23        THE COURT:  And then she said she was frustrated.

24        MR. REED:  She -- and probably with good reason, a

25   relationship that gone on for seven years that had had its ups

1    and downs.  She had an expectation that he would come that

2    night and he came, you know, at 2:30 in the morning knocking on

3    the door.  She was angry.  She was upset.  There was a

4    disagreement.  It's not a pretty thing, but it is not a felony

5    charge of unauthorized entry into a dwelling.  And there is no

6    felony charge of an intent to deprive someone permanently of

7    something that belongs to them on the basis of the evidence

8    that we've heard.

9         Now, with regards to a simply battery, indisputably

10   there were physical contact between each other --

11             THE COURT:  Yes.

12             MR. REED:  -- in going in and out of that doorway.

13   And, you know, that is not the ideal way again to handle

14   something.  But you have seen Ms. Ashford for yourself.  She's

15   a tall woman.  She is a big woman.  She's a strong woman.  This

16   is not --

17             THE COURT:  She's a pretty woman.

18             MR. REED:  And she is a pretty woman indeed.

19             THE COURT:  That's right.  She certainly is.

20             MR. REED:  The charge is and the way this whole thing

21   came out and the way this whole thing was originally played,

22   and the way it's played still in the affidavit is that an ex-

23   boyfriend from long ago long ditched not welcome, you know at

24   least since January of 2008 according to the way it was

25   originally played in the affidavits that she had ceased all

1    relationships with him at the beginning of 2008 and no longer

2    wanted him around anymore and that he was unwelcome and there

3    had been a little social contact but nothing intimate.  I mean

4    that's the way this whole thing -- and that's what would make

5    it grave forcing his way into her home, confronting her in her

6    home, taking her things from her home, and that is not what it

7    was at all.  It was a continuing romantic, intimate

8    relationship that had its ups and downs.

9            There was no hitting, slapping, beating.  There was a

10   tussle between the two of them and I'm not here to excuse that

11   and, indeed, I'm here for Mr. Shepherd to apologize for that

12   which he when he speaks to the Court will do.

13           But that brings us to the question of what do we do

14   about the bond on those facts?  I mean how can you credit --

15   you know, Your Honor has seen countless situations, domestic

16   situations over the many years that you've been in practice in

17   this Court, in the Criminal District Court of where claims of

18   wrongs done by one party to the other are exaggerated out of

19   anger and out of getting even, and so forth.  And that's what

20   happened here.  An angry woman, an angry person under those

21   circumstances who that night threw a brick at the car and she

22   calls the police.  She changes the relationship to make her

23   exaggerated claims credible, because they're not likely to be

24   believed if she says, no, we've been still together and he

25   comes over from time to time and he was late that night and,

1  yeah, I was real angry at him that night.  Instead she gives an

2  account where this altogether unwelcome out of my person

3  imposes himself upon me in the middle of the night, when it's

4  somebody who was essentially an hour and a half late on a

5  Friday night with all the, you know, considerations that that

6  tends to bring to someone's mind and engenders anger.  And she

7  did not want to tell them that, because she knew that some of

8  those other details were thereafter not going to be believed in

9  most circumstances, or at last there would be a different view.

10         You know, I was not there.  Mr. Magner was not there.

11  Your Honor was not there.  We have sworn testimony here from,

12  as the Court could tell by asking her, a woman of considerable

13  dignity, education, skill, and it is true --

14         THE COURT:  She's been around courts before.

15         MR. REED:  That's right.  And it is true that there

16  are battered women situations in all sorts of context, but

17  there's no -- she said that she had never been struck or hit by

18  Mr. Shepherd, you still have tumultuous relationships and I

19  chose not to bring it out and embarrass Ms. Ashford with it.

20  But Your Honor is aware that there's a prior occasion when

21  Ms. Ashford was arrested for an unauthorized entry and it's in

22  the materials that were tendered by Mr. Magner, unauthorized

23  entry and I think battery.

24         You know and none of this is to excuse that, but

25  we're talking here about the constitutional right of someone to

1  remain fee and at liberty while facing severe charges brought

2  by the United States Government.  Now, that right we see eroded

3  away over the years by arguments of dangerousness and failure

4  to appear.  The improprieties of that encounter that night

5  however they end up being treated by the courts, and I think it

6  exceedingly unlikely that there could ever be a felony charge

7  of unauthorized entry for failing to leave when asked.  In fact

8  the only statute that I'm aware of that covers failing to leave

9  when asked is the criminal trespass statute which I think is

10 still a 30-day misdemeanor which is entering on premises when

11 told not to or remaining when told to leave.  I think it's

12 exceedingly unlikely that the circumstances of leaving with a

13 cell phone that has been exchanged at the end of an argument --

14          THE COURT:  Well, let me tell you when I read the

15 statements and listened to the detectives' testimony as well as

16 the testimony of Ms. Ashford, it would give one to believe that

17 when the detective made his report that he just came inside the

18 first time.  She opened the door and he came in.  The next exit

19 or entrance from the side doors as one would call it, that's

20 questionable.

21          MR. REED:  Well, I don't think there was a second

22 entrance, Your Honor, if I can go over those facts again as

23 testified to.  She goes out of the house to bring him out of

24 the house.

25          THE COURT:  Yeah, I remember that.

1          MR. REED:  He goes back in the house.

2          THE COURT:  Locks her out.

3          MR. REED:  And locks her out.  They maintain a

4    conversation -- locks her out as a way to maintain a

5    conversation, whatever you have, but there's no -- I think it's

6    a stretch to find that an unauthorized entry where the two are

7    going back and forth and in and out of the house.

8          THE COURT:  And then she finally talks him into

9    letting her inside.

10         MR. REED:  That's right.  And then he pushes her out

11   and she pushes him out and that's the end of it.

12         THE COURT:  That wasn't the end of it according to

13   her testimony.  When he goes and gets into the car she was

14   supposed to have stood behind the car, I don't know what for,

15   and then as he drove out she stepped away and supposedly threw

16   a rock or something and broke the glass.

17         MR. REED:  Right.  That's correct.

18         THE COURT:  And as I remember the testimony of the

19   agent saying that there's a report coming from a repairperson

20   on Monday, if I remember correctly, that there was this

21   Crown Victoria Ford with the window knocked out and they

22   reported it to the U.S. Attorney's Office.  Now, it was

23   supposedly shot out they claimed.  I didn't hear anything to

24   show there was a bullet.

25         MR. REED:  No, it --

1          MR. MAGNER:  Your Honor, --

2          THE COURT:  And I saw something in the thing that

3    looked like about a hole about my fist, but you can't go by

4    that.

5          MR. MAGNER:  May I speak to that point?

6          THE COURT:  Well, on your rebuttal, yeah.

7          I'm just trying to put it all together.

8          MR. REED:  I think --

9          THE COURT:  Go ahead.

10         MR. REED:  I think you have put it all together.

11         THE COURT:  All right.

12         MR. REED:  But I don't think the way it puts together

13   is in terms of the felony charges that were originally brought

14   out of that sort of situation.  I don't think at this time

15   there is probable cause to believe that felonies have been

16   committed.  I don't think at this time that there is an absence

17   of circumstances and conditions that can assure the safety of

18   persons and the appearance of Mr. Shepherd at trial.  I don't

19   think there's any issue about his appearance at trial.

20         THE COURT:  All right.

21         MR. REED:  And the fact that out of this kind of

22   romantic situation that is not handled well by either party

23   apparently over some period of time, I don't think this

24   entitles an American citizen prior to conviction for any charge

25   and given the dubious over-charging in the form of the arrest,

1    I don't think this disentitles an American citizen faced with

2    felony charges in a court of the United States from the right

3    to his or her freedom pending trial under such conditions as

4    they're appropriate.

5          I would say at the risk of responding to some of what

6    Mr. Magner said that I can understand that this is certainly an

7    important matter and the relationship and what happened that

8    night are of consequence to the Court and have to be dealt

9    with.  But it seems to me that from the very beginning the

10   matter has been somewhat exaggerated in terms of what happened.

11   I think much was clarified today.

12         And the Government sometimes likes to see its

13   defendants in jail because we all know the extreme difficulty

14   of preparing a case for trial while confined.  It is burdensome

15   and ties if not both hands behind a defendant's back, at least

16   part of one.  And unless there are clear and convincing reasons

17   for doing so the Court should not deny bail to an accused

18   person who at this point has been convicted of nothing

19   anywhere.

20         And the only person who brings an accusation has at

21   least shed sufficient light on this subject to I think give

22   great pause as to whether it happened in the way originally set

23   forth in that affidavit by a police officer relying on

24   testimony on an account that in its fundamental facts that were

25   essential to him did not tell him the truth about what the

1    relationship was between the parties, what the expectations

2    were that night between the parties, how it all started and

3    what it was all about.

4              THE COURT:  All right, thank you.

5              MR. REED:  Thank you.

6              THE COURT:  It's the Government's motion, so I'll let

7    you have the last comment.

8              MR. MAGNER:  There's one additional thing and I don't

9    want to plow any old ground here, that the Defense has very

10   conveniently overlooked is that it appears that Mr. Shepherd

11   never anticipate that his girlfriend, former girlfriend would

12   recant so completely.  So when he was released from jail at

13   3:30 in the morning as the detective testified, he said, "I

14   made one mistake here.  I made one mistake and that was that I

15   didn't call the police first.  You know because people can

16   threaten me, but they can't threaten my mama, they can't

17   threaten my sister.  And there are going to be, you know,

18   consequences and repercussions for that."

19             Okay, well that was Story A, okay.  That was what he

20   told to the press at 3:30 in the morning.  It makes absolutely

21   no sense.  It doesn't make a lick of sense.  It completely

22   undermines the Defense's position here, you know, that when,

23   you know, they suggest, you know, something to the contrary.

24             THE COURT:  But Mr. Magner some people go to grand

25   juries and then they come out and they say, "I told them

1    everything they wanted to know," and they may not have said a t

2    thing.

3              MR. MAGNER:  And people --

4              THE COURT:  I mean I'm just saying you just don't

5    know.  I don't know.  It may be just like you said, I don't

6    know.  I can only go by they come in and they said they did

7    something like this or whatever, you know, people do things.

8              MR. MAGNER:  And people lie, and cheat, and steal all

9    the time.

10             THE COURT:  I agree with you on that, people do.

11             MR. MAGNER:  Yes.  And so that's why it's all that

12   much more important that we look at the physical evidence.  The

13   physical evidence that was touched upon just a moment ago was

14   when Story A -- well, that would be Story B.  The Story A was

15   in the early morning hours after the 911 call about 30 minutes

16   later the detective testified that the Defendant drove his car

17   to the body shop.  And then the Defendant had a call with the

18   body shop and said, "I need my car windshield replaced because

19   someone shot it."  Okay, that was Story B, okay.

20             So now we're left with -- and then we have, you know,

21   a woman who clearly recanted her testimony, there's no doubt

22   about that.  I think the more likely, the more trustworthy is

23   what she told the police officers that night in light of the

24   physical evidence.  And I'm going to wrap it up very quickly

25   here.

1          But under her own -- even what she has admitted to

2    and she has conceded here today, is that man is in her house at

3    four o'clock in the morning and she's outside, okay.  She has a

4    tussle with him and she has bruises on her wrist and on her

5    stomach.  That's undeniable and undenied, okay.  She said that

6    night she was punched in the stomach, today it's something a

7    little bit less than that.  But I think under this

8    uncontradicted, unrebutted physical evidence and the damage --

9    and, you know, Judge, it speaks for itself.  That is somebody

10   who wanted to get in that room.  And that's undeniable.  And

11   that's why these police officers did a very credible job

12   knowing that precisely this situation might happen, you know,

13   where a former girlfriend of a very well connected, very

14   powerful man you know in this community you know somehow uses

15   whatever forces he has to bear to make sure that she shows up

16   in Bruce Netterville's law office at 12:50 Monday afternoon.

17   This is after the press conference where they announce -- where

18   the Defendant's publicist announced that it was all -- there

19   was going to be a big apology and they're going to have a joint

20   appearance, and all was going to be forgiven and there was

21   going to be hugs and kisses.

22          THE COURT:  This was before his initial appearance

23   before me yesterday.

24          MR. MAGNER:  Yes.  Okay, so that was even before the

25   woman shows up at Bruce Netterville's law office.  So, I think

1   it is very important, Judge, that this Defendant not be

2   permitted to have a Plan A, have a Plan B, have a Plan C, but

3   if we have to go to Plan D and get the woman in Bruce

4   Netterville's office and sign an affidavit, we'll do that.

5           So, I think I've had my say, probably more than my

6   say and I'll submit it.

7           THE COURT:  Well, let me say this, I've listened here

8   about two hours and a half and some minutes and I believe that

9   the police of the Jefferson Parish detectives responded to the

10  call.  There was a 911 call, one officer there, then they sent

11  the lead detective out to take care of matters immediately.

12          A person would have to be awfully angry to give a

13  detailed statement to a detective and I didn't see anything in

14  the writings or testimony that she was crying, that she was

15  emotionally distraught.  I believe that something took place

16  there and I think it probably was an argument and whether or

17  not she has lied to the detectives is one issue.  The other

18  issue is whether or not she told the truth here on the witness

19  stand under oath.

20          I don't see any reason why the detectives would lie

21  -- or the detective would lie in making his presentation.

22  After all, he was under oath as well here in open court.

23          The issue to me is an explosive one.  It's one where

24  citizens in this country, and particularly in this area, have

25  to deal with very often that is domestic situations.  But here

1    this is in the context of a violation of release, and I can say

2    a $5,000 unsecured release with certain general conditions and

3    specific conditions.

4              There's no doubt in my mind that a violation of the

5    bond has taken place.  But I have to look at the ramifications

6    surrounding that particular violation.  I do not believe at

7    this point after I've considered the testimony of Ms. Thaise

8    Ashford, who has testified in open court for the whole world to

9    know that she didn't consider the infractions or the activities

10   of Mr. Shepherd to have been an unauthorized entry into her

11   home.

12             Now, the question is what kind of confidence will the

13   people of this country have with regard to the courts and give

14   credence to testimony in the following of the law?  Now, I'm

15   obliged to follow the law and that is what I'm going to do.

16             I'm going to find that Mr. Shepherd is in violation

17   of his bond.  However, there are conditions of release that I'm

18   going to modify.  I don't believe at this point that the

19   testimony and the evidence is such that I should under the law

20   revoke his bond and detain him under 18 USC 3148, sanctions for

21   violations of release conditions.  However, I am going to try

22   to fashion amended release conditions in accordance with the

23   law which refers us back to 3142(g) practice.

24             I'm given to understand that I don't believe that the

25   Judge Commissioner would have issued a stay away order if he

1    had not believed the story that had been presented to him.   And

2    judicial officers we are sworn to uphold the law and take

3    affidavits and as such testimony and to act on it in accordance

4    with the law.

5           In this instance fortunately there weren't any

6    serious physical damages or injuries.   In many cases in state

7    courts sometimes people are injured severely or in fact a

8    homicide takes place and that's what bothers me.   What

9    conditions can I set upon Mr. Shepherd that would reasonably

10   assure this Court of the safety of individuals in this

11   community, more particularly Ms. Thaise Ashford.   There's

12   already a stay away order, which it looked like it was a 30-day

13   order if I'm not mistaken, somewhere thereabout.   And I will

14   listen to any recommendation that Pretrial Services may have.

15   I have something in my mind that I think should take place

16   here, but I will hear from Pretrial Services in that regard.

17          MR. LAMY:  Yes, Your Honor.   James Lamy with the

18   Federal Pretrial Services Office.

19          We've prepared some bond conditions in the event that

20   Your Honor chose to modify the conditions of bond.

21          THE COURT:  Let me hear what you have to offer, sir.

22          MR. LAMY:  We're going to recommend Pretrial Services

23   supervision with home detention with electronic monitoring.   To

24   specify, that allows the Defendant to leave his home for work

25   related purposes, or for church services, or any emergency

1    matters, or any other matter that is approved by Pretrial

2    Services.  Also within that electronic monitoring with home

3    detention we'd like to add, this is an unusual condition,

4    Your Honor.  I'm not even sure if you're aware that we have

5    this capability.

6              THE COURT:  Electronic monitoring with what?

7              MR. LAMY:  With --

8              THE COURT:  Home confinement?

9              MR. LAMY:  -- home detention --

10             THE COURT:  Detention.

11             MR. LAMY:  -- components of the home confinement

12   program.

13             THE COURT:  All right.  Now what's the other thing?

14             MR. LAMY:  We're recommending that an exclusion zone

15   be ordered to include the block surrounding 115 Cameron Drive,

16   Gretna, Louisiana, with the specific parameters to be

17   determined by Pretrial Services once we've had a chance to

18   survey the map.

19             THE COURT:  That's reasonable.

20             MR. LAMY:  The Defendant is to have no contact with

21   co-defendants which is an existing condition, or with

22   Ms. Thaise Ashford either directly or indirectly.

23             THE COURT:  Does she say Thaise or --

24             MR. LAMY:  Thaise.

25             THE COURT:  Thaise, okay, very well.

1          MR. LAMY:  Travel restricted to the State of

2    Louisiana with travel outside of the Eastern District of

3    Louisiana to be approved by Pretrial Services.

4          That the Defendant is to refrain from any consumption

5    of alcohol, and mental health counseling as deemed appropriate

6    and as directed by Pretrial Services.

7          THE COURT:  I'll go along with that as well.

8          MR. LAMY:  Now, Your Honor, it is my understanding

9    that Mr. Shepherd needs to inform our office of which residence

10   he would like to choose to be -- to reside at while under or

11   electronic monitoring program.

12         THE COURT:  I saw two addresses.

13         MR. LAMY:  In the past Mr. Shepherd has maintained

14   that he has resided at various addresses which we have --

15         THE COURT:  Yes.

16         MR. LAMY:  -- and we'll have to zero that in.  And

17   also we're not aware if there's a phone line that's attached to

18   that residence, whatever residence he may choose.  So, if that

19   is an issue, we'd recommend that a temporary condition of

20   remaining in the halfway house on a 24-hour basis until a phone

21   line can be established, residence chosen, and electronic

22   monitoring equipment installed.

23         THE COURT:  All right.  Thank you, Officer Lamy.

24         MR. MAGNER:  I had a point of inquiry, Your Honor.

25         THE COURT:  Of course.

1          MR. MAGNER:  I've seen in the past that Pretrial

2     recommends what they call "Intensive Pretrial," I forget what

3     the phrase word is, intensive Pretrial supervision --

4          THE COURT:  Supervision.

5          MR. LAMY:  Intensive supervision.

6          MR. MAGNER:  And we'd like to be able to see that if

7     the Pretrial Officer felt it appropriate to conduct drug

8     testing at a particular time that that be available to them as

9     part of their supervision.

10          THE COURT:  He's already recommended no --

11          MR. LAMY:  Yes, Your Honor.

12          MR. MAGNER:  Alcohol.

13          THE COURT:  -- no alcohol consumption.  There's been

14     no evidence of any drugs about -- well, of course alcohol is a

15     drug.

16          MR. MAGNER:  It is and of course we haven't been able

17     to do any testing to know -- I mean the testimony was that he

18     appeared intoxicated.  We don't know what that means other than

19     he appeared intoxicated.  So, we would be comfortable leaving

20     it up to the discretion of the Pretrial Officer to be able to

21     drug test as needed.

22          MR. LAMY:  Your Honor, just a -- as you may recall,

23     at the initial appearance of the Defendant when he first came

24     into our office Mr. Shepherd had declined to submit to Pretrial

25     Services a pre-initial urinalysis at that time.

```
 1              THE COURT:  He didn't have to.

 2              MR. LAMY:  And he did not have to.

 3              MR. REED:  And by the way I wasn't involved, but as

 4  everybody know I have an office policy on that.

 5              THE COURT:  Well, you don't have to.

 6              MR. LAMY:  So, we have no information --

 7              THE COURT:  You can't hold it against anybody.

 8              MR. LAMY:  -- about a substance abuse information

 9  whatsoever, but we can use urinalysis testing for alcohol use

10  as well as for other substance abuse.  If Your Honor thinks

11  that's appropriate, we will --

12              THE COURT:  Well, I haven't heard anything about any

13  other substance abuse other than he appeared drunk.  Now, I'm

14  going to leave it as it is.  Now, if some suspected drug or

15  something would have been found at his home, I would deal with

16  that.  There's been no indication from the papers that I've

17  read that that's involved.

18              MR. MAGNER:  Thank you, Your Honor.  I --

19              THE COURT:  Wait, wait, just a minute, let me hear

20  from him.

21              MR. LAMY:  Your Honor, can we test for alcohol

22  separately from other substances.

23              THE COURT:  That's what I thought.

24              MR. MAGNER:  But all we know is he appeared

25  intoxicated.  We don't know if he was high on --
```

1          MR. REED:  I think the word was drunk --

2          MR. MAGNER:  That doesn't necessarily mean --

3          MR. REED:  -- I mean which generally --

4          THE COURT:  Look, I remember what the testimony was,

5     gentlemen.

6          I am going to -- I'm not going to change the amount

7     of the bond.  It's not the amount that makes the difference,

8     it's the conditions.

9          MR. MAGNER:  One thing that might make a difference

10    though is we would request a third-party custodian who would be

11    able to stand for him, a responsible member of the community

12    who would be able to be --

13         THE COURT:  I'm not going to put that on there,

14    because I'm going to tell you like this, if he violates any

15    other condition and I determine that and it meets the law, I

16    don't know which way my discretion would go.  I would be

17    inclined to feel that he's not trying to be in compliance

18    depending on what the facts would be.  So, I'm just saying

19    that.

20         So, what I'm going to --

21         Mr. Shepherd, come on up.

22         MR. LAMY:  Your Honor, just a point of clarification

23    on the earlier point on the intensive supervision by Pretrial

24    Services, that is really encompassed within our home detention

25    supervision, so --

1            THE COURT:  I thought it was.

2            MR. LAMY:  -- that really -- sometimes we'll use that

3     terms as a midway point between an electronic monitoring type

4     of supervision and standard supervision.  In this case that's

5     really not -- we're really going beyond that with the

6     supervision that we would be providing.

7            THE COURT:  All right.

8            Mr. Shepherd, I have received those recommendations

9     and I am adopting them and hereby imposing them upon you.

10           And before I rule formally, I see your client is

11    raising his hand.  Do you want to address the Court?

12           MR. REED:  Your Honor, Mr. Shepherd wishes to make a

13    statement to the Court if he may.

14           THE COURT:  Certainly.

15           MR. REED:  Thank you.

16           DEFENDANT SHEPHERD:  First of all, thank you,

17    Your Honor, for allowing me to address the Court.

18           I want to apologize to this Court and to my family

19    and to Ms. Ashford and to Mr. Lamy and Pretrial Services and

20    the public in general for the difficulties in this private

21    matter becoming public, and the issues that I caused this past

22    weekend.  I take full responsibility and I accept the facts

23    that the Court has found in this previously judgment that there

24    was a violation of my bond in this particular instance.

25           Also to the embarrassment at the time that this has

1  taken the Court up.  I would just ask the Court, I understand

2  that the Court may be inclined to modify my bond.  Let me

3  assure you, Your Honor, that you will not receive any reports

4  of possibly violations of my bond dealing with this.

5              I do have a district to represent.  I do have a

6  living to attempt to make.  I'm asking the Court just to

7  consider that in the modifications of the restrictions or where

8  to go and things to do, if the Court could look at possibly not

9  the electronic monitoring or restrictions to the geography, I

10  could understand that to the state, but electronic monitoring,

11  Your Honor, I would just ask that the Court would look at that.

12              THE COURT:  Thank you.

13              Mr. Reed?

14              MR. REED:  Nothing, further, Your Honor.

15              THE COURT:  Mr. Shepherd, I'm going to tell you, I'm

16  not going to modify it with regard to electronic monitoring nor

17  with the home detention component.  The reason I'm saying that

18  is because I would not want to see you or anyone else have a

19  big problem in their civilian life because of something I

20  neglected to do under the law.  I do believe after looking

21  through this, and I have been studying this just marking the

22  book up reading everything that I could, reading the

23  Government's memo, looking through the different exhibits and

24  if I did not really believe under the law that these conditions

25  could not reasonably assure the safety of this community or

1   your appearance in court, I would order you detained.

2   I've read about you.  You served your country.  You

3   were a major.  You certainly understand responsibility.  You

4   certainly understand what an order means.  This Court has made

5   a ruling that you violated this order.  Now, you can say it may

6   have been bad judgment, but it still constitutes a violation.

7   And I do believe that these conditions, and I want to know

8   right now, will you be in compliance with all of them?  And I'm

9   going to have the Clerk read them back.

10   Mr. Stechmann, did you get them all?  If not, I'll

11   have the officer repeat them.

12   THE CLERK:  I got them.

13   THE COURT:  You have it?

14   THE CLERK:  It is -- the other ones we've got to make

15   sure I've got all those new conditions --

16   THE COURT:  Yeah, the other ones are still in effect.

17   MR. LAMY:  There's been a modification of the travel

18   restriction.

19   THE COURT:  Yeah, there's some modification.

20   MR. LAMY:  And the no contact condition.

21   THE COURT:  Well, if he doesn't have a hard line

22   phone he's going to have to remain in the halfway house until

23   that's determined and they need 24 hours to do that.

24   MR. LAMY:  Your Honor, I just wanted to address an

25   issue that I think is going to be how we intend to apply

1   Pretrial discretion regarding travel.  I would recommend it and

2   Your Honor has imposed the travel restriction to the State of

3   Louisiana with travel outside of the Eastern District to be

4   approved by our office.

5                THE COURT:  That's correct.

6                MR. LAMY:  We understand that under Mr. Shepherd's

7   duties as State Representative that he has responsibilities --

8                THE COURT:  Legislative responsibilities.

9                MR. LAMY:  -- to travel to the Middle District of

10  Louisiana --

11               THE COURT:  As long as he clears that and he has an

12  itinerary --

13               MR. LAMY:  -- and perhaps other areas of the state

14  and even beyond.  And Your Honor is aware that there ways to

15  request travel permission.  I also add that, you know, if the

16  Legislature is in session and he requires more extended time

17  there we have an ability to transfer our electronic equipment

18  to that district and we can set up supervision there.  So, this

19  not precluding his ability to we believe to answer, you know,

20  the primary call of duty as a Legislative --

21               THE COURT:  He's an attorney.  He can still practice,

22  I suppose.

23               Are you still practicing law, sir?

24               DEFENDANT SHEPHERD:  Yes, sir.

25               THE COURT:  Well, he can do that.  He's got to make a

1    -- he has to make a living.

2             MR. LAMY:  Now, I would like to comment also on his

3    military service.  Your Honor, our office has been in contact

4    with Lieutenant Colonel Phillip -- excuse me, his Commander.

5    I'll get his name in just a moment, I have the notes here --

6    Phillip Foster.  Mr. Foster advised that and Mr. Shepherd's

7    attorney had advised as well --

8             THE COURT:  Wait a minute, he's a Lieutenant what?

9             THE WITNESS:  He's a Lieutenant Colonel of the

10   United States Army.

11            THE COURT:  He's a grade over Lieutenant Colonel.  I

12   got it.

13            MR. LAMY:  That's correct.

14            THE COURT:  He's a grade over regular.

15            MR. LAMY:  Now, Mr. Shepherd had been -- received

16   orders to report to Texas next week to begin his two-week tour

17   of active duty while within the Reserves.  However, when I

18   spoke to Lieutenant Colonel Foster this morning he said that he

19   had already been aware that -- of the incidents from this

20   weekend and he had already planned to revoke those orders for

21   this weekend.  He said that it was his plan to cancel that tour

22   of duty and that any weekend duty that might arise, he's aware

23   of the circumstances and he will make arrangements as he has in

24   the past already to allow Mr. Shepherd to serve his duty here

25   in Louisiana even from his home and he explained that there's a

1    way for him to send him materials through e-mail that he can do

2    the work, and that's what has been happening.  That was a

3    choice that he made on his own, Your Honor.  It wasn't that we

4    recommended it.  I called for information --

5            THE COURT:  I'm not going to get involved with the

6    military.  They've got military courts.

7            MR. LAMY:  We have been trying to consider those

8    eventualities with this Defendant.

9            Thank you, Your Honor.

10           THE COURT:  Thank you.

11           THE CLERK:  Do you want to read through these?

12           THE COURT:  Yes, read through them.

13           THE CLERK:  Okay.  The Defendant shall report to

14   Pretrial Services Officer.  Travel is restricted to the State

15   of Louisiana with travel outside of the Eastern District of

16   Louisiana to be approved by Pretrial Services.  No contact with

17   co-defendants, or Thaise Ashford, or any other witnesses.

18   Refrain from use of alcohol.  Participate in the home detention

19   with electronic monitoring.  An exclusion zone to include the

20   block surrounding 115 Cameron Drive, Gretna, Louisiana with

21   parameters to be determined by Pretrial Services.  Mental

22   health counseling as deemed appropriate and as directed by

23   Pretrial Services.  Halfway house stay on a 24-hour basis until

24   phone line installed.

25           THE COURT:  That ought to be able to be investigated

138

1  within 24 hours.

2          THE CLERK:  I think that's everything.  I have

3  everything from his notes --

4          THE COURT:  Now, that is an amendment to the ones

5  that were previously there, do not be in violation of any

6  state, local, or federal law, show up each and every time --

7          THE CLERK:  Yes, Judge.

8          THE COURT:  You already put them on there?

9          THE CLERK:  That's already all on here.  That's

10  automatically on here.  I'm going to have him sign -- I'm going

11  to redo the whole bond --

12          THE COURT:  Yes.

13          THE CLERK:  -- and have him sign everything again.

14          THE COURT:  Now, you have to report back to the

15  halfway house until we get the clearance from Pretrial

16  Services.  Hopefully, that will be tomorrow.

17          DEFENDANT SHEPHERD:  Thank you.

18          THE COURT:  And you have to decide on which residence

19  you will be living at.

20          All right, good luck to you.

21          DEFENDANT SHEPHERD:  Thank you, Your Honor.

22          MR. REED:  Thank you, Judge.

23          THE CLERK:  That concludes the docket.

24          THE COURT:  Very well, we stand in recess.

25                      *    *    *    *    *

## **C E R T I F I C A T E**

       I certify that the foregoing is a correct transcript from the electronic sound recording of the proceeding in the above-entitled matter.

**S/Dorothy M. Bourgeois**                                        **8/1/08**
 **DOROTHY M. BOURGEOIS**                                       **DATE**