SEALED TRANSCRIPT

1    UNITED STATES DISTRICT COURT

2    EASTERN DISTRICT OF LOUISIANA

3

4

5 UNITED STATES OF AMERICA   * Docket 07-CR-384-J
               *
6 versus          * New Orleans, Louisiana
               *
7 DERRICK D.T. SHEPHERD    * October 7, 2008
 * * * * * * * * * * * * * * * *
8

9     SEALED STATUS CONFERENCE BEFORE
      THE HONORABLE CARL J. BARBIER
10      UNITED STATES DISTRICT JUDGE

11
 <u>APPEARANCES</u>:
12

13 For the Government:    U.S. Attorney's Office
            BY: GREGORY M. KENNEDY, ESQ.
14           BY: MICHAEL WILLIAM MAGNER, ESQ.
           BY: DANIEL PATRICK FRIEL, ESQ.
15           500 Poydras Street
           Room HB-210
16           New Orleans, Louisiana 70130

17

18 For Derrick Shepherd:   Glass & Reed
            BY: ROBERT GLASS, ESQ.
19           BY: JOHN WILSON REED, ESQ.
           530 Natchez Street, Suite 350
20           New Orleans, Louisiana 70130

21

22

23 For Derrick Shepherd:   CLARENCE ROBY JR., ESQ.
           3701 Canal Street
24           Suite U
           New Orleans, Louisiana 70119
25

SEALED TRANSCRIPT

1   <u>APPEARANCES</u>:

2

3   Official Court Reporter:      Jodi Simcox, RMR, FCRR
                                 500 Poydras Street
                                 Room HB-406
4                                New Orleans, Louisiana 70130
                                 (504) 589-7780
5

6   Proceedings recorded by mechanical stenography, transcript

7   produced by computer.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SEALED TRANSCRIPT

**SEALED PROCEEDINGS**

1

**(October 7, 2008)**

2

3          (WHEREUPON the following proceedings were held in

4    chambers and placed under seal.)

5          **THE COURT:**  All right.  Let's go on the record in

6    United States versus Derrick Shepherd, Criminal No. 07-384.

7    Let the record reflect that counsel for Mr. Shepherd are all

8    present and Mr. Shepherd is present and counsel for the

9    government are also present.

10               This is going to be under seal, at least for the

11   time being.  This arises out of a letter that I received.  It

12   looks like it was faxed to the Court late yesterday -- or last

13   night, actually -- I saw it sometime this morning -- from

14   Mr. Roby.

15         **MR. ROBY:**  Yes, sir.

16         **THE COURT:**  So I don't know who wants to go first in

17   telling me what this is all about and talking about it.

18         **MR. ROBY:**  Judge, I faxed the letter, so I guess it

19   would be more important for me to start.

20         **THE COURT:**  Let me ask:  First of all -- excuse me,

21   Mr. Roby -- I haven't seen any motion by the government to

22   disqualify Mr. Roby.  Has the government filed one or intends

23   to file one?

24         **MR. MAGNER:**  The government has not filed such a

25   motion.  We suggested to Mr. Roby that we think it would be

SEALED TRANSCRIPT

1    appropriate that he withdraw voluntarily due to the conflict of
2    interest and the potential of his being a witness, but we have
3    not filed a motion at this time.

4              I would prefer for Mr. Roby to take such a step
5    on his own initiative.  But if he does not do that, then we'll
6    have to review the matter further.  I think there is a
7    conflict -- a clear conflict of interest.  I think there's a
8    potential violation of Rule 3.7.  Whether it's waivable or not
9    by the client, I'm not entirely sure.  I haven't researched it
10   completely.  I have some questions about that, though.

11             So there is no motion before Your Honor.
12             **MR. REED:**  Well, notwithstanding Mr. Roby's
13   statements, I think it's our collective position that the
14   government has sent an e-mail, I think the Court was copied
15   with that e-mail --

16             **THE COURT:**  Well, the only thing I have is Mr. Roby's
17   letter dated yesterday, October 6th, which apparently was faxed
18   at like 10:00 last night.  As I said, I didn't see it until
19   this morning.

20             Apparently, I assume -- it looks like Mr. Roby
21   attached the e-mails back and forth between you-all --

22             **MR. ROBY:**  I did.

23             **THE COURT:**  -- and a copy of what appears to be a
24   302?

25             **MR. ROBY:**  That's correct, Judge.

SEALED TRANSCRIPT

1          **THE COURT:**  FBI-302.  That's what I have and that's

2     what I've seen.

3          **MR. REED:**  I think it's our position that the

4     government, having raised this issue in the manner it did,

5     inappropriately and informally, and we're glad that they did,

6     but I think before Mr. Roby needs to respond, I think the

7     government needs to articulate what its position is as to why

8     it's placing Mr. Roby in this position.

9               So, although Mr. Roby initiated the letter, I

10    think, really, the ball's in the government's court to explain

11    why and what's going on.

12         **THE COURT:**  Well, Mr. Roby asked for a conference;

13    but at the same time, I think I got word, informally, that the

14    government was also asking for a conference.  I think, in fact,

15    Mr. Magner alluded to something -- is this the same issue that

16    you alluded to in court yesterday afternoon as maybe needing to

17    have to come here today?

18         **MR. MAGNER:**  Yes.

19         **THE COURT:**  So both of you, I guess, are asking for a

20    conference.  As I said, it's a little bit unusual in that

21    there's no formal motion in front of me to recuse anybody.  But

22    since this issue's been raised, I guess we have to deal with

23    it.

24              So it would probably be a good idea -- I think

25    Mr. Reed's suggestion is a good one, Mr. Magner.

SEALED TRANSCRIPT

1          **MR. MAGNER:**  In terms of who goes first?

2          **THE COURT:**  Yes.  I don't think it makes any

3     difference.

4          **MR. MAGNER:**  I don't think it's a matter of semantics

5     here.  This isn't anything that the government seeks.  We're

6     not looking to disqualify Clarence Roby from this case.  I

7     think we have been presented, the Court has been presented, the

8     case has been presented with what is a very clear conflict of

9     interest.

10         I think it has arisen through the defendant,

11    Mr. Shepherd's, actions and I think he has placed his attorney

12    in an untenable situation, and I'll explain why and there are a

13    number of bases for it.

14         Would you like me to review what the issues are?

15         **THE COURT:**  Yes, please.

16         **MR. MAGNER:**  All right.

17         Your Honor, the government subpoenaed -- through

18    the grand jury, subpoenaed Mr. Shepherd in a subpoena that he

19    was served with on August 6th, 2007.  He told the agents at

20    that time that he was going to be going on military leave and

21    he asked for a continuance.

22         It was the government's position that we would,

23    provided that he produce the documents that were responsive to

24    the subpoena on the time and date requested, which was

25    August 9th.

SEALED TRANSCRIPT

1          **THE COURT:**  What was the date of the subpoena, you
2     said?

3          **MR. MAGNER:**  The subpoena was dated June 25th.  We
4     had some difficulty in tracking down Mr. Shepherd.  The agents
5     found him on August 6th, interviewed him then and served him
6     with the subpoena, and it was returnable on the 9th, which was
7     either going to be a Thursday or a Friday.

8               Mr. Roby produced a number of records -- and I'm
9     going to deal with each group of them in turn -- but probably
10    the most important one was a copy of what we now know is a time
11    and expense control journal.  It was illegible when it was
12    first presented, so we weren't able to read it.  Subsequently,
13    we got a better copy and that's what it is.

14              Mr. Roby produced that to us under a covering
15    letter and represented it, essentially, as being his client's
16    time sheet sheets for the work that he did with -- that he
17    allegedly did with Ms. Moyo.  After Mr. Shepherd completed his
18    military duty, he came into the grand jury on August 30th,
19    2007, and again on September 6th, 2007.

20              He identified the time and expense control
21    journal, which I'll call the "time sheet" for now.  He
22    identified it.  He initialed it.  He said that it was created
23    contemporaneously with the work that he did for Ms. Moyo in
24    November and December of 2006.

25              He explained how the codes worked and that the

SEALED TRANSCRIPT

1  codes were on, I guess, sort of the top of the sheet and that

2  he used those codes and that he wrote down the hours that he

3  worked.  We were skeptical about this document, pretty much,

4  from the get-go.

5        THE COURT:  Is that a copy or an original?  What is

6  that?

7        MR. MAGNER:  That's a copy of the carbon that we got

8  approximately a couple weeks ago in response to the 17(c)

9  subpoena.

10       We were skeptical for a number of reasons, not

11 the least of which, for example, on December 5th, 2006, it

12 shows Mr. Shepherd doing 20 hours worth of work for Ms. Moyo,

13 which we didn't believe at the time, and subsequently we've

14 investigated that in great detail.

15       And I think we'll be able to prove at trial that

16 on December 6th, 2006, Mr. Shepherd was doing everything

17 conceivable under the sun other than doing legal work for

18 Ms. Moyo.  He was campaigning for Congressman Jefferson.  He

19 was calling girlfriends.  He was going to the dentist.  He went

20 to a dinner party.  And did just many, many, many other things

21 other than do legal work for Ms. Moyo.

22       Particularly, it shows that he's in court on

23 December 5th.  He was not at any court hearing or at any court

24 matter in connection with the matter.

25       THE COURT:  "Court" being these codes, you mean,

SEALED TRANSCRIPT

1   shows that?

2       **MR. MAGNER:**  Yes, sir.

3           So, for example, on December 5th, it shows a

4   code of 4.  We subsequently got an original of these kind of

5   time sheets and that shows a court appearance, and we'll be

6   able to establish that he was not in court in connection with

7   anything to do with Ms. Moyo.

8           So at the time that Mr. Shepherd, you know, came

9   to the grand jury the second time, I.D.'d this document, we

10  asked for the originals.  We told Mr. Shepherd we wanted the

11  originals and we would deal with Mr. Roby in obtaining the

12  originals.  We never did obtain the originals.

13          As we were preparing for trial in the last month

14  or so, our attention was turned back to this time sheet.  It

15  was very troubling.  It was an unusual time sheet.  It wasn't

16  anything we had ever seen before.  We tried to go see if we

17  could get one at Home Depot -- or Office Depot or Office Maxx

18  and found that we couldn't.  It wasn't commercially available

19  in the retail market.

20          So we went online, found the manufacturer and

21  contacted the manufacturer.  The manufacturer told us that

22  these things are only sold through distributors, through sales

23  representatives.  So we contacted the sales rep for this

24  metropolitan area and he told us that he would give us a list

25  of the attorneys that he sold these things to.

SEALED TRANSCRIPT

1          We got the list.  It's approximately 15

2    attorneys in the metropolitan area, most of which are -- about

3    four or five are in the New Orleans, Metairie, West Bank area.

4    The remainder are in Houma, Hammond, Covington, North Shore

5    area.  And when we saw the list of attorneys, we were surprised

6    to see that one of the attorneys on the list was Clarence Roby;

7    and Mr. Roby was the only attorney that we recognized as having

8    any connection with this case.

9               In the last couple of days, the agents have

10   contacted, I think, all of the other attorneys but two or

11   three.  And the ones they've been able to reach, none of them

12   have any connection with Mr. Shepherd or with this case, and we

13   were troubled by that.

14              We've always suspected this thing was doctored,

15   created out of "whole cloth" in connection with the defendant's

16   defense in the case, but we just had no idea where he got it,

17   how he got it, and then we saw that Mr. Roby was one of the

18   people who used this --

19              **THE COURT:**  Is this an original here?

20              **MR. MAGNER:**  This is how the form works --

21              **THE COURT:**  The actual form?

22              **MR. MAGNER:**  Yes, sir.

23              They're timeslips, which I never used as a

24   private attorney, but I've always heard people talk about

25   timeslips.  Essentially, what happens is the attorney, I guess,

SEALED TRANSCRIPT

1   if you follow the methodology that appears to be used on the

2   sample, writes a date, his initials, the client, the matter, a

3   file number, then a code that's consistent with these time

4   charge codes here, and then the hours.  That appears what was

5   done here.

6                   But we don't know, although we've requested now

7   through subpoena and through the grand jury several times,

8   we've never been given anything other than a photocopy or a

9   Xerox copy of this time sheet, despite many, many requests.

10  So, apparently, after you do that, you do it per entry or per

11  thing that you do, you rip off the timeslip and then what

12  you're left with is a carbon similar to this.

13                   So my co-counsel and I have talked about this a

14  lot.  We've talked about it with the agents.  We feel that this

15  is very probative evidence of the defendant's intent to

16  defraud, we believe his intent to create documents to conceal

17  his illegal activity, and we thought that there was a

18  possibility that he had gotten these time sheets from Mr. Roby.

19                   I called Mr. Roby last Friday around noon.  I

20  told him that we needed to talk with him about some things.  He

21  came over.  I presented the situation to him in probably

22  shorter terms than I've gone through here, but essentially the

23  same terms.  He was upset.  He said that he had no knowledge or

24  participation in any creation of any such documents.

25                   We felt that he acknowledged that there was a

SEALED TRANSCRIPT

1  conflict of interest that was created by the situation.  And he

2  also stated something that we thought was very significant to

3  us and that, you know, he said that Mr. Shepherd was not a

4  typical client, that he would come over unannounced,

5  unexpected, and gave us the impression that he would have

6  access to the office.

7              Mr. Roby was very cooperative with us.  He was

8  upset, but he also allowed us to speak with his staff, which we

9  appreciated.  I have not seen the 302s of those interviews.

10  They've been described to me.  Essentially, Mr. Roby's office

11  manager/secretary had never seen the form before, wasn't

12  familiar with the form, at least that's how it was described to

13  me.

14              His paralegal, who I understand is Vicki, was

15  familiar with the form, had seen the forms before, but neither

16  of them had any knowledge of how Mr. Shepherd might have gotten

17  his hands on the form.

18              The other thing, I guess, I probably should

19  mention is in the course of our interviews, we've also asked

20  all of Mr. Shepherd's office staff as to whether or not he ever

21  used a form like this, and they all have denied him ever using

22  a form like this.  His receptionist denied it.  His secretary,

23  who also happens to be his cousin, denied ever using a form

24  like this.  And his associate, Sharelle Lacey, denied ever

25  seeing a form like this in the office as well.

SEALED TRANSCRIPT

1          In fact, from our investigation, it appears that

2   Mr. Shepherd has primarily a personal injury/criminal defense

3   practice, does not bill by the hour on a general -- as a

4   general matter.  He bills on a contingency fee or sort of a

5   flat fee basis.  I think he does some successions work, too,

6   and simply does not use this form or any type of similar form

7   in connection with his legal practice.

8          Mr. Shepherd's law firm did some work for the

9   Kenner Housing Department and had to bill their hours then.

10  But we were told by Mr. Shepherd's associate that they,

11  basically, had to create a billing form, sort of, to accomplish

12  that.  So this form isn't anything that was used in the Derrick

13  Shepherd Law Office.

14          So that is probably what gives us our biggest

15  concern.  We think it's highly probative evidence.  The fact

16  that he had an opportunity to obtain these documents from his

17  attorney's office, that his attorney had purchased as many of

18  500 of these in his last purchase.  The last purchase was in

19  2001, but he did purchase 500 of them.  We think they're, if

20  not unique, we think that they're very unusual, and we think

21  that that's pretty important evidence.

22          There's some additional areas that we think go

23  to Mr. Shepherd's fraudulent intent and potential obstruction

24  of justice here as well and it involved matters Mr. Roby had a

25  hand in, in terms of being familiar with, being knowledgeable

SEALED TRANSCRIPT

1   of, and I'm not suggesting being complicit, but he was

2   knowledgeable of what was going on.

3              On August 30th when Mr. Shepherd came into the

4   grand jury, he referenced some case law research that, like the

5   time sheets, he insisted had been done contemporaneous with his

6   alleged legal work for Moyo.  He was very clear that he did the

7   legal research when he was doing his legal work for Moyo and

8   that he kept track of it on his time sheets.  He made a point

9   of saying that this was Westlaw research.

10             Well, subsequently, we spoke with the same

11  associate of Mr. Shepherd's -- let me -- before I go there.  He

12  didn't -- when he came to the grand jury, he didn't produce

13  that Westlaw research, rather it was sent over from Mr. Roby's

14  office by a courier, a secretary, later that afternoon.

15             We interviewed Mr. Shepherd's associate.  She

16  said that after the FBI had interviewed Mr. Shepherd and she

17  thought after the matter had become public, that Mr. Shepherd

18  gave her a petition from the Department of Insurance lawsuit

19  against Ms. Moyo and said, "Research this."  This would have

20  been at least eight or nine months after he had concluded the

21  legal work which he claimed he had done for Ms. Moyo.

22             He said, "Here, research this."  And the

23  associate, Ms. Lacey, said, "Well, what are the legal issues?"

24  He basically threw the petition back at her and said, "You're

25  an attorney, figure it out."  She then did Westlaw research, as

SEALED TRANSCRIPT

1   best she could, not really knowing what the issue is, other

2   than what she could discern from the petition.  And we believe

3   it was that Westlaw research that Mr. Roby's office gave to us

4   on August 30th in connection with that.

5              We've contacted Westlaw recently.  They advised

6   that during that period of time, that August/September period

7   of time, Mr. Shepherd's Westlaw account had been frozen for

8   nonpayment.  But that on August 9th, the day that Mr. Shepherd

9   came to the grand jury, someone from his office had called

10  Westlaw and said, "We need to research Louisiana cases,

11  Louisiana documents, how can we do that?"  The Westlaw folks

12  said, "You can't because you haven't paid your bills.  Sorry,

13  but you can't use Westlaw."

14             So we asked the associate about that, "Well, how

15  did you do Westlaw research if the account had been closed?"

16  She said, "Come to think of it, Mr. Shepherd gave me a Westlaw

17  password from Helen."  He said, "Who's Helen?"  She didn't

18  really know who Helen was other than a friend or girlfriend of

19  Mr. Shepherd's.

20             We tracked down Helen last Friday as well and it

21  is a former girlfriend of Mr. Shepherd's.  And Helen told us

22  that she had, in fact, given her Westlaw password to

23  Mr. Shepherd.

24             **THE COURT:**  She's a lawyer?

25             **MR. MAGNER:**  She is a law school graduate who's

SEALED TRANSCRIPT

1   waiting for her bar results.  She's a Southern grad.  So that

2   all seemed consistent, again, with Mr. Shepherd creating

3   documents to create the illusion of him doing actual legal work

4   for Ms. Moyo, but doing it well after the fact that he was

5   doing this alleged legal work.

6            So then we really started scratching our heads

7   and figuring out what the heck was going on here.  And we

8   remembered that Mr. Roby -- no, I'm sorry.  I take that back --

9   that Mr. Shepherd had given us a binder of hand-copied, the

10  old-fashioned way, from the books, of some cases that he said

11  were part of his legal research for Ms. Moyo.  And we went back

12  and looked at that and thought about that and we looked at the

13  cases and those cases had nothing to do that we could discern

14  with Ms. Moyo's case.

15           It just looked to be a bunch of cases that might

16  have something to do with insurance, but there were Jones Act

17  cases.  There were just a bunch of -- it looked to us to be a

18  bunch of irrelevant stuff that was stuck together in a binder.

19  We had discussed that with Mr. Roby and Mr. Shepherd in one of

20  our sessions with them and that was produced to the grand jury

21  as well.

22           The third area that I wanted to bring to the

23  Court's attention in evaluating the possible conflict issues

24  here relate to the calendars that Mr. Shepherd produced to the

25  grand jury.  Again, just to -- I believe it was the same

SEALED TRANSCRIPT

1   sequence.  They were produced to me on August 9th by Mr. Roby

2   through his covering letter.

3              And they were the calendars -- they were

4   supposed to be the calendars from October 2006 through April of

5   2007.  What was noteworthy about them, though, is that there

6   were no entries for October, November, and the first three

7   weeks of December.

8              And there was a note on the calendars that said,

9   "Entries were archived," or words to that effect.  We didn't

10  think much of it at the time; but with all these other events

11  that have come up since, we went back and asked the Court for a

12  Rule 17(c) subpoena.  We asked the Senate to see if they had

13  backup copies of those calendars, and they did.  The backups

14  that were done, I think in either December 2006 or

15  January 2007, and those showed entries for November and the

16  first three weeks of December.  It had many entries in them.

17             But as I recall, there were no entries there

18  relative to Ms. Moyo, which we think would belie Mr. Shepherd's

19  claim that he was actually doing extensive 20-hour-a-day legal

20  work for her.

21             We tried to take it one step further to see when

22  those records -- so we figured they were deleted.  We believe

23  they were deleted by Mr. Shepherd.  So we tried to figure out

24  when they were deleted.  So we asked for another subpoena to

25  see if they might have been deleted in and around the time that

SEALED TRANSCRIPT

1  he was served the grand jury subpoena.

2              They couldn't tell us that.  They couldn't

3  verify that.  All they could do is tell us that it existed --

4  the data existed on the calendars for November and the first

5  three weeks of December when it was backed up in either late

6  December or January, but that at some point after that it was

7  gone.

8              Again, this is the kind of evidence -- this was

9  the evidence that was produced to us by Mr. Roby, and we think

10 is further evidence of an ongoing pattern of Mr. Shepherd to

11 create fraudulent evidence, to destroy evidence, to create

12 evidence that's supportive of his legal theory.

13             We just think that Mr. Roby is inextricably

14 intertwined with Mr. Shepherd's schemes, perhaps through no

15 fault of his own, perhaps completely unwittingly on his part,

16 perhaps for no other reason than Mr. Shepherd set him up and

17 figured what better way to set him up was then through his own

18 attorney, who could not be called as a witness.

19             We think at this point if the only attorney who

20 has any connection with this case stocked these types of

21 timeslips, we think that's very probative evidence and we think

22 we have to at least reserve our rights to call Mr. Roby as a

23 witness at trial.  If not that, when we start pointing out

24 these discrepancies and these very curious occurrences here,

25 then it seems to us that the defendant may have to be in the

SEALED TRANSCRIPT

1   position to call Mr. Roby to defend his honor.

2            But in either event, I think for no other reason

3   than by virtue of the fact that Mr. Roby produced these records

4   to me in lieu of Mr. Shepherd's grand jury appearance on

5   August 9th, I think, if for no other reason, he has placed

6   himself in the position where he is a witness in this case.

7            I would hope, again, that Mr. Roby would

8   recognize his ethical dilemma, his ethical situation in this

9   situation and withdraw.  I don't see how he can do anything

10  other than that in terms of preserving -- preserving the

11  integrity of this matter, and I would hope he would do that on

12  his own.

13           I don't want to be -- this isn't a motion -- I'm

14  as competitive a lawyer as you'll come across, but this isn't a

15  motion that I want to file and win.  This isn't anything that

16  we take any pleasure in.  Why we bring it up is that this is

17  the kind of matter that for justice to be administered in this

18  case, I don't see how Clarence Roby can continue to act as

19  defense counsel.

20           If I could just confer with my co-counsel to see

21  if I've missed anything?

22           **THE COURT:**  All right.

23           **MR. MAGNER:**  The other thing we want to make very

24  clear is that we have no interest whatsoever in probing of

25  privileged conversations, privileged communications between

SEALED TRANSCRIPT

1   Mr. Roby and Mr. Shepherd.  That's not anything that we're

2   interested in or that we want to invade.

3                    Rather, we would see that Mr. Roby would be a

4   fact witness in this case, either for the government or for the

5   defense.  But in any event, we felt duty bound to raise this

6   issue.  We hoped to do it just through counsel and see if we

7   can resolve it that way.  We did it informally.  We agreed that

8   this should be pursued under seal before the Court.

9                    If we have to have an evidentiary hearing on

10  this matter, we would, likewise, prefer that it be done under

11  seal.  No one's looking to gain any tactical advantage here.  I

12  could care less about that.  I like Mr. Roby.  I've enjoyed

13  working with him.  I just don't see how he can continue on this

14  case.

15           **MR. ROBY:**  If I can respond, Judge?

16           **THE COURT:**  Sure.

17           **MR. ROBY:**  To say that I was upset when I talked with

18  Mr. Magner and the agents on last Friday would probably be an

19  understatement.  And I've read the source and substance of the

20  302 that Mr. Magner provided me with yesterday.

21                    I take the allegations of being a conflict in

22  this case extremely serious, Judge.  I've been involved in this

23  case from the onset, starting from the initial interview that

24  was conducted with Mr. Shepherd.  I have made it no secret that

25  any time the government has asked me for documents, I've made

SEALED TRANSCRIPT

1   those returns.

2          I don't know how a lawyer can simply adhere to a

3   return request from the government, and taking the government's

4   logic, say the exception -- I'll deal with the billing records

5   later -- but say the exception of receiving those documents

6   from the client and making a return, a lawyer would almost be

7   in the same position in every case of this magnitude.

8          I've made myself available.  I've made my staff

9   available.  I don't question the fact that those are billing

10  records that my office utilized.  If the records say 2001, I'm

11  not here to argue with that.  I know for a fact, and I've

12  shared as much with Mr. Magner, not just on Friday but in the

13  past, that I use an electronic billing system.  I don't use

14  those documents.

15         I'm not here to argue that Clarence Roby's

16  office at some point -- the Law Office of Clarence Roby may

17  have ordered those documents.  And I think Mr. Magner, although

18  I kind of saw the documents in passing, there may be a history

19  going back to 1993 where those documents may have been utilized

20  either by myself or some lawyer who was employed in my office.

21         The question was raised during this

22  conference -- and I guess lesson learned, nothing is ever

23  really informal, and I should have not let my emotions dictate

24  how frustrated I was just by being put in the position to have

25  my integrity questioned.

SEALED TRANSCRIPT

1            But the question was raised as to whether or not

2   my client could have lifted the document or had access.  And,

3   you know, I've been as open about this whole process as

4   possible.  I would like to think that the government is not

5   relishing, a week before trial, in this apparent conflict.

6            And I did acknowledge, if there is some

7   information to suggest that my client has procured a document,

8   either with my knowledge or without, or by the assistance of

9   someone in my staff, yeah, that would create a hell of a

10  problem.

11           But there's no way at this point, a week before

12  trial, that I would simply say, "Okay.  Well, I got the

13  e-mail."  And I thought that I owed the Court, at the very

14  least, some notice.  It wasn't -- I got your e-mail,

15  Mr. Magner, and it suggested that I voluntarily withdraw.

16           But even if voluntarily withdrawing was

17  something that I would consider, I think that it would do a

18  disservice to my client, who has a right to counsel.  And the

19  appearance as though his lawyer walks in a week before trial,

20  whether it's under seal or not, I'm not sitting at that table.

21           And as far as the public is concerned, they've

22  seen me as part of his team.  And I've tried at every turn, and

23  I believe I've been successful, in adhering to the ethical

24  rules and obligations.

25           I have never ever placed myself in a situation

SEALED TRANSCRIPT

1  where I have been complicit in -- or providing the returns, and

2  I'm not really sure what to make of the government's position

3  of starting from, I guess, the initial returns up until the

4  time sheets.

5           I mean, I've given them -- and not to waive any

6  type of privilege -- I've given them the information that I've

7  had, didn't ever vouch for the validity or the authenticity of

8  the documents, it was simply adhering or addressing a return.

9  Even sending a courier or someone from any staff to the U.S.

10 Attorney's Office, and I guess implicit in that is they must be

11 a part of this whole situation too.

12          The concern that I have, Judge, is there's no

13 question that my office may have ordered it.  I did not -- when

14 asked if my staff could be interviewed, did not announce,

15 didn't call them, didn't -- and I'm sure the agents will tell

16 you, when they went into the conference, I didn't even tell

17 them why they were there.

18          They showed their credentials and I simply just

19 sat at the table and said, "Relax and answer the questions."  I

20 can't be any more transparent than that.  And to say that this

21 is a very frustrating position is an understatement.

22          **MR. MAGNER:**  Counsel, I didn't put you in this

23 position.

24          **MR. ROBY:**  I'm sure you did, Mike.

25          **MR. MAGNER:**  Do you have any alternative explanation

SEALED TRANSCRIPT

1   for where your client got ahold of this?  Is there any

2   alternative thing that I can evaluate on behalf of the

3   government so that I can make an intelligent election here of

4   how to proceed?

5           **MR. ROBY:**  I have an obligation -- an ethical

6   obligation to a client and I've answered the questions as

7   honestly and as earnest as I can.  And I respect the fact that

8   the government has formed the opinion that I appear to be

9   conflicted.  But because that's the government's position,

10  that's not the government's sole call.

11              When you made -- when you offered -- you

12  extended the opportunity for me to voluntarily withdraw with

13  the agent's 302, I deemed it necessary to, at the very least,

14  notice the Court.  You simply had announced that there may be

15  some conference tomorrow, and I've had a heavy burden hanging

16  over my head since Friday.  It's like "Big Brother" coming

17  home.

18              I know that this is not a heavy-hand,

19  intentional tactic by the government, but I deemed it

20  necessary, at the very least, to address it now.  This trial

21  starts on Tuesday of next week.

22          **THE COURT:**  Anyone else?  Mr. Reed, anybody else have

23  anything to say on this?

24          **MR. REED:**  Well, I think the bottom line for

25  Mr. Shepherd is -- and I don't know when the -- or quite how

SEALED TRANSCRIPT

1   the appropriate occasion to address that is -- that we

2   believe -- we're opposed in any way to the introduction of any

3   evidence that connects Mr. Roby to the allegations -- the

4   implicit allegations from Mr. Magner and the government that

5   Mr. Shepherd engaged in some wrongdoing in connection with the

6   evidence in the case, and we have to oppose any evidence that

7   connects Mr. Roby to that.

8              Now, there may or may not be ways to do that.

9   But I think however we get to the end of the day, our position

10  is that that would be terribly prejudicial to unfairly to

11  Mr. Shepherd's right to a fair trial if in the course of the

12  trial, the government is introducing evidence that one of the

13  attorneys -- and I realize this plays out in various ways, and

14  depends on various rulings -- but in any way connects one of

15  the attorneys at counsel table implicitly, explicitly, subtly,

16  subject to a speculation in jurors' minds to wrongdoing.

17             Because if that's the case, then the defense has

18  no probative force with the government at all.  So I think

19  that's our bottom line.  I've said it?

20        MR. GLASS:  Yes.  If we have to defend against the

21  government and wrongdoing at the defense table, our credibility

22  before the jury evaporates.

23        MR. REED:  We're not suggesting at all -- we just

24  think that that notion lurks.  I'm not suggesting that Mike is

25  going to argue it one way or the other, but it lurks.

SEALED TRANSCRIPT

1          **THE COURT:**  What I'm not clear on -- let me ask a

2    couple questions.  Rule 3.7 says:  "A lawyer shall not act as

3    an advocate at a trial in which the lawyer is likely to be a

4    necessary witness."  So the first question is whether Mr. Roby

5    would be a necessary witness.

6              Unless and, of course, one of the exceptions is

7    if disqualification of the lawyer would work a substantial

8    hardship on a client, which is another factor to consider.

9              And then Rule 3.8 talks about, which is inherent

10   I think in 3.7, that the prosecutor should not subpoena or

11   attempt to call a lawyer in a criminal proceeding to present

12   evidence about a past or present client unless the prosecutor

13   reasonably believed:

14             One, the information sought is not protected

15   from disclosure by any applicable privilege;

16             Two, the evidence sought is essential to the

17   successful completion of an ongoing investigation or

18   prosecution; and.

19             Thirdly, there is no other feasible alternative

20   to obtaining the information.

21             I'm still trying to understand, does the

22   government -- from what I'm hearing, the government believes it

23   can show that this document was not something that Mr. Shepherd

24   used in his law office?  It's not something that was used.

25             **MR. MAGNER:**  That's correct.

SEALED TRANSCRIPT

1          **THE COURT:**  Does it make any difference where he got

2   it from beyond that?

3          **MR. MAGNER:**  The fact that Mr. Roby acknowledged --

4          **THE COURT:**  I mean, if you're not -- but if you're

5   not insinuating or if you're not trying to -- if you have no

6   evidence that Mr. Roby, which I'm interpreting your comments to

7   say, you're not trying to implicate Mr. Roby in any wrongdoing

8   here except for the fact that, perhaps, Mr. Shepherd could have

9   lifted one of these forms from his office at some point.

10          I'm just trying to understand, in my own mind,

11  why that would be relevant and why that would necessitate

12  calling Mr. Roby.

13          **MR. MAGNER:**  I think we also have to look at

14  Rule 1.7, which is the general conflict disciplinary rule.  And

15  I think all the things that Mr. Glass and Mr. Reed said --

16          **THE COURT:**  Remind me again what Rule 1.7 says.

17          **MR. MAGNER:**  It's the general conflict rule, you

18  know, of a -- for an attorney.  But for all the reasons that

19  Mr. Reed and Mr. Glass said that any suggestion that this had

20  anything to do with the defense would be incredibly prejudicial

21  to the defendant and the defense counsel, I'd have to agree.

22          But we have a relatively unique kind of

23  old-fashioned document that the only lawyer that we've been

24  able to discern thus far who has any connection with this case

25  who ordered it was Mr. Roby, that Mr. Shepherd had access to

SEALED TRANSCRIPT

1  Mr. Roby's office in a way that was unusual, in a way that he

2  would sort of pop over --

3         **THE COURT:**  I understand all of that.  But why is it

4  necessary for you to even go there?  If you're not trying to

5  implicate Mr. Roby in any wrongdoing, again, whether he lifted

6  it surreptitiously from Mr. Roby's office, or down the street

7  somewhere else, or wherever he would have gotten it, if you can

8  otherwise prove that it's not a document that he used in his

9  office, he would have had to get it from somewhere obviously.

10             Now, what difference does it make where he got

11 the form?  It's not the form that's the problem.  It's what you

12 believe, that it was created after the fact, fraudulently.

13        **MR. MAGNER:**  Well, and, of course, we have Mr. Roby

14 being the one then to produce the photocopy of it to me.

15        **THE COURT:**  Well, he produced all the evidence.  All

16 the evidence comes through him.  I don't know that that makes

17 him a witness to anything, other than -- I mean...

18        **MR. KENNEDY:**  Well, Judge, what we're trying to show

19 is -- I mean, it's no secret that, obviously, this time sheet

20 is a very large part of the government's case and the

21 government's theory.

22             And we are, basically, stating that everything,

23 including the sheet itself, is completely fabricated as part of

24 Mr. Shepherd's steps to show that he actually performed work

25 for Ms. Moyo.

SEALED TRANSCRIPT

1            And in part of that fabrication, it goes to show

2   the lengths that he will go to in order to cover up his actions

3   and to manifest a complete falsity in creating this document.

4   It goes to show the length that he will go to, what he did, the

5   steps that he went to.  And it also shows the fact that he had

6   access to a blank form that otherwise he would not have had

7   access to, and it shows the way in which he would have gotten

8   that document.

9            So what it is, is the government is showing the

10  entirety of the picture.  Not only did he completely falsify

11  this, but then he got a document from some place, we believe

12  from Mr. Roby's office, and then created this document in order

13  to give it to the government to satisfy the government's

14  subpoena.

15           And it was right around the time frame in which

16  he was served with the subpoena to return all the documents

17  that are related to his representation of Ms. Moyo.  So,

18  therefore, it gives the jury a complete picture of exactly how

19  he went about fabricating this and where he got the documents

20  to fabricate it.

21           **THE COURT:**  Well, where the danger is, I think the

22  defendant, Mr. Reed, raised a valid point:  It gives the jury

23  the impression that Mr. Roby was somehow complicit in all of

24  this, which then makes Mr. Roby maybe have to become a witness,

25  but unnecessarily so, perhaps.

SEALED TRANSCRIPT

1          I'm still not clear on why you need to bring
2  that out and why he needs to be a witness in the case.  First
3  of all, even assuming you'd have to show it could have come
4  from his office, you can show that through other witnesses,
5  can't you?  Don't you have his office staff that confirmed
6  that?

7          **MR. MAGNER:**  Don't we have all the same problems with
8  that?  Once we call Vicki, the paralegal, who says, "Oh, yeah,
9  we had that form in our office."

10          **MR. ROBY:**  Well, there's no question, Mike, and I've
11  said this before, there is no question, even according to the
12  documentation from Safeguard, that the last time my office
13  ordered those documents was in 2001.  In 2001, I had no less
14  than four other lawyers working for me, and, you know, either
15  one of which could have utilized those forms.

16          I've said it the other day, I have not used
17  those forms in -- at least since 2003.  Whether or not they
18  were still in existence in the office, I wouldn't know because
19  I haven't used them.  I'm sure when you talked to Peter Smith
20  when he asked the ladies to the person, they addressed and they
21  answered question head-on, "Yes, we've seen those forms.  Yes,
22  we -- you know, Sherry hadn't even ordered the forms during her
23  tenure, and she's been there since 2003.  Wanted to see
24  where -- if we had them, where would they be kept?

25          So I understand the government's position

SEALED TRANSCRIPT

1  regarding I ordered these forms in 2001.  But because I ordered

2  the forms in 2001 and I'm one of a handful of lawyers in the

3  New Orleans area who is affiliated with Derrick Shepherd in

4  2008, well that somehow connects me to a conflict.  I don't see

5  that and I don't know what else to do.

6              **MR. FRIEL:**  Your Honor, if I could briefly --

7              **THE COURT:**  Yes.

8              **MR. FRIEL:**  -- and I think, hopefully, to answer the

9  question as to why Mr. Roby could potentially be a very

10 probative witness himself for this.

11             If the scenario was that Mr. Shepherd shared

12 office space, shared an office condo with another attorney and

13 our records showed that that attorney was the one that had

14 received these records, and at the time when Mr. Shepherd was

15 supposed to be returning these records, he had popped in and

16 had free access to that other attorney's office and happened to

17 use and submit the exact same record, the government would

18 certainly call that witness in that scenario.  Given the fact

19 that there's no conflict whatsoever, we wouldn't even be having

20 the meeting about it.

21             But it would certainly put that form in context

22 as to where Mr. Shepherd got it, what his motivation was in

23 getting it and why he returned what he did.  So with respect to

24 the conflict that exists, it's almost unavoidable at this point

25 if Mr. Roby were to be called.

SEALED TRANSCRIPT

1               Or even if we do present the evidence that

2   Mr. Shepherd was not on the list of the 15 law firms that

3   received this, Mr. Roby's name does appear on it.  There's no

4   way to avoid that element of that conflict.

5               **MR. MAGNER:**  And we know that Mr. Shepherd was in

6   Mr. Roby's office between the time he got the subpoena on

7   August 9th and the time it was returned -- received it on

8   August 6th and returned it on August 9th.  So we know that he

9   was in that office during that time period, which is the

10  relevant time period for when these things are produced.

11              **MR. KENNEDY:**  And if we were to call a member of the

12  staff, that member of the staff would still be a member of

13  Mr. Roby's law firm.  So, therefore, it involves Mr. Roby.

14              **THE COURT:**  Well, the problem I could see that could

15  arise -- I'm thinking through this as we are talking -- if

16  Mr. Shepherd testifies, and obviously I don't know if he's

17  going to testify or not --

18              **MR. GLASS:**  Judge, if I can -- I'm sorry, I'm

19  interrupting.

20              **THE COURT:**  No.  I'm trying to think of what-if

21  scenarios.  What if Mr. Shepherd elects to testify, then

22  certainly the government is going to ask him where this

23  document comes from and whatever he says could implicate then

24  having to go to this evidence.

25              If he says something different than, "Oh, yeah,

SEALED TRANSCRIPT

1   I got it from Mr. Roby's office."

2              **MR. MAGNER:**  And that seems to me to be a built-in --

3              **THE COURT:**  Yes.  Mr. Reed?

4              **MR. REED:**  First of all, just for the record, in

5   terms of getting defense counsel involved simply for making

6   returns, I, for example, made the return last week on the

7   original document -- the original, quote, "document".

8              **THE COURT:**  I'm really only focusing now on these

9   billing records, not the other documents.

10             **MR. REED:**  With regard to the billing records and the

11  person sharing the condominium or something, that's one point

12  of the investigation in the case.  Now we're seven days away

13  from trial and the government's decisions and choices have

14  impacted now the defendant's right to counsel of his choice.

15                  And, incidentally, although the government only

16  got the actual, quote, "original" within the last few weeks.

17  The copy had "Safeguard" on it and that was a line of approach

18  the government could have taken long ago.  That all said --

19             **MR. MAGNER:**  But we did.  I mean, we demanded the

20  original at the time.  It was never provided, and we still have

21  not received the original.  We've received a carbon.  We have

22  not received any of these time sheets.  We have not received

23  the original.

24             **MR. REED:**  With that said, there is something, Your

25  Honor, with respect, that the defense would like to offer to

SEALED TRANSCRIPT

1  the Court that bears directly on the resolution of this

2  issue --

3        **THE COURT:**  All right.

4        **MR. REED:**  -- but we would have to do it out of the

5  presence of the government and on the record and appropriately,

6  that answers some of the issues in the case.

7        **MR. MAGNER:**  We think that notwithstanding how the

8  Court might deal with this, that Mr. Shepherd would -- this is

9  why we were insistent that he be here -- that he acknowledge

10 that he understands this issue fully.  I think we've aired most

11 of the issues.  I think he has to waive any potential conflict.

12        But, again, we'll have to do a little legal

13 research, but I think, at the very least, that that would have

14 to be done.  He would have to waive any conflict of interest

15 for these purposes, for *habeas corpus*, 2255 purposes, and, you

16 know, including the possibility of this coming out at trial,

17 and waiving any claim to a mistrial later on.

18        Again, I would say I understand the Sixth

19 Amendment issues here.  I understand Mr. Shepherd is entitled

20 to counsel of his choosing.  I understand all that.  But I

21 think that this is something that -- I don't think this is a

22 close call in terms of you having to withdraw.  I really don't.

23 But it's not just my decision, you're right.

24        **THE COURT:**  All right.  Do you have any problem with

25 me meeting with them for a few minutes and see what they want

SEALED TRANSCRIPT

 1  to propose?

 2              **MR. MAGNER:**  No, sir.

 3              **MR. KENNEDY:**  Sure.

 4              **THE COURT:**  All right.

 5              (WHEREUPON, all counsel for the government exited the

 6  conference room.)

 7              **THE COURT:**  All right.  Let the record reflect that

 8  all counsel for the government are now out of the room.  Go

 9  ahead, Mr. Reed.

10              **MR. REED:**  Your Honor, the defense has been aware for

11  some time of the problems with various documents that were

12  returned in connection with the investigation in this case.

13  Specifically, aware that the problems with the time sheets and

14  aware that they were confected.  And our defense is to concede

15  that to the government, to the Court, to the jury in opening

16  statement.

17              And our defense is, essentially, that

18  Mr. Shepherd did have a relationship -- attorney/client

19  relationship with Ms. Moyo, but that he did not do that kind of

20  hourly work, that he did not spend those hours, that he spent

21  very little time on the case and, in any event, for relevant

22  purposes here, that that document is not a genuine and real

23  representation of what he recorded and did at the time.

24              And that section of -- you know, just my draft

25  of the opening statement, which was written beginning the

SEALED TRANSCRIPT

1   middle of last week and over the weekend, has in it, at this

2   time, and before this issue came up on Friday:

3                   "And, yes, not only did -- and, yes, Derrick

4   Shepherd not only didn't tell it like it was when he met with

5   the FBI on August 6th and again when he met on August 30th, but

6   in a foolish effort to back up what he had told the FBI

7   originally, he submitted paperwork to the government that

8   wasn't the real thing, all to show that he had done things that

9   he hadn't done, that he had worked hard as a lawyer and billed

10  like a lawyer."

11                  And our position is that since the defense is

12  going to concede, essentially, what the government is saying

13  about, certainly these documents, almost certainly the Westlaw

14  documents, that it no longer becomes necessary to prove the

15  point that the government wants to prove because it will be

16  conceded.  It will not be an issue and, therefore, no need to

17  bring Clarence Roby into that mix.

18                  And that's what we, essentially, wanted to say.

19  We are going to concede all of that part of the government's

20  case.  We do not wish to tell the government that at this point

21  because we don't think it's to our advantage to do so.

22                  Anything you want to add?

23            MR. GLASS:  So the Court's point of why you may need

24  it to prove that it was a Safeguard record that came -- may

25  have come remotely or directly from Clarence Roby's office is

SEALED TRANSCRIPT

1    less relevant than it ever was because we're going to concede

2    that the document was --

3                THE COURT:  What if Mr. Shepherd testifies and they

4    ask him, "Where did you get the document from?"

5                MR. REED:  It is not foreseeable that Mr. Shepherd

6    would testify.

7                THE COURT:  Well, that's going to be his decision,

8    not yours.

9                MR. REED:  Well, I think that Your Honor's correct.

10               THE COURT:  And we won't know until the time comes.

11               MR. REED:  Well, I mean, these are the

12   representations, I think, being made to the Court.  I guess the

13   Court can ask Mr. Shepherd on the record about that.  But given

14   that, it's very problematic for Mr. Shepherd to testify to

15   those circumstances.  Anyway...

16               MR. GLASS:  So what we would ask, given our

17   representations, so long as we carry through on our

18   representations, that any reference to Mr. Roby be kept out of

19   the case in opening statement and the FBI agents who are

20   witnesses.

21                    If something changes, as the Court was just

22   talking about Mr. Shepherd testifying, then it opens up what

23   has been closed.

24               THE COURT:  What's the problem with telling the

25   government what you just told me now?

SEALED TRANSCRIPT

1       **MR. REED:**  Because I think the government has pitched

2   its entire effort on a theory of the case that paints

3   Mr. Shepherd guilty because he did all these things afterwards.

4           And our theory of the case is that he was not

5   hiding his guilt of culpability in regard to these offenses,

6   but hiding the fact that he had collected the fee for not doing

7   the work for a client and collecting a fee for things he might

8   not have properly represented as a senator, and that's all part

9   and parcel of that.

10      **THE COURT:**  Well, they're going to make that,

11  regardless of whether you concede this or not.  The

12  government's still going to go forward with the same theory or

13  its arguments in their case.

14      **MR. REED:**  It is.  But we think its put all its

15  ammunition into disproving these excuses or these

16  justifications.

17      **MR. ROBY:**  Judge, my biggest concern, and I've shared

18  as much with my co-counsel, we've discussed this concession,

19  but by no means am I still wanting to be put in a position --

20  and I know this is not necessarily about me, my client has a

21  right of interest -- but as I shared with the government, I

22  don't want to become the story on the eve of trial where the

23  perception is, you know, he must have done something wrong so

24  much so in combination with his lawyer that the lawyer has now

25  stepped out of the game.

SEALED TRANSCRIPT

1      **THE COURT:**  Well, I don't know that that would be the

2  case.  There's a lot reasons why lawyers step out of cases.

3  Maybe your client didn't pay you.  That happens sometimes too.

4  There are a lot of reasons why lawyers step out of cases.

5      **MR. REED:**  So, ultimately -- I can see there are

6  still sensitive issues.  But, ultimately, the government will

7  not have to prove that these documents are false.  Because we

8  will concede in opening statement that they are false and,

9  therefore, the particulars of how they might have been made

10  aren't relevant to proving that they're false.

11      I mean, as you said --

12      **THE COURT:**  Well, I'm just trying to go through a

13  what-if, if I was the government.  It might be that they would

14  still want to show the particulars of it to try to debunk your

15  concession as to why he did what he did, that it was more than

16  just...

17      I mean, if he was -- I'm making their argument

18  now -- I guess devil's advocate here -- if he was just trying

19  to support that he did work for a client that he really didn't

20  do to justify a fee, would he have had to go through the

21  lengths of going to Mr. Roby's office, perhaps, and lifting a

22  form?

23      I mean, I used to do the same kind work probably

24  that Mr. Shepherd does, mostly personal injury work, very

25  little time billing.  The only time records I ever kept is if I

SEALED TRANSCRIPT

1  did a social security case; and then even later years, you

2  didn't have to do that because they let you charge a contingent

3  fee, as I recall.

4             But longshore cases, I think, sometimes you have

5  to keep time records, and I was terrible about keeping time

6  records.  So, usually, I would have to reconstruct it from my

7  file, you know, from the letters and phone calls and stuff like

8  that and I never had a system like this.

9             But you can just type a time bill.  We see that

10 all the time from lawyers.  You don't have to have a special

11 form to create a billing record.  I don't know.  I'm just

12 thinking this through.  I'm not sure what I'll do in this.

13      MR. GLASS:  Judge, your point at the very beginning

14 to the government was that if you can prove that it's false --

15 a false document, then what do you need?  And that's a balance

16 of prejudice over --

17      THE COURT:  Well, if you're going to -- if the issue

18 then becomes, why did he falsify it, you're changing the issue.

19 The issue now becomes not merely was it false or fraudulent,

20 but why was it falsified.  You're going to be arguing it was

21 falsified for one reason, which is presumably not necessarily

22 inculpatory of what he's charged with in this case; and the

23 government's going to be, you know, trying to show, no, the

24 reason he was doing it was to cover up his guilt in this case.

25      MR. GLASS:  But does the fact that the form came from

SEALED TRANSCRIPT

1   Kinko's or his lawyer's office make any real difference that is

2   outweighed by prejudicial value in that proof?

3          **THE COURT:**  I don't know.

4          **MR. ROBY:**  And I feel like I'm watching --

5          **THE COURT:**  And the problem is if all that somehow

6   comes in, one way or another, either through Mr. Shepherd

7   testifying or some other position of the defense, if you open

8   the door to the government getting in some of that evidence,

9   then that puts Mr. Roby right in the middle of it.

10              Because if in any way it comes in that

11  Mr. Shepherd might have gotten this document from Mr. Roby's

12  office -- I don't know.  I don't know what to think of it right

13  now.  I'm just listening and talking.

14         **MR. GLASS:**  If we open the door, shame on us.

15         **MR. ROBY:**  The last purchase was made in 2001.

16         **THE COURT:**  Well, that doesn't mean you didn't have a

17  stock in your office at that point.

18         **MR. ROBY:**  Judge, I recognize that.  But to the

19  person -- and I've even asked the staff the same thing, "Go

20  through every closet space, go through all the boxes" -- I have

21  a stack of boxes.

22         **THE COURT:**  Are you saying that you don't have any

23  supply of them in your office?

24         **MR. ROBY:**  No.  I haven't been able to find any.  And

25  that's why when the agent came in, I didn't -- they beat me to

SEALED TRANSCRIPT

1  the office.  And the guy walks in and he says, "Well, do you

2  mind?"  I didn't think I had anything to hide.  I walked in,

3  the office manager took him around and he looked and pulled

4  open the doors.  And I have at least three places where

5  supplies could be kept, and they looked in all three places.

6           So I'm hearing the conversations, but I feel

7  like I'm watching something in an out-of-body experience where

8  people are making the connection because they were ordered,

9  then they must have been there.  I don't know -- I don't want

10 to be the problem.

11          Whatever the Court decides to do, Judge, I want

12 to make sure that this case moves and I'm not the story.  So

13 whatever it is that the Court decides, you know, it is what it

14 is.  I just don't want to be thrown in the mixes, though, when

15 we're having these conversations, be it our side or the

16 government, you know, I'm not part of the conversation, and I

17 don't want these assumptions to continue.

18          **MR. REED:**  Judge, I would add, I think I understand

19 the Court's argument as to proof as to, on the one hand,

20 getting it from Kinko's, from the other hand, to getting it

21 from a lawyer's office in some way.

22          But we would think that if that -- if the

23 falsity were conceded, that putting into evidence

24 Mr. Shepherd's canonicity with lawyers when it doesn't have

25 much probative value is -- really taints the defense, no matter

SEALED TRANSCRIPT

1  who is at the defense table.

2          **THE COURT:**  Uh-huh.

3          **MR. REED:**  The apparent role of lawyers in the case.

4          **MR. GLASS:**  Whether Mr. Roby is gone or sitting at

5  the table, it was the lawyer.

6          **MR. REED:**  And the argument is he used lawyers to

7  confect this evidence, now he's using lawyers to sell this

8  defense.  It's a needlessly slippery slope --

9          **THE COURT:**  Well --

10          **MR. REED:**  -- and if not used, exploited or whatever.

11          **THE COURT:**  Here's the problem with your suggestion,

12  as I see it, I don't know how that let's me resolve this

13  pretrial.  We don't want this to erupt during the middle of the

14  trial, then we have big problems.

15          **MR. REED:**  No.

16          **THE COURT:**  If you're not willing or able -- and I'm

17  not saying you should -- but if you're not willing or able to

18  disclose to the government why you don't think it's going to

19  make any difference and see if that pacifies them and take the

20  issue off the table -- and if they press the issue with a

21  motion to recuse, I'm going to have to deal with it somehow.

22          **MR. REED:**  Could we then --

23          **THE COURT:**  Do you-all want to talk among yourselves?

24          **MR. REED:**  Yes, I think we would.  Is there a

25  courtroom or --

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

SEALED TRANSCRIPT

1           **THE COURT:**  Yes, instead of making Jodi get up, why

2    don't you take them out into the courtroom and let them talk

3    out there okay?

4           (WHEREUPON, the defense lawyers had a private

5    discussion.)

6           **THE COURT:**  All right.  We're back on the record.

7    Let the record reflect that all three defense counsel are here,

8    plus Mr. Shepherd.  The government's attorneys are still

9    outside the room.

10          **MR. REED:**  Judge, after much discussion this is where

11   we are:  We think that our concession that the document was

12   fabricated, plus that Mr. Shepherd is not going to make an

13   issue of where the document came from, makes any reference to

14   Mr. Roby, or his office, or any connection between Mr. Shepherd

15   and the document through Mr. Roby's office marginal at best,

16   and that after reflection, the Court, we hope, would come to

17   that position.

18              We think Mr. Roby needs to be in the case.  So

19   we're not voluntarily withdrawing -- he's not voluntarily

20   withdrawing at this time.  If the government would persist and

21   file a motion, you would have to make a ruling.  But we would

22   ask that, at the very least, in light of our concessions and

23   our commitments that there be no mention of anything connected

24   with Mr. Roby and the Safeguard in opening statements.

25          **THE COURT:**  All right.  So what are we going to tell

SEALED TRANSCRIPT

1   the government here today?  What are you going to tell the
2   government?
3          MR. REED:  I think we tell the government that he's
4   not withdrawing.
5          THE COURT:  That he's not withdrawing and it's their
6   call as to what they want to do?
7          MR. REED:  And ask that whatever they decide to do,
8   that they do under seal, and in no event that they list
9   Mr. Roby in a document that is publicly filed.
10          MR. GLASS:  Or his staff.
11          THE COURT:  Or what?
12          MR. ROBY:  Or my staff.
13          MR. REED:  Or Safeguard.  We all know about it and
14   get whatever private notice is necessary so it doesn't get out
15   in the public domain, which we think would be very damaging to
16   picking a jury.
17          THE COURT:  Okay.  Anything else before I bring them
18   in?
19          MR. REED:  No, Your Honor.
20          THE COURT:  Okay.  I told Jodi that this is all going
21   to be sealed.  Nobody will get access to this transcript unless
22   and until I lift the seal.  Not even counsel are going to have
23   access to this transcript at this point, okay?
24          MR. REED:  Yes, sir.
25          (Whereupon, all counsel for the government entered

SEALED TRANSCRIPT

1  the conference room.)

2          **THE COURT:**  All right.  Let the record reflect we're

3  back on the record now and counsel for the government are all

4  back in the room.  I guess I'd let Mr. Reed or Mr. Roby tell

5  you what they've decided.

6          **MR. REED:**  I think the defense position at this time

7  is Mr. Roby is not voluntarily withdrawing, which leaves it to

8  you to do whatever is necessary.  We've asked the Court that

9  whatever you decide to do, that you file under seal.

10          **MR. MAGNER:**  I've already said I would do that.

11          **MR. REED:**  Right.  And that in the meantime until

12  there are any resolutions of these issues, that you not list

13  Mr. Roby, Safeguard, or the staff as witnesses so that this

14  issue doesn't leak out in any way.

15          **MR. MAGNER:**  As long as -- I guess if we have it

16  understood that if I send you a letter saying we may -- well --

17          **MR. REED:**  I think I know who your staff witnesses

18  are already.

19          **MR. FRIEL:**  We can do them by attachment under seal

20  to the witness list.

21          **THE COURT:**  That's a possibility.

22          **MR. MAGNER:**  Because I'm concerned, we don't have

23  Ms. Moyo here -- so do I understand that the defendant wishes

24  Mr. Roby to remain as defense counsel and he waives any

25  objection to any of the issues that we have raised here today?

SEALED TRANSCRIPT

1           Because that will have a bearing on whether or

2    not we pursue a motion to disqualify or not.  Because I don't

3    really care to move to disqualify.

4           **MR. REED:**  I think the answer is at this point the

5    matter is not formally addressed and he's not waiving anything

6    to that.

7           **MR. MAGNER:**  He's not waiving objections -- he's not

8    waiving any objections he has to conflict-free counsel?

9           **MR. REED:**  We think it's your move to file the

10   papers.

11          **MR. MAGNER:**  I think the fact, Judge, that the

12   defendant at this point does not waive this conflict makes it

13   absolutely clear that this has to happen now.

14          **THE COURT:**  All right.  Then I think we ought to get

15   this all on paper, under seal.  But file your motion and any

16   supporting authority, and as soon as you can, if that's what

17   the government decides to do.  I'll let them respond and I'll

18   rule on it.

19          **MR. KENNEDY:**  Judge, there is the issue as far as

20   potential witnesses being listed and the impact it would have

21   upon Ms. Moyo being able to inform her as far as witnesses.

22          **THE COURT:**  I don't know how any of this could impact

23   Ms. Moyo.

24          **MR. KENNEDY:**  Well, if he becomes a witness in this

25   case, then she's entitled to know about that if he's a witness

SEALED TRANSCRIPT

1   in this case.  Unless the Court's telling us we don't have to

2   do that.

3           THE COURT:  I think -- until I rule on this, I think

4   you have to do it under seal and we'll deal with that.

5           MR. KENNEDY:  Okay.

6           MR. MAGNER:  Judge, I'm going to write it up.

7           THE COURT:  Okay.

8           MR. MAGNER:  I'm going to do some research and get

9   smarter people than me involved.  But it just seems to me at

10  this point that if Mr. Shepherd does not waive any objections

11  he has to conflicts that Mr. Roby may have, that, by

12  definition, Mr. Roby needs to be disqualified.

13          I think that this is -- that this crystalizes

14  the issue in such a way that there really is no choice.  But

15  like I said, I'll write it up.  But I think this takes it

16  beyond the pale now.  But we will do those witnesses under seal

17  and we will prepare written pleadings.  What form that takes, I

18  don't know.  But I will do something by close of business

19  tomorrow.  Okay.  There --

20          THE COURT:  Okay.  You do it by close of business

21  tomorrow.  What's tomorrow, Wednesday?

22          MR. ROBY:  Yes, sir.

23          MR. KENNEDY:  Yes, sir.

24          THE COURT:  Defendant can file any response by the

25  following day, which is Thursday.  Why don't we just plan to

SEALED TRANSCRIPT

1  reconvene here and hear it out on Friday morning?

2           MR. MAGNER:  Would you envision that that would be

3  argument such as we've done been doing here or would it be an

4  evidentiary hearing?

5           THE COURT:  It could be both.  Whatever you want to

6  present.

7           MR. MAGNER:  Okay.  We have another matter completely

8  unrelated to this that we would like to take up with the Court.

9  It would just take a minute or two.

10          THE COURT:  Now?

11          MR. MAGNER:  Yes, sir.  We probably should do it on

12 the record.

13          THE COURT:  Okay.  Does this need to be --

14          MR. MAGNER:  Ex parte in camera.

15          THE COURT:  Oh, okay.

16          (WHEREUPON, all counsel for the defense exited the

17 conference room.)

18          THE COURT:  All right.  Let the record reflect that

19 all defense counsel and the defendant, Mr. Shepherd, have

20 departed.  Mr. Magner?

21          MR. MAGNER:  I've spoken with the AUSAs in the Middle

22 District of Louisiana concerning their ongoing investigation.

23 It is ongoing -- do you want to follow --

24          MR. KENNEDY:  Yes, sir.

25          MR. MAGNER:  -- but they feel -- they've expressed a

SEALED TRANSCRIPT

1   belief to me at this point that if we disclose the tape of the

2   consensual recording made with Mr. Roby subject through a

3   protective order now a week before trial --

4           **THE COURT:**  You made with Mr. Roby, you mean with

5   Mr. Shepherd?

6           **MR. MAGNER:**  -- Mr. Shepherd, yes -- that that would

7   be sufficient under the circumstances for their purposes.

8               So I've asked them to prepare a draft order -- a

9   draft protective order that will allow us to disclose that tape

10  to the defense, subject to certain protections and caveats:

11  Namely, that they not disclose it to third parties; and that if

12  they intend to raise any issues about it, that they do it under

13  seal to the Court.  I think that addresses the issues.

14              So I'm hoping that that will be on my computer

15  when I get back.  And if the Court would indulge me, give me

16  about a half hour and I should be able to get that to you.  I'm

17  going to produce it.  We'll let Mr. Reed and Mr. Roby know that

18  we have something for them and we'll try to get it to them this

19  evening.

20          **THE COURT:**  You mean as soon as I sign the order; is

21  that what you mean?

22          **MR. MAGNER:**  Yes, sir.

23          **THE COURT:**  All right.  That's it.

24          (WHEREUPON, the Court was adjourned.)

25                          *****

SEALED TRANSCRIPT

1          **CERTIFICATE**

2               I, Jodi Simcox, RMR, FCRR, Official Court Reporter

3    for the United States District Court, Eastern District of

4    Louisiana, do hereby certify that the foregoing is a true and

5    correct transcript, to the best of my ability and

6    understanding, from the record of the proceedings in the

7    above-entitled and numbered matter.

8

9

10                              S/ Jodi Simcox, RMR, FCRR
                               Jodi Simcox, RMR, FCRR
11                             Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25